IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PHILLIP L. JONES,               )
                                )      CASE NO. 5:19 CV 2063
            Petitioner,         )
                                )
        v.                      )      JUDGE SOLOMON OLIVER, JR.
                                )
TIM SHOOP, Warden,              )
                                )      **MEMORANDUM OF OPINION**
            Respondent.         )      **AND ORDER**
                                )

### INTRODUCTION

Petitioner Phillip Jones was convicted and sentenced to death in an Ohio state court for the rape and aggravated murder of Susan Yates. Jones has filed a petition and amended petitions for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence. (Docs. 11, 35, 44.) Respondent Warden Tim Shoop has filed a return of writ to the second amended petition. (Doc. 57.) And Jones has filed a traverse (Doc. 60), to which Respondent has replied (Doc. 67). For the reasons stated below, Jones' second amended petition is denied.

### FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Jones' convictions and sentence:

*The state's case-in-chief*

*The criminal investigation*

{¶ 6} At around 6:20 a.m. on April 23, 2007, Richard Wisneski was jogging his usual route on the paved path through Mount Peace Cemetery in Summit County when he discovered a woman's body. The body was lying face up on the ground next to the path and in front of some headstones. Wisneski ran out of the cemetery. After unsuccessfully attempting to flag down a motorist, Wisneski ran to a McDonald's restaurant and called 9–1–1.

{¶ 7} Police officers arrived at the cemetery shortly thereafter and quickly determined that the woman, later identified as Susan Marie Christian Yates, was dead. Yates was wearing a brown sundress under a denim skirt and vest, a denim jacket, and a bra. Her skirt was torn. So was her bra, which had been ripped at the connecting fabric between the cups and was turned around on her torso. Her shoes, a denim hat, and a pocketknife were on the ground near her body. Yates's face and neck had numerous bruises. A small, plastic, glow-in-the dark cross had been placed over her right eye.

{¶ 8} The police searched the scene and collected evidence, including two buttons that they found on the roadway, 27 and 44 feet from the body, that appeared to match buttons on Yates's dress. One of Yates's earrings was also recovered from the roadway.

{¶ 9} The police were not able to immediately identify Yates because she did not have any identification on her and none of the officers recognized her. Later that same day, Yates was identified through her fingerprints, but her name was not released to the media. The next day, April 24, an article in the Akron Beacon Journal newspaper reported that the body of an unnamed woman had been found in the cemetery.

{¶ 10} Around 4:00 p.m. that day, Jones was watching the news on television and reading the newspaper. Afterwards, he and his wife, Delores, had a conversation about the news. Shortly thereafter, the couple walked to a nearby store, and Jones bought some cigarettes. Upon returning home, Delores got in her car and drove to the home of her friend, Charletta Jeffries.

{¶ 11} Delores arrived at Jeffries's home between 4:30 p.m. and 5:00 p.m. Delores ran up Jeffries's stairs and screamed, "He did it, he did it." Jeffries asked, "He, who?" and Delores replied, "My husband, Phil." Jeffries then asked, "Did what?" and Delores responded, "Murdered the woman." Jeffries then asked, "What woman?" and Delores replied, "The woman that they found in the cemetery."

{¶ 12} Delores then called the police, told them that she had information about the woman found at the cemetery, and asked to speak to "somebody in charge."

{¶ 13} Shortly after the phone call, Detective Richard Morrison arrived at Jeffries's home. Delores was hyperventilating and acting "hysterical." Morrison asked Delores, "Do you have something you need to tell me?" Delores replied, "My husband is the one

that killed that girl in the cemetery." Morrison then asked, "How do you know this?" and Delores said, "Because he told me her name was Susan. Isn't it Susan?"

{¶ 14} Delores also disclosed that she had arrived home on April 22 at around 10:30 p.m., and Jones was not there. Delores was unable to determine Jones's whereabouts, and she spent the night with her mother. Between 7:00 and 8:00 the next morning, Delores returned home and found Jones asleep in bed. She noticed that Jones had a scratch on his shoulder and lip.

{¶ 15} During further questioning at the police department on April 24, Morrison showed Delores the cross found over Yates's eye. Delores said that she did not recognize it. Later that evening, police officers accompanied Delores to her home, where she collected clothing and her jewelry box before going to a domestic-violence shelter.

{¶ 16} On April 25, Delores notified police that she had found a glow-in-the-dark cross in her jewelry box and that it was similar to the cross found at the cemetery. Delores testified that Jones had given her the glow-in-the-dark cross in June 2006 and that she knew that Jones kept another glow-in-the-dark cross in his wallet.

{¶ 17} Based on the information learned from Delores's interview, the Akron Police Department issued a "be on the lookout" for Jones. Thereafter, the police secured an arrest warrant for Jones.

*The arrest*

{¶ 18} At around 11:00 p.m. on April 24, police spotted Jones driving near his home and arrested him. Jones was briefly interviewed at the police station that night and stated only, "[A]ll I'm going to say about this is that it was an accident."

{¶ 19} Investigators examined Jones's car and took swabbings from the interior of the vehicle. Subsequent testing found no evidence that the victim had ever been in the car.

*The autopsy*

{¶ 20} The chief deputy medical examiner for Summit County, George Sterbenz, M.D., conducted the autopsy on Yates. Dr. Sterbenz noted abrasions on the upper chest, collar bones, neck, and jaw line. Yates had bruising around her right eye and scalp and smaller abrasions over her arms, legs, feet, and back. Dr. Sterbenz also noted that the "blows caused abrasions * * * all over the neck and jaw and over the collar bones and shoulders." There were "gouging" or "fingernail type abrasions" on her neck, right thumb, and elbow. Petechiae, or "pinpoint type hemorrhages," were found on her face and in her eyes. Yates's larynx was fractured in two places: the hyoid bone and the thyroid cartilage.

{¶ 21} Dr. Sterbenz concluded that Yates died from asphyxia by strangulation. He opined that Yates had been dead for 6 to 12 hours before her body was found.

{¶ 22} Dr. Sterbenz also concluded that Yates had been sexually assaulted. There were extensive vaginal injuries, including bruising of the fatty and muscular tissues that form the deep wall of the vagina. He opined that such injuries may have been caused by "a fist * * * or very large rigid foreign object." He also found a wadded Kleenex or toilet-type paper inside Yates's vagina.

{¶ 23} There was also a significant amount of internal, deep bruising to the anus and rectum. Dr. Sterbenz stated that a long and rigid object likely caused these injuries from the object's having been violently "placed into the anus" and "jammed up into the rectum." A twig was also found in the fecal material inside the rectum about four to six inches from the anal opening.

{¶ 24} A toxicology screen detected the presence of cocaine and alcohol. Yates's blood-serum level of alcohol was .096 percent.

*The forensic evidence*

{¶ 25} Evidence collected during the criminal investigation and the autopsy was sent for testing to the Ohio Bureau of Criminal Identification and Investigation ("BCI").

{¶ 26} Dale Laux, a forensic scientist at BCI in charge of examining samples to identify body fluids, found sperm on the vaginal swabs taken from Yates. He also detected sperm on stains found on the inside of Yates's skirt. No seminal fluid was detected on the rectal swabs or on tissue paper found near the body.

{¶ 27} Laux forwarded the samples that tested positive for sperm to Stacy Violi, a DNA examiner at BCI, for DNA testing. Violi concluded, "Phillip Jones cannot be excluded as a source of semen on the vaginal swabs and cuttings from the skirt." Violi testified, "Based on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the DNA profile identified in the sperm fraction of the vaginal swabs and the cuttings from the skirt * * * is one in three sextillion, thirteen quintillion unrelated individuals." In other words, Violi explained that she would have to test more than three sextillion individuals before finding the same DNA profile. The world's population is less than seven billion people.

{¶ 28} Violi also tested swabs obtained from the surface of Yates's breast. Violi concluded that "[t]he DNA profile from the breast swabs is a mixture of at least two individuals. The major DNA profile is from an unknown male. The minor DNA profile is consistent with contributions from Susan Yates." Violi also tested the cross, but did not find enough DNA to make a comparison.

*Other acts evidence*

4

{¶ 29} In 1990, Jones had pled guilty to two counts of attempted rape. He was sentenced to an indefinite prison term of four to 15 years. Jones served 14 years and two months in prison before being released in July 2004.

{¶ 30} A victim, T.J., who had been 16 years old at the time of the assault, testified at Jones's capital trial about the 1990 assault. She recalled that on the evening of April 16, 1990, Jones, who was a friend of T.J.'s older sister, requested that T.J. accompany him and some of his friends on a drive to look for T.J.'s sister and to attempt to buy some marijuana. Ultimately, Jones dropped the others off at their homes but drove T.J. to a wooded area near a park. Jones stopped the car and pulled himself close to T.J. As T.J. tried to fight Jones off, he put his hands around her neck and started choking her. T.J. opened the car door and half of her body fell out.

{¶ 31} Jones exited the car from the driver's side, took hold of T.J., and forced her up a hill into a wooded area. Jones continued to choke T.J. and also tried to remove her clothing while he threatened her, beat her on the back, and attempted to anally rape her.

{¶ 32} A police car arrived and parked behind Jones's car. A police officer got out of the car and started shining lights around the area. Jones put a hand over T.J.'s mouth and a hand on her throat and threatened to kill her if she said anything. He then attempted to rape her anally. After the police officer drove away, Jones took T.J. back to his car and choked and vaginally raped her.

{¶ 33} Afterwards, Jones told T.J. that he would kill her if she told anyone what he had done. He then drove her home and dropped her off around the corner from her house. T.J. ran home and told her family what happened; her sister called the police. The police arrived and interviewed T.J. and then took her to the hospital for treatment.

{¶ 34} During the trial for the crimes at issue in this appeal, the state introduced T.J.'s medical records, which reflect her treatment at the hospital after the sexual assault in 1990, as well as the certified judgment entry reflecting Jones's convictions for the crimes against T.J.

*Defense case*

{¶ 35} Jones testified in his own behalf.

{¶ 36} At the outset of his testimony, he addressed T.J.'s testimony. Jones stated that he had first met T.J. around November 1989. Jones said that they had had sex "[a]t least several, maybe four times" before the rape. Jones claimed that the sexual intercourse in the park that formed the basis of the 1990 conviction had been consensual.

{¶ 37} Jones said he never choked T.J. and could not have done so because he has limited mobility in his right arm, which he asserted had been shattered in late 1989 and had led to the surgical removal of the radius bone.

{¶ 38} Jones testified that T.J. may have claimed that she was raped because he had told her that he was not going to leave his girlfriend, Christy Harmel. Nevertheless, Jones explained why he had pled guilty to two counts of attempted rape: "[I]t was my understanding that, the plea agreement, I would be granted super shock probation within 18 months to two years. But it didn't work out that way."

{¶ 39} Jones then testified about his relationship with Yates. Jones stated that he first met Yates in February or early March 2007. Jones had taken Yates, who was then homeless, to his house while his wife was at work; he let her shower, eat, and take some cigarettes. In late March, Jones saw Yates at a McDonald's restaurant and gave her some money to buy food.

{¶ 40} At around 8:45 p.m. on April 22, Jones was driving on Balch Street in Akron and saw a man hitting a woman on the sidewalk. Jones stopped to assist the woman, who was defending herself with a knife. Jones recognized the woman as Yates. Jones broke up the fight and told Yates to get in his car. Jones and the man were "tussling," and Jones alleged that the man punched and scratched Jones. The man then fled the scene.

{¶ 41} Jones returned to the car to find Yates making a "primo" cigarette by inserting crack cocaine into a nicotine cigarette. Jones stated that Yates appeared "kind of battered" from the fight, and her skirt was ripped. She did not have a purse. Yates smoked the cigarette and said she wanted more cocaine.

{¶ 42} Jones drove Yates to the apartment of Deitra Snodgrass because he thought Snodgrass might know someone who was selling crack. Jones and Yates arrived at the apartment and had a short conversation with Snodgrass, but left the apartment without any crack. Thereafter, Jones and Yates bought crack from a man on a street corner. Jones also purchased some beer and wine at a drive-through market. Jones testified that he had one beer, and Yates drank the rest.

{¶ 43} Jones and Yates decided to go to Mount Peace Cemetery to avoid the police and arrived at 9:00 or 9:30 p.m. Jones had worked as a groundskeeper at the cemetery, and his father had been buried there the previous June.

{¶ 44} Yates prepared three more "primo" cigarettes and smoked them. Jones spread a blanket on the ground, and they got on it and started kissing and hugging. Yates then urinated in the street, wiped herself with tissue that she had in her pocket, and then left the tissue on the roadway in the cemetery.

{¶ 45} According to Jones, he and Yates decided to have vaginal intercourse and did so while he was wearing a condom. He testified that Yates was not wearing underwear and that she had pulled up her skirt and the dress she was wearing underneath. Jones testified that they did not have anal intercourse and that he did not do anything to Yates's anal area.

{¶ 46} Jones testified that Yates told him she wanted to have "rough" sex. According to Jones, Yates told him to put his hands around her throat and restrain her breathing as she neared orgasm. Jones placed one hand around her throat while they engaged in vaginal intercourse. At some point, he "heard like a crack, cracking sound or popping sound." Jones realized that Yates was not moving. He stopped having sex with her and then noticed that the condom had broken. He purportedly used CPR to try to revive Yates but was unsuccessful.

{¶ 47} Once Jones realized that Yates was dead, he panicked because he "had a rape case." He retrieved his blanket—which was partially underneath Yates and partially tangled on Yates's neck—put the blanket in the trunk, and left the cemetery. Around 10:30 or 10:45 p.m., Jones arrived home. Delores was home; he told her that he had been out and had broken up a fight.

{¶ 48} On April 24, Jones read a newspaper article about the police finding a dead woman in Mount Peace Cemetery. Around 4:00 p.m., Jones had a conversation with Delores. Jones and Delores then walked to a nearby store to buy cigarettes. After returning home, Delores left the house, but Jones did not know where she went.

{¶ 49} Jones then contacted his sister, Yolanda, and drove to her home. They talked, and Jones decided to turn himself in to the police that night. Later that evening, Jones drove back to his house to see if Delores had returned home. The police then stopped and arrested him.

{¶ 50} Jones testified that Yates's death was "an accident." Jones said, "I guess it * * * went too far, [I] applied too much pressure." Jones testified that he did not leave the cross that was found over Yates's eye. And he denied ever seeing the cross that his wife had found in her jewelry box.

{¶ 51} During cross-examination, the state presented a life-size doll and told Jones to demonstrate how he strangled Yates as he had testified on direct, which Jones attempted to do. Jones also testified that he did not cause the injuries to Yates's face and neck and that he had no explanation for the twig found in Yates's rectum or her anal injuries, except to say that "some other guy" might have caused them.

{¶ 52} Jones did not notify the police after he left the cemetery because he thought they would accuse him of intentionally killing Yates. Jones stated that he threw his used condom onto the ground in the cemetery and also left some beer cans.

{¶ 53} Deitra Snodgrass testified on Jones's behalf. She said that Jones and a tall, slender African American woman came to her apartment during the spring of 2007. Snodgrass testified that the woman was wearing a long, "full-length" denim skirt that was either split or ripped on the side. The woman had bruises on her face, and her face was swollen. Snodgrass had a short conversation with them, and they left.

{¶ 54} During cross-examination, Snodgrass conceded that she did not come forward until Jones's brother, whom she referred to as "Uncle Wayne," approached her approximately one week before she took the witness stand and told her that she might need to testify. Snodgrass conceded that the day before she testified, she had told a detective that the woman's denim skirt was short, not long.

*Rebuttal testimony*

{¶ 55} Dr. Sterbenz refuted Jones's testimony. After using the demonstrative doll to confirm Jones's version of Yates's death, Dr. Sterbenz explained the ways in which the physical evidence contradicted Jones's testimony.

{¶ 56} Detective Terrence Hudnall testified that the police found no wine bottle and no beer cans in the cemetery. A used condom was found about 100 yards from the body, but it was not broken.

*The verdict and sentence*

{¶ 57} The jury found Jones guilty of all counts and specifications. Jones was sentenced to death for the aggravated murder of Yates. He was sentenced to 20 years in prison for the two rape convictions. The court also sentenced Jones to 10 years in prison for the repeat-violent-offender specifications in Counts 3 and 4 and ordered that they be served concurrently with each other, but consecutively to the sentence imposed in Counts 3 and 4, for a total of 30 years.

*State v. Jones*, 135 Ohio St. 3d 10, 10-17 (Ohio 2012).

These factual findings "shall be presumed to be correct," and Jones has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## PROCEDURAL HISTORY

### A.  State-Court Proceedings

#### 1.  Trial

On May 8, 2007, a Summit County grand jury indicted Jones on four counts: the aggravated murder of Susan Yates while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, rape (Ohio Rev. Code § 2903.01(B)); the murder of Susan Yates as a proximate result of committing or attempting to commit rape

8

and/or felonious assault (Ohio Rev. Code § 2903.02(B)); and two counts of rape (Ohio Rev. Code § 2907.02(A)(2)). (*See* Doc. 18-1 at 31-32.)[1]

At his arraignment on May 15, 2007, Jones entered a plea of not guilty to all charges. (*Id*. at 43.) The court assigned attorneys Donald Hicks and Kerry O'Brien to represent him. (*Id*.)

On June 8, 2007, Jones entered a plea of not guilty by reason of insanity and requested a determination of Jones' competency to stand trial. (*Id*. at 54.) On August 17, 2007, the court, after having reviewed the reports of examination of the Criminal Court Psycho-Diagnostic Clinic, ruled that Jones was competent to stand trial. (*Id*. at 64.) Defense counsel then asked the court to authorize its expert, Robert Bynes, Ph.D., to conduct a sanity and competency evaluation of Jones (*id*. at 65-66, 82) and to authorize the release of Jones' medical records, which the court granted (*id*. at 84, 86). Counsel also moved for funds to retain Dr. James Siddall and Thomas Hrdy for mitigation purposes, which the court granted. (*Id*. at 92 269.)

On October 22, 2007, the State supplemented Jones' indictment with principal-offender (Ohio Rev. Code § 2929.04(A)(7)) and repeat-violent-offender (Ohio Rev. Code § 2941.149) specifications to count one; and repeat-violent-offender specifications to each of the remaining three counts. (Doc. 18-1 at 87-88.)

Jones' counsel filed a motion to suppress statements he made to the police that he alleged were obtained in violation of his constitutional rights on November 1, 2007. (*Id*. at 203-06.) The court conducted a hearing on the motion on November 15, 2007. (Doc. 19-1 at 40-64.) The court denied the motion five days later. (Doc. 18-1 at 232-33.)

---

[1] For ease of reference, all citations to page numbers of documents filed in the court's electronic court filing system ("ECF") are to the ECF-assigned page numbers of the individual documents, not to the documents' original page numbers or the ECF "PageID" numbers.

Jones' trial began on December 3, 2007. (*See* Doc. 19-1 at 68.) On December 17, 2007, the jury reached a verdict of guilty on all charges and specifications. (*Id*. at 567-70.) The mitigation phase of the trial commenced on January 10, 2008. (*See id*. at 590.) The following day, the jury recommended that Jones be sentenced to death. (*Id*. at 973.) On January 30, 2008, the trial court accepted the jury's recommendation and sentenced Jones to death on the aggravated-murder charge and attached specifications. (Doc. 18-1 at 341.) It further sentenced Jones to ten years' imprisonment for each rape charge, to be served consecutively, and ten years' imprisonment for each repeat-violent-offender specification attached to the rape charges, to be served concurrently with each other but consecutively with the rape charges. (*Id*. at 341-42.) It also merged the murder charge and attached repeat-violent-offender specification with the aggravated-murder charge. (*Id*. at 342.)

### 2. Direct Appeal to Ohio Supreme Court

Jones filed a timely notice of appeal to the Ohio Supreme Court on March 14, 2008. (Doc. 18-1 at 416-21.) He was represented by Lawrence Whitney and Nathan Ray. (*See id*. at 416.)

In his merit brief, Jones presented the following propositions of law, stated as:

1. The trial courts [sic] permitting the State to use a life[-]sized doll in the cross-examination of Appellant violated Appellant's right to a fair trial as guaranteed by Amendment IV of the United States Constitution.

2. The trial court erred in permitting the prosecution to admit a hearsay statement of Appellant's wife as an "excited utterance" in violation of Appellant's rights as guaranteed by the Fifth, Sixth, Eight[h] and Fourteen[th] Amendments to the United States Constitution and Article I, Sections 9 and 10 of the Ohio Constitution.

3. The admission of State's Exhibit 13, a cross which was given to the police by Appellant's wife, violated Ohio law and Appellant's right to due process and a fair trial as guaranteed by Amendment V, United States Constitution[,] and Article I, Section 10 of the Ohio Constitution.

10

4. The admission of "other act" testimony in this case violated Appellant's rights to a fair trial as guaranteed by Amendment V, United States Constitution[,] and Article I, Section 10 of the Ohio Constitution.

5. Prosecutorial misconduct during the penalty phase of Appellant Jones' trial deprived him of his right to due process of law and against cruel and unusual punishment pursuant to the United States and Ohio Constitutions.

6. The excusal for cause of potential jurors based upon their views of the death penalty violated Appellant's right to a fair trial and due process of law as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitutional and the Ohio Constitution.

7. Prosecutorial misconduct during the penalty phase of Appellant's trial deprived Appellant of his right to due process of law and against cruel and unusual punishment pursuant to the United States and Ohio Constitution[s].

8. The death sentence in Appellant Jones' case is unreliable and inappropriate under the Eighth and Fourteenth Amendments to the United States Constitution.

9. The proportionality review that this Court must conduct in the present capital case pursuant to Ohio Revised Code § 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth and Fourteenth Amendments to the United States Constitutions, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code § 2929.05.

10. Ohio's death penalty law is unconstitutional. Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Phillip Jones. United States Constitution Amendment[s] Five, Six, Eight[], [and] Fourteen[]; Ohio Constitution, Article[s] 1, 2, 9, 10, and 16. Further[,] Ohio's death penalty statute violates the United State's obligations under international law.

(*See id*. at 437-43 (capitalization altered).) The State filed an opposing brief. (*Id*. at 569-638.)

The Ohio Supreme Court affirmed the trial court's judgment on December 6, 2012.

*Jones*, 135 Ohio St. 3d at 10.

On May 16, 2013, Jones, now represented by the Ohio Public Defender's Office, filed in the Ohio Supreme Court an application to re-open his direct appeal pursuant to Ohio Supreme Court Practice Rule 11.06. (Doc. 18-1 at 743-62.) That rule permits defendants to request to

reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause."  Ohio S. Ct. Prac. R. 11.06(A); *see also State v. Murnahan*, 63 Ohio St. 3d 60 (Ohio 1992).

In his reopening application, Jones claimed that appellate counsel were ineffective for failing to assert five claims, stated as:

1. A trial court violates a capital defendant's constitutional rights to a fair trial and due process when it commits prejudicial errors during the capital defendant's trial. U.S. Const. Amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20[:] (a) failed to record all sidebars; (b) permitted the State to refer to acts not yet proven beyond a reasonable doubt without using the term "alleged"; (c) permitted biased and speculative testimony from the medical examiner; (d) admitted cumulative, gruesome photos in both phases and the autopsy protocol in mitigation; (e) allowed the admission of victim[-]impact evidence; (f) allowed the circumvention of the requested separation of witnesses; (g) failed to give requested jury instructions; (h) failed to life-qualify Jones' venire; (i) misstated the burdens of proof; (j) relied on improper sentencing considerations; (k) misapplied the rape[-]shield statute; and (l) did not permit cross[-]examination on relevant matters.

2. A capital defendant is denied the right to the effective assistance of counsel when counsel prejudicially fails his client during his capital trial. U.S. Const. VI and XIV[:] (a) failing to request expert assistance and forensic testing; (b) failing to object to the admission of other acts testimony, the admission of the plastic cross found in Delores Jones' jewelry box, and the prejudicial nature of the mannequin and demonstration; (c) failing to object to prosecutorial misconduct throughout Jones' trial; (d) failing to request a continuance and advocate for their client; (e) opening the door during mitigation phase; (f) failing to effectively advocate during voir dire; and (g) failing to effectively advocate during mitigation.

3. A capital defendant is denied his substantive and procedural due process rights to a fair trial and reliable sentencing as guaranteed by U.S. Const. Amends. VIII and XIV; Ohio Const. Art. I, §§ 9 and 16 when a prosecutor commits acts of misconduct during his capital trial[:] (a) repeatedly asked leading questions on direct examination; (b) elicited inadmissible hearsay; (c) elicited inflammatory information; and (d) committed misconduct during closing argument.

(*Id*. at 745-53.)  The Ohio Supreme Court summarily denied the application on June 3, 2015.

(*Id*. at 763.)

### 3.  Post-Conviction Proceedings

Prior to the release of the Supreme Court's decision on direct appeal, now represented by Ruth Tkacz of the Ohio Public Defender's Office, filed a timely petition for post-conviction relief in the trial court, on March 23, 2009.  (Doc. 18-2 at 25-76.)  He submitted with the petition 205 pages of exhibits.  (*Id*. at 77-282.)  Jones also filed motions requesting funds for neuropsychological testing and discovery.  (*Id*. at 283-95; 297-305.)

Jones presented the following grounds for relief, stated as:

1.  Jones's conviction and death sentence are void or voidable because he did not receive effective assistance of counsel during his capital trial. Defense counsel failed to use an expert to refute the coroner's findings. The State's evidence does not prove beyond all reasonable doubt that Jones committed rape. Not only should Jones's convictions for rape be reversed . . ., but also his death sentence because the sole aggravating circumstance in his case was rape under R.C. 2929.04(A)(7) . . . .

2.  The death sentence imposed on Jones is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel's failure to investigate and present available, relevant, and compelling mitigating evidence to the jury prejudiced Jones.

3.  The death sentence imposed on Jones is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel failed to conduct a reasonable mitigation investigation and properly prepare witnesses to testify. Defense counsel's mitigation presentation failed to reveal the extent of the dysfunction within Jones's family.

4.  The death sentence imposed on Jones is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel failed to investigate and present compelling mitigating evidence. Counsel's failure to conduct a complete and reasonable investigation and to adequately prepare witnesses to testify left the jurors without important mitigating evidence of Jones's family background.

5.  The death sentence imposed on Jones is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel failed to investigate and present witnesses who would have testified to Jones's disturbing upbringing and family background.

6. Jones's death sentence is void or voidable because his trial counsel rendered ineffective assistance at the penalty phase of trial. The defense's presentation of psychological mitigating evidence failed to provide the jurors with comprehensive and accurate information regarding Jones's turbulent, dysfunctional background. The testimony of the defense's expert witness, Dr. James Siddall, fell short and failed to provide important details pertaining to Jones's family and his psychological development. Without comprehensive testimony, the jurors could not provide much, if any, weight to the evidence offered.

7. Jones's death sentence is void or voidable because his attorneys rendered ineffective assistance at the penalty phase of trial. Defense counsel failed to conduct a thorough investigation of mitigating evidence. This inaction violated Jones's rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

8. The death sentence imposed on Jones is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel's failure to present available, relevant, and compelling mitigating evidence to the jury prejudiced Jones. Defense counsel failed to seek a continuance so that they would have a reasonable amount of time to conduct a proper mitigation investigation.

9. The death sentence imposed on Jones is void or voidable because he did not receive effective assistance of counsel at the penalty phase of his trial. Defense counsel failed to introduce important mitigating evidence – namely, hospital records of Phillip Jones.

10. Jones's Sixth, Eighth, and Fourteenth Amendment rights to a fair trial and reliable sentence were violated when a member of his jury failed to follow the trial court's instructions of law.

11. Ohio's death-penalty scheme does not work. Jurors neither understand the law nor apply it when deciding capital cases. In Jones's case, at least one juror either misunderstood or completely disregarded the trial court's instructions, resulting in a death sentence that is void or voidable. Jones's case is an example of a capital trial system that is defective. Jones's rights under the United States Constitution's Sixth, Eighth, and Fourteenth Amendments were violated, and he was prejudiced.

12. Jones's conviction and death sentence are void or voidable because the trial court erred by allowing the State to introduce evidence of a prior bad act.

13. The prosecutor committed prejudicial misconduct at Jones's capital trial that violated Jones's Sixth, Eighth, and Fourteenth Amendment rights to a fair trial, a reliable sentence, and due process.

14

14. Jones's conviction is void or voidable because he did not receive effective assistance of counsel at his capital trial. Defense counsel's failure to present available expert testimony relevant to Jones's defense prejudiced Jones.

15. Jones's conviction is void or voidable because he did not receive effective assistance of counsel at his capital trial. Defense counsel failed to elicit testimony from a defense witness-testimony that would have enhanced the witness's credibility and would have given her overall testimony weight.

16. Jones's conviction is void or voidable because he did not receive effective assistance of counsel at his capital trial. Defense counsel failed to introduce available photo exhibits that would have shown the jurors that Jones did not have any injuries on his hands.

17. Jones's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his postconviction petition individually warrant the relief sought from this Court, the cumulative effect of the errors and omissions presented in this petition's foregoing paragraphs is prejudicial. The cumulative errors denied Jones his rights secured by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(*Id*. at 31, 34, 37, 40, 43, 46, 49, 52, 55, 58, 60, 62, 64, 67, 70, 72, 74.)

The State moved to dismiss the petition (*id*. at 312-58), which Jones opposed (*id*. at 359-64).  On January 20, 2010, the court granted the State's motion and dismissed the petition.  (*Id*. at 365-67.)  It found Jones' sentencing entry was improper because of an error related to his sentence of post-release control.  (*Id*. at 366.)  The court therefore found Jones' sentence was void and his petition for post-conviction relief was premature.  (*Id*. at 367.)  Jones' remaining motions were denied as moot.  (*Id*.)

Jones appealed the trial court's judgment in the court of appeals.  (*Id*. at 368.)  While this appeal was pending, Jones filed a second, identical post-conviction petition in the trial court on April 14, 2010.  (*Id*. at 546-798.)  The appellate court reversed the trial court's decision dismissing Jones' first post-conviction petition and remanded to the court for the petition's adjudication on the merits.  *State v. Jones*, No. 25254, 2010 WL 3239315 (Ohio Ct. App. Aug.

15

18, 2010).  On remand, the trial court dismissed both of Jones' post-conviction petitions on the merits and denied his motions for funds for an expert and discovery.  (Doc. 18-2 at 844-64.)

Jones appealed the trial court's judgment.  (*Id*. at 865-66.)  He raised the following assignments of error, stated as:

1. The trial court erred in dismissing Jones' postconviction petition when he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing.

2. The trial court erred when it failed to grant funding for a neuropsychological expert in violation of Jones' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

3. The trial court erred when it refused to allow Jones to conduct discovery in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(*See id*. at 975 (capitalization altered).)  The State filed an opposing brief.  (*Id*. at 1047-1100.)

On November 23, 2011, the state appellate court affirmed the trial court's judgment in part, but remanded the case to the trial court for an evidentiary hearing as to Jones' claims of ineffective assistance of counsel at the mitigation phase of his trial.  *State v. Jones*, No. 25695, 2011 WL 5869752 (Ohio Ct. App. Nov. 23, 2011).

Jones appealed the dismissed claims to the Ohio Supreme Court on January 9, 2012. (Doc 18-2 at 1156-58.)  He asserted the following of propositions of law in his memorandum in support of jurisdiction:

1. When a death-sentenced defendant files a post-conviction petition, due process, equal protection, the right to counsel, and the freedom from cruel and unusual punishment require that the defendant receive funding for expert assistance and discovery upon a showing of good cause. U.S. Const. amend. VI, VIII, XIV.

2. Effective assistance of counsel at the trial phase of a death-sentenced individual requires that counsel consult with necessary experts and use appropriate evidence

16

readily at hand to support the theory of defense. U.S. Const. amend. VI, VIII, XIV.

3. Ohio's aliunde rule contained in Evidence Rule 606 violates a capital defendant's established right to have a jury properly consider all mitigation evidence and when information from a juror demonstrates that he or she considered a nonstatutory aggravating factor, the defendant's death sentence is void. U.S. Const. amend. VI, VIII, XIV.

4. Ohio's death penalty is unconstitutional because jurors cannot understand the weighting process that is required by Ohio's death penalty scheme. U.S. Const. amend. VIII, XIV.

(*Id.* at 1160.)  The State waived filing a memorandum in response.  (*Id.* at 1219.)

The Ohio Supreme Court declined jurisdiction on May 22, 2013.  (*Id*. at 1220.)

Meanwhile, on remand in the trial court, Jones, still represented by the Ohio Public Defender's Office, filed two motions in limine:  one asking the court to admit into evidence at the evidentiary hearing the affidavit of Jones' deceased mother, and one requesting that the court rule that his attorneys may not testify as to information protected by the attorney-client privilege. (Doc. 18-3 at 38-58.)  The court granted permission to present the affidavit with redactions (*id.* at 228-29), but denied the motion regarding his counsel's testimony (*id.* at 239-40).  The also court denied Jones' request for funds to retain an expert.  (*Id*. at 251-52.)  Jones appealed the court's decision regarding his attorney's testimony.  (*Id*. at 253-56.)  The court of appeals dismissed the appeal on September 24, 2013, on the ground that it lacked jurisdiction over the matter.  (*Id.* at 594.)

The evidentiary hearing commenced on Monday, November 18, 2013, and concluded the following Monday, November 25, 2013.  (*See id*. at 417.)  Jones presented twelve witnesses, with twenty-two exhibits; the State offered four witnesses and one exhibit.  (*See* Doc. 19-2 at 1021-23.)  The trial court again dismissed Jones' petition on November 30, 2015.  (Doc. 18-3 at 417-85.)

17

Jones filed a timely appeal of the trial court's judgment.  (*Id*. at 487-88.)  In his merit brief, he asserted two assignments of error:

1. The trial court erred by concluding that Jones did not receive ineffective assistance of counsel, when Jones's attorneys conducted their investigation after the trial began, did not allow their experts enough time to fully investigate Jones's background, and failed to discover sexual abuse endured by Jones as a child. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 1 and 10, of the Ohio Constitution.

2. The trial court erred by refusing to consider out[-]of[-]court statements for hearsay and nonhearsay purposes, in violation of Due Process and Ohio law. Fifth and Fourteenth Amendments to the United States Constitution, and Sections 10, 16, Article I of the Ohio Constitution.

(*See id*. at 750.)  The State filed a responsive brief.  (*Id*. at 857-966.)  The appellate court affirmed the trial court's judgment on January 30, 2019.  *State v. Jones*, No. 28063, 2019 WL 385467 (Ohio Ct. App. Jan. 30, 2019).

Jones filed a timely appeal of the appellate court's judgment with the Ohio Supreme Court.  (Doc. 18-3 at 1083-85.)  In his memorandum in support of jurisdiction, he set forth two propositions of law, stated as:

1. When a death-sentenced defendant irrefutably demonstrates that his trial counsel conducted their mitigation investigation after the trial began, did not allow their experts enough time to fully investigate their client's background and, as a result, failed to discover their client's childhood sexual abuse, those attorneys are ineffective to that death-sentenced defendant's prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. U.S. Const. amend. VI, VIII, XIV.

2. Where Due Process and Ohio [l]aw demand that the affidavit of an unavailable witness should be considered for hearsay and/or non-hearsay purposes, a trial court errs when it fails to consider that affidavit.

(*See id*. at 1087.)  The State filed an opposing memorandum.  (*Id*. at 1276-90.)

On June 26, 2019, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (*Id*. at 1291.)

Meanwhile, on January 11, 2017, Jones filed a motion for leave to file a motion for a new mitigation trial pursuant to the recently decided United States Supreme Court decision in *Hurst v. Florida*, 577 U.S. 92 (2016). The State opposed the motion. (Doc. 18-3 at 1331-32.) The trial court denied the motion on January 26, 2017. (*Id.* at 1336.)

Jones filed a timely appeal of the trial court's decision. In his merit brief, he asserted two assignments of error:

1. The trial court erred in denying Jones' Motion for Leave to File a Motion for New Mitigation Trial without making any determination as to whether Jones was unavoidably prevented pursuant to Crim. R. 33(8) from filing his Motion within 14 days after the verdict was rendered.

2. The trial court erred when it denied Jones' Motion for a New Mitigation Trial when Jones proved that he was sentenced to death under a statutory scheme that violates the Sixth and Fourteenth Amendments of the United States Constitution. *Hurst v. Florida,_* U.S.\_, 136 S. Ct. 616 (2016).

(*See id.* at 1471.) The State filed a responsive brief. (*Id.* at 1501-20.) The state appellate court affirmed the trial court's judgment on May 15, 2019. *State v. Jones*, No. 28547, 2019 WL 2150280 (Ohio Ct. App. May 15, 2019).

Jones appealed the appellate court's decision to the Ohio Supreme Court. (Doc. 18-3 at 1623-25.) In his memorandum in support of jurisdiction, he set forth two propositions of law, stated as:

1. A trial court errs when it denies a motion for leave to file a new mitigation trial pursuant to Crim. R. 33(B) when a defendant demonstrated that he was unavoidably prevented from filing his motion within 14 days after the verdict was rendered.

2. The State of Ohio's death penalty scheme violates a defendant's right to a jury trial as guaranteed by the Sixth and Fourteenth Amendment[s] to the United States Constitution.

(*See id.* at 1627.) The State filed an opposing memorandum. (*Id.* at 1664-74.) The court declined jurisdiction on October 1, 2019. (*Id.* at 1675.)

19

**B.  Federal Habeas Proceedings**

Jones filed his original petition for writ of habeas corpus in this court on June 24, 2020. (Doc. 11.)  On July 28, 2020, he filed an unopposed motion to amend the case management order to allow additional time for investigation with leave to amend the petition, which the court granted.  (Doc. 13.)  On October 9, 2020, Jones requested discovery of various records of the county coroner's office relating to Ms. Yates to assist his expert in assessing the forensic medical evidence admitted at trial in support of several claims of ineffective assistance of trial counsel. (Doc. 16.)  Respondent opposed the motion.  (Doc. 17.)  The court granted the motion for additional time to amend his petition and denied the motion for discovery as premature until after he had filed his amended petition and Respondent had filed a return of writ asserting any procedural defenses.  (Doc. 33.)

On January, May, and September of 2021, Jones filed three unopposed motions for extension of time to file an amended petition.  (Docs. 28, 32, 34.)  The court granted all three motions.  Jones filed an amended petition on October 29, 2021 (Doc. 35), and second amended petition on April 8, 2022 (Doc. 44).

On April 19, 2022, he filed a motion to stay this case and hold it in abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), so that he could exhaust two claims of ineffective assistance of trial counsel.  (Doc. 45.)  Respondent opposed the motion.  (Doc. 47.)  The court denied Jones' motion to stay, finding that Jones already had raised the two claims at issue in state court on post-conviction review, where they were adjudicated on the merits.  (Doc. 54 at 5-9.)

Respondent filed a return of writ to the second amended petition on May 17, 2023.  (Doc. 57.)  And Jones filed a traverse (Doc. 60), to which Respondent replied (Doc. 67).  Jones asked the court in his traverse to reconsider its denial of his stay-and-abeyance motion (Doc. 60 at 156-

20

58; 170-73), which the court denied (Doc. 66).  Jones also filed a motion renewing his prior

motion for discovery (Doc. 65), which the court again denied (Doc. 70).  Jones also filed a

conditional motion for evidentiary hearing on February 21, 2024 (Doc. 71), which Respondent

opposed (Doc. 72).  The court will address that motion in this memorandum of opinion and

order.

### PETITIONER'S GROUNDS FOR RELIEF

1. The State violated Petitioner Mr. Jones's right of confrontation due to the hearsay testimonies of Richard Morrison and Charletta Jefferies [sic] in the culpability phase of the trial. U. S. Const. Amends. 6 & 14.

2. Trial counsel rendered ineffective assistance in the culpability phase of Mr. Jones's capital trial, violating his rights under the Sixth and Fourteenth Amendments to the Constitution.

3. The State violated Petitioner Phillip Jones's due process right to a fair trial by the admission of unduly prejudicial evidence in the culpability phase of the trial. U.S. Const. Amend 14.

4. Mr. Jones [sic] trial was marred by juror misconduct in violation of his Sixth, Eighth, and Fourteenth Amendment rights.

5. Mr. Jones's right to due process, fair trial and the effective assistance of counsel was denied by counsel's deficient performance during the penalty phase of his trial in violation of the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution.

6. Mr. Jones's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments was violated when counsel failed to properly and timely investigate Petitioner's social history and retain experts to present in the mitigation phase of the trial as demonstrated in the post-conviction evidentiary hearing. U.S. Const. Amends. 6 & 14.

7. The State violated Petitioner Jones's right to present a defense by preventing him from introducing mitigation evidence. U. S. Const. Amends. 6 & 14.

8. Prosecutorial misconduct during the penalty phase deprived Mr. Jones of a fair trial. U.S. Const. Amends. 5, 8, & 14.

9. Appellate counsel was ineffective on direct appeal to the Ohio Supreme Court, depriving Mr. Jones's [sic] of his due process rights under U. S. Const. Amends. 6 & 14.

10. Petitioner's trial counsel rendered ineffective assistance due to counsels' [sic] failure to present mitigating evidence of Mr. Jones's pediatric developmental disabilities or effect. U.S. Const. 6 & 14.

11. Petitioner's trial counsel rendered ineffective assistance due to counsels' [sic] failure to utilize a forensic medical expert to support Petitioner's claim that he accidentally caused the victim's death. U.S. Const. Amends 6 & 14.

(*See* Doc. 44-2 at 2-6 (capitalization altered).)

STANDARD OF REVIEW

**A.    AEDPA Review**

Habeas corpus is essentially "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  Jones' petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date).  The Act, which amended 28 U.S.C. § 2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).[2]

At the same time, however, AEDPA was intended "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal

---

[2]  Jones asserts in his petition that AEDPA's §§ 2254(d) and (e) are unconstitutional under the Thirteenth and Fourteenth Amendments to the United States Constitution, and therefore those provisions do not apply to his claims in this case.  (Doc. 44-2 at 28-43.)  There is no controlling authority for this proposition, however, and the court declines to address this argument.

rights." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.* at 19.

Most significantly, § 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts will presume a state court has adjudicated a federal claim "on the merits," and AEDPA deference therefore applies, regardless of whether the last state court to decide the claim provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (applying presumption to state-court summary dispositions); *see also Johnson v. Williams*, 568 U.S. 289, 292-93 (2013) (applying *Richter* presumption to state-court decisions that rule against a defendant and address some issues, but not expressly the federal claim in question).

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). When identifying what a Supreme Court

23

decision actually holds, courts should not frame the decision "at too high a level of generality." *Woods v. Donald*, 575 U.S. 312, 318 (2015).  Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case.  *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

A state-court decision is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Andrade*, 538 U.S. at 75 (citations omitted).  "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable."  *Id.* (citations omitted).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error."  *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003).  The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence."  *Burt*, 571 U.S. at 18; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence.  28 U.S.C. §

2254(e)(1).[3]  The Supreme Court has cautioned, however, that "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

In deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact under § 2254(d), a habeas court must "'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims,' . . . and to give appropriate deference to that decision . . . ."  *Wilson v. Sellers,* 548 U.S. –, 138 S. Ct. 1188, 1191-92 (2018) (quoting *Hittson v. Chatman*, 576 U.S. –, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari).  In cases in which the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion, a habeas court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."  *Id.* at 1192.[4]  But

---

[3] Section 2254(e)(1) provides:  "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

[4] The Sixth Circuit has adhered to *Wilson*'s directive.  *See, e.g., Cassano v. Shoop*, 1 F.4th 458, 472 (6th Cir. 2021) ("this Court reviews only the Ohio Supreme Court's reasons for denying Cassano's claim") (citing *Wilson*, 138 S. Ct. at 1192); *Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("AEDPA requires this court to review the actual grounds on which the state court relied") (citing *Wilson*, 138 S. Ct. at 1192); *Thompson v. Skipper*, 981 F.3d 476, 480 (6th Cir. 2020) (following and quoting *Coleman*);.  But the circuit court also has acknowledged that "[i]n the wake of *Wilson*, courts have grappled with whether AEDPA deference extends only to the reasons given by a state court (when they exist), or instead applies to other reasons that support a state court's decision."  *Thompson*, 981 F.3d at 480 n.1 (listing cases); *see also id.* at 483-85 (Nalbandian, J., concurring in result but emphasizing that "[f]ederal courts have never been required to confine their habeas analysis to the exact reasoning that the state court wrote, and neither [*Wilson* nor *Coleman*] compels us to change our analysis").

when the last state court to adjudicate a federal claim on the merits issues an *unexplained* order upholding a lower court's *explained* judgment on a federal claim, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Id.* (adopting the "look through" presumption in determining procedural default of federal habeas claims established in *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). The state may then rebut this presumption "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued for the state supreme court or obvious in the record it reviewed." *Id*.

The Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Richter,* 562 U.S. at 102-03 (internal quotation marks and citation omitted). A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B. Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement,

however, "refers only to remedies still available at the time of the federal petition."  *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile."  *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is an "important corollary" to the exhaustion requirement.  *Davila v. Davis,* 582 U.S. 521, 527 (2017) (internal quotation marks and citation omitted).  The doctrine generally prevents federal courts from hearing federal constitutional claims that were not presented to the state courts "consistent with [the state's] own procedural rules."  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  It occurs when a habeas petitioner failed to either:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available.  *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28.

Where a state court declines a prisoner's federal claim because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[5]

---

[5] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.  It is:

First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the petitioner's] claims are now procedurally barred under [state] law'" (internal citations omitted)).

---

enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle,* 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'"  *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts again employ a "look through" presumption and review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst,* 501 U.S. at 805 (emphasis in original).  If the last state court "explicitly imposes a procedural default," then the claim is presumed defaulted.  *Id.* at 803; *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) (state court must "clearly and expressly state[] that its judgment rests on a state procedural bar" to result in procedural default).  Conversely, if the last state court presented with the claim reaches its merits in a decision that "'fairly appear[s] to rest primarily upon federal law,'" then any procedural bar is presumed removed, and the federal habeas court may consider the merits of the claim in its review.  *Ylst*, 501 U.S. at 803 (citation omitted).[6]

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750.  "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him."  *Id*.  To establish prejudice, a petitioner must

---

[6] Also, where a later state-court decision rests upon a prohibition against further state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ."  *Ylst*, 501 U.S. at 804 n.3.

demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent in respect to eligibility for the death penalty.  *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992).  In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law."  *Id*. at 336.  This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty."  *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

### C.  Cognizability

To the extent a claim alleges state-law violations, it is not reviewable by a federal habeas court and must be dismissed on that basis.  The Supreme Court has made clear that "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

31

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993).

## ANALYSIS

### I.  **First Ground for Relief:** *Trial-Court Error / Right to Confrontation*

For his first ground for relief, Jones claims that the trial court violated his Sixth Amendment right to confront witnesses against him when it admitted out-of-court statements made by his wife, Delores Jones, through the trial testimony of Detective Morrison and Charletta Jeffries.  (Doc. 44-2 at 44-55.)  Jones raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits.  It is therefore preserved for federal habeas review.

The Ohio Supreme Court ruled:

{¶ 112} **Excited utterances by Jones's wife.** In proposition of law II, Jones argues that the trial court erred in admitting his wife's statements to Jeffries and Detective Morrison as excited utterances. Jones contends not only that the statements did not meet the

definition of excited utterance, but that their admission violated the spousal privilege and the Confrontation Clause. . . .

*Delores's testimony*

{¶ 115} Before trial began, the trial court advised Jones's wife, Delores, that she did not have to testify against Jones because he was her husband. Delores said that she wished to testify. But because Jones asserted spousal privilege, the trial court ruled that Delores would not be allowed to testify "as to anything [Jones] told her relative to this matter."

{¶ 116} Consistent with that ruling, Delores testified during the state's case-in-chief that at around 4:00 p.m. on April 24, Jones was at home reading the newspaper and watching the news on television. She testified that she and Jones had a conversation about something that was on the news, but she did not testify about what they discussed. "A little while later," they walked to a store because Jones wanted to get some cigarettes.

{¶ 117} After returning home, Delores drove to the home of her friend, Jeffries. Delores testified that she was "[h]ysterical, upset, and hyperventilating." Delores also testified that she arrived at Jeffries's home and told Jeffries what her husband had said.

{¶ 118} Delores and Jeffries then called the police; Delores spoke to someone at the detective bureau and stated that she "wanted to speak to somebody in charge" about the dead woman found in the cemetery. Shortly thereafter, Detective Morrison arrived at Jeffries's home, and Delores told him what Jones had said. Delores stated that when she talked to Morrison, she was still upset and scared.

{¶ 119} Delores was not asked—and did not testify—as to the communication between her and Jones. . . .
…

{¶ 131} We now turn our attention to the rules that apply to the admission of these out-of-court statements—the federal Confrontation Clause and our Rules of Evidence. In doing so, we first more fully detail the relevant trial testimony.

*Jeffries's and Morrison's testimony*

{¶ 132} Jeffries testified that Delores arrived at her home between 4:30 and 5:00 p.m. on April 24. Delores immediately ran upstairs to Jeffries. Delores was "upset" and "screaming." Jeffries noticed that Delores was wearing shoes even though Delores knew that the rule was no shoes inside the house. Jeffries and Delores then had the following exchange:

A: I said: Delores, take your shoes off. And that's when she begins to say: He did it, he did it.

* * *

33

Q: And you said what now?

A: He, who? And she said: My husband, Phil. And I said: Did what? And she said: Murdered the woman. And I said: What woman? And she said: The woman that they found in the cemetery.

{¶ 133} Jeffries testified that Delores then called the police. Delores was "really upset" and kept dialing the wrong number. Morrison arrived at Jeffries's home "[p]robably ten minutes" after the phone call.

{¶ 134} Morrison testified that he had been assigned to investigate Yates's murder and that another detective, Detective Urbank, had called him at home around 5:00 p.m. on April 24 and said that a woman wanted to speak with the detective working on the case of the dead woman found at the cemetery. Urbank told Morrison that the woman was emphatic that she wanted to speak to someone working that day.

{¶ 135} Morrison drove to Jeffries's home immediately after the call and met Delores inside the house. Morrison described his meeting with Delores:

A: I couldn't quite figure her out at first, she kept running back and forth, looking out the windows and pacing, making sure no one was coming. She was hyperventilating and basically hysterical with me. And basically I said: Look, you called me. And that's when I asked her: Do you have something you need to tell me? You called me out. And she said: My husband is the one that killed that girl in the cemetery.

Mr. O'Brien (defense counsel): Objection, hearsay.

The Court: Note the objection, overruled.

Q: And when she told you that, * * * what was your response?

A: I was as shocked as anybody. I actually had to ask her, tell her to calm down: Are you sure? How do you know this? And she said: Because he told me her name was Susan. Isn't it Susan? Is it Susan?

* * *

Q: Delores Jones tells you that her husband is the one that killed the woman in the cemetery, and that he told her * * * the woman's name is Susan?

A: Yes.

Q: And you indicated previously that that information had not been released to the press, correct?

A: That was only known to us.

34

{¶ 136} Admission of an out-of-court statement must comport with both constitutional dictates and evidentiary law. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because certain testimonial statements are barred by the Confrontation Clause of the Sixth Amendment to the United States Constitution irrespective of their admissibility under the Rules of Evidence, we undertake the constitutional inquiry first. *See id*.

Crawford *inquiry*

{¶ 137} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant had had a prior opportunity to cross-examine the witness. *Crawford* at 54, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 138} At the threshold, we hold that even though Delores testified at trial, she was unavailable for purposes of the Confrontation Clause because Jones had invoked the spousal privilege.

{¶ 139} The facts of *Crawford* are substantially similar to those of this case as to the unavailability of the witness. In *Crawford*, the defendant invoked the marital privilege to keep his wife, Sylvia, from testifying against him at trial. *Id*. at 40, 124 S.Ct. 1354, 158 L.Ed.2d 177. During trial, the state played the wife's tape-recorded statement to police that described the offense he committed. *Id*. Noting that the wife had admitted facilitating the offense, the state invoked the hearsay exception for statements against penal interest. *Id*. Crawford countered that admitting this evidence violated his Sixth Amendment rights. *Id*. During appeals in state court, the state had argued that Crawford waived his right to confrontation when he neglected to call his wife to testify. *State v. Crawford*, 147 Wash.2d 424, 429, 54 P.3d 656 (2002). The Supreme Court of Washington rejected this argument and held that the defendant did not waive his right to confrontation when he invoked the marital privilege. It reasoned that "forcing the defendant to choose between the marital privilege and confronting his spouse presents an untenable Hobson's choice." *Id*. at 432, 54 P.3d 656.

{¶ 140} The Supreme Court expressly did not reach the waiver argument because the state did not challenge that portion of the decision. *Crawford*, 541 U.S. at 42, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 1. Nevertheless, it did conclude that "[i]n this case, the State admitted Sylvia's testimonial statement against petitioner, *despite the fact that he had no opportunity to cross-examine her*. That alone is sufficient to make out a violation of the Sixth Amendment." (Emphasis added.) *Id*. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 141} Similarly here, the state does not argue that Jones waived his Sixth Amendment right to confront Delores by invoking the spousal privilege. *See State v. Keairns*, 9 Ohio

35

St.3d 228, 460 N.E.2d 245 (1984), paragraph one of the syllabus (Confrontation Clause requires the prosecution, as the proponent of the evidence, to show unavailability of a witness). Nor does the state argue that Jones had (but failed to pursue) the opportunity to cross-examine Delores while she was on the stand.

{¶ 142} Consistent with *Crawford*, we hold that Delores was unavailable as a witness because Jones invoked the spousal privilege and that he had had no prior opportunity to cross-examine her. In doing so, we, as in *Crawford,* need not reach the waiver issue because it has not been asserted by the state.

{¶ 143} Thus, the admission of Delores's statements pass constitutional muster only if they are nontestimonial for purposes of the Confrontation Clause. Accordingly, we must now determine whether Delores's statements to Morrison and Jeffries were testimonial. Doing so involves different inquiries for Morrison and Jeffries, because Morrison was a responding police officer.

*Statements to Morrison*

{¶ 144} In *Crawford*, the court explained that whatever else the term "testimonial evidence" covers, "at a minimum, it applies to * * * prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. Since then, the court has expended considerable effort expounding on the meaning of "testimonial" in the context of police interrogation.

{¶ 145} Two years after its decision in *Crawford*, the court revisited the issue in the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In these cases, the court distinguished between police interrogations that concern an ongoing emergency and those that relate to past criminal conduct. In considering whether the statements made in the context of these two different scenarios were testimonial, the court formulated the primary-purpose test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 146} *Davis* involved statements that a domestic-violence victim made to a 9–1–1 operator identifying her assailant and describing his whereabouts immediately after an assault. *Id*. at 817–819, 126 S.Ct. 2266, 165 L.Ed.2d 224. Applying the test, the court determined that "the circumstances of [the 9–1–1] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Id*. at

828, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court reasoned that "the nature of what was asked and answered [during the 9–1–1 call], again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." (Emphasis sic.) *Id*. at 827, 126 S.Ct. 2266, 165 L.Ed.2d 224. In addition, the call "was plainly a call for help against bona fide physical threat" and involved "frantic answers" given "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id*. Accordingly, the court held that these statements were nontestimonial. *Id*. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 147} *Hammon* involved a victim's statements to police officers responding to a domestic-violence complaint after they had secured the scene. *Id*. at 819–820, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court held that these statements were testimonial and were barred by the Sixth Amendment. *Id*. at 829–832, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court stated that there was "no immediate threat" to the victim and "no emergency in progress," because the police had separated the abusive husband from the wife. *Id*. at 829–830, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court reasoned that when the officer questioned the victim, he was "not seeking to determine (as in *Davis*) 'what is happening' but rather 'what happened.'" *Id*. at 830, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court concluded that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime * * *." *Id*.

{¶ 148} In *Michigan v. Bryant*, ––– U.S. ––––, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93 (2011), the court provided further explanation of the "ongoing emergency" discussed in *Davis*. In *Bryant*, police officers responding to a shooting call found the victim, Anthony Covington, lying on the ground with a gunshot wound. *Id*. at 1150. Police officers asked Covington " 'what had happened, who had shot him, and where the shooting had occurred.' " *Id*., quoting *People v. Bryant*, 483 Mich. 132, 143, 768 N.W.2d 65 (2009). Replying that "Rick" (the defendant) had shot him, Covington told the police that he had gone to Rick's house and had a conversation with him through the back door. *Id*. Covington explained that when he turned to leave, he was shot through the door and then drove to the gas station where the police found him. *Id*. Covington died within hours. *Id*. At trial, police officers who spoke with Covington testified about what Covington had told them. *Id*. The perpetrator was at large.

{¶ 149} The United States Supreme Court held that Covington's identification and descriptions of Bryant and the location of the shooting were nontestimonial statements because the primary purpose of the statements was to enable police to meet an ongoing emergency. *Bryant* at 1166–1167. In reaching its decision, the court provided further clarification of the "ongoing emergency" circumstance that occurs in the context of a nondomestic dispute that "extends beyond an initial victim to a potential threat to the responding police and the public at large." *Id*. at 1156.

{¶ 150} *Bryant* emphasized that in assessing whether a statement is testimonial in such a case, the ultimate inquiry focuses on whether the primary purpose of the interrogation is to meet an ongoing emergency or to establish past events for later criminal prosecution.

*Id.* at 1156–1157. In such an inquiry, a court must "objectively evaluate the circumstances in which the encounter occur[red] and the statements and actions of the parties." *Id.* at 1156. The focus is not on the subjective or actual purpose or intent of the interrogator or the declarant, but on "the purpose that reasonable participants would have had" under the same circumstance. *Id.* The court cautioned that the focus must be on the perspective of the parties at the time of the interrogation, and not based on hindsight, for "[i]f the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause." *Id.* at 1157, fn. 8.

{¶ 151} The court also emphasized that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant*, —— U.S. ——, 131 S.Ct. at 1158, 179 L.Ed.2d 93. The court noted that "[d]omestic violence cases like *Davis* and *Hammon* often have a narrower zone of potential victims than cases involving threats to public safety." *Id.* The court explained that "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.* The court also stated that "the duration and scope of an emergency may depend in part on the type of weapon employed." *Id.* In *Bryant*, the victim had been mortally wounded, the weapon was a gun, and the police had not known the identity of the shooter. Under these circumstances, the shooter continued to pose a threat to Covington and possibly others because he was still on the loose. *Id.* at 1166.

{¶ 152} The court also noted, as it had in Davis, that "'a conversation which begins as an interrogation to determine the need for emergency assistance'" can "'evolve into testimonial statements.'" *Id.*, ——U.S. ——, 131 S.Ct. at 1159, 179 L.Ed.2d 93, quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court explained:

> This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in Davis, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude "the portions of any statement that have become testimonial * * *."

*Id*. at 1159, quoting *Davis* at 829, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 153} The court stressed that "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id*. at 1160.

{¶ 154} Another factor involves the informality of the encounter, because "formality suggests the absence of an emergency and therefore an increased likelihood that the

purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution.'" *Id.,* quoting *Davis* at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. In *Bryant*, the police encountered a "fluid and somewhat confused" situation. *Id*. at 1166. Their questioning lacked formality because it "occurred in an exposed, public area, prior to the arrival of emergency medical services, and in a disorganized fashion." *Id*. at 1160.

{¶ 155} The court also stated that "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id*. The court stated, "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator. In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers." *Id*. at 1160–1161. Additionally, the court stated, "Objectively ascertaining the primary purpose of the interrogation by examining the statements and actions of all participants is * * * the approach most consistent with our past holdings." *Id*. at 1162.

{¶ 156} Viewed objectively, the totality of circumstances surrounding Delores's statements to Morrison demonstrate that the "primary purpose" of Morrison's questioning was to obtain information about Yates's murder. We recognize that some of the facts tend to demonstrate that initially Jones appeared to pose a continuing threat to Delores and maybe others. When Morrison arrived at Jeffries's home, he was unsure of what he was going to encounter. He found Delores, who was "hysterical" and afraid and who "kept running back and forth, looking out the windows and pacing, making sure no one was coming." Moreover, this encounter occurred at Jeffries's home, an informal setting, and not the police station.

{¶ 157} On the other hand, Morrison was not dispatched to an active crime scene, unlike in *Bryant* and *Davis*. He went to Jeffries's home because he was told that a person had information about Yates's death. Her body had been found the previous day at a different location. No gun was involved in Yates's killing. Thus, although the police were still trying to identify and apprehend an at-large perpetrator, Morrison's arrival at Jeffries's home and his contact with Delores did not occur in the midst of an ongoing emergency as in *Davis* and *Bryant*. And they were not faced with the same type of ongoing threat as in *Bryant*. Moreover, Morrison's arrival at Jeffries's home greatly reduced any immediate threat to Delores.

{¶ 158} From Delores's perspective, she called police to report that her husband had confessed to killing the woman found in the cemetery. She insisted on speaking with "someone in charge." And although Delores was nervous and afraid, there is no indication that Jones had threatened her in any way.

{¶ 159} For all of these reasons, we conclude that Delores's statements to Morrison were testimonial, and their admission into evidence violated the Confrontation Clause.

*Statements to Jeffries*

39

{¶ 160} Delores's statements to Jeffries do not involve police interrogation. Therefore, in order to resolve the Confrontation Clause question, we look to *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus, which sets forth the applicable test.

{¶ 161} In *Stahl*, we adopted the "objective-witness test" for out-of-court statements made to a person who is not law enforcement. We explained that such a statement is testimonial for Confrontation Clause purposes if the witness would have reasonably believed that her statement would be available for use at a later trial. *Id.* The focus is on "the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *Id.* at paragraph two of the syllabus.

{¶ 162} Delores's statements were made to a friend after Delores arrived at her home. Delores was crying and hysterical when she told Jeffries that her husband had told her that he killed the woman found in the cemetery. An objective witness would not reasonably believe that Delores's statements to her friend while in an emotional state, repeating what her husband had told her, would be available for later use at trial. Indeed, Delores did not call the police until after she told Jeffries what Jones had told her.

{¶ 163} Ohio courts of appeals have reached the same conclusion in similar situations. *See State v. Zadar,* 8th Dist. No. 94698, 2011-Ohio-1060, 2011 WL 826271, ¶ 38 (statements to a friend and a therapist not testimonial under "objective witness" test); *State v. Peeples*, 7th Dist. No. 07 MA 212, 2009-Ohio-1198, 2009 WL 737922, ¶ 31 (statement to a friend not testimonial because objective witness would not reasonably believe that the statement would later be used at trial).

{¶ 164} For all of these reasons, we conclude that Delores's statements to Jeffries were not testimonial, and their admission into evidence did not violate the Confrontation Clause.
. . .

{¶ 176} . . . [W]e conclude that Delores's statements to Jeffries qualified as excited utterances under Evid.R. 803(2) and were therefore properly admitted into evidence. But because Delores's statements to Morrison were testimonial under *Crawford* and were improperly admitted into evidence, we must determine whether the error was reversible or harmless.

*Harmless error beyond a reasonable doubt*

{¶ 177} We hold that the erroneous admission of Morrison's testimony relaying Delores's out-of-court statements was harmless beyond a reasonable doubt in view of the remaining evidence establishing Jones's guilt. "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 178} Properly admitted evidence establishing Jones's guilt beyond a reasonable doubt includes expert testimony that Jones's DNA was found on vaginal swabs obtained from the victim and a stain found on the inside of Yates's skirt. The police also recovered a cross from Jones's home that was similar to the cross found over Yates's eye. Delores's excited utterance to Jeffries provided further evidence linking Jones to Yates's murder.

{¶ 179} Moreover, Jones admitted that he killed Yates when he testified on his own behalf. He claimed that her death was an accident that occurred while they were having "rough" sex. However, Dr. Sterbenz testified that Yates had been strangled for an extended period of time. He found extensive bruising on Yates's neck and face during the autopsy. Dr. Sterbenz also found vaginal injuries that may have been caused by "a fist * * * or very large rigid foreign object." A twig was also found inside the victim's rectum about four to six inches from the anal opening. Finally, T.J. testified that Jones had threatened, choked, and raped her under similar circumstances in 1990.

{¶ 180} Based on the foregoing, we overrule proposition II.

*Jones*, 135 Ohio St. 3d at 29-44 (footnote omitted).

Jones contends the Ohio Supreme Court's decision is both contrary to, and an unreasonable application of, Supreme Court precedent and is based on unreasonable determinations of fact.  (*See* Doc. 60 at 48-53.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  As Ohio's high court thoroughly set forth, the Supreme Court held in *Crawford v. Washington*, 541 U.S. 36, 59 (2004), that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Id.* at 53–54.  The Court declined to give a precise definition of "testimonial," but explained that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Crawford*, 541 U.S. at 68.

In the years following *Crawford*, the Court devised the "primary purpose" test, in which a statement is not barred under the Confrontation Clause unless its primary purpose was testimonial. *See Ohio v. Clark*, 576 U.S. 237, 245 (2015). Under this test, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id*. (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). "'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" *Id*. (quoting *Bryant*, 562 U.S. at 359). In applying the test, the Court has distinguished between statements made to police concerning past criminal conduct that are possibly relevant to a later criminal prosecution, which are testimonial, and statements made to police that are intended to assist them in an "ongoing emergency," which are not. *Davis v. Washington and Hammon v. Indiana*, 547 U.S. 813, 822 (2006).

### 1.  Statements to Detective Morrison

Jones argues that while the state court correctly decided that the trial court's admission of Delores Jones' statements to Detective Morrison violated his right to confrontation, it misapplied Supreme Court precedent and made unreasonable determinations of fact in ruling that the violation constituted harmless error beyond a reasonable doubt in light of the remaining evidence. (Doc. 60 at 48-51.)

In *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court held that, "when a defendant demonstrates on direct appeal that a constitutional error occurred at his trial, his conviction cannot stand unless the government proves the error's harmlessness 'beyond a reasonable doubt.'" *Brown v. Davenport*, 596 U.S. 118, 133 (2022) (quoting *Chapman*, 386 U.S. at 24). In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Court found this standard

"inappropriate" in federal habeas review of final state-court judgments.  *Davenport*, 596 U.S. at 133 (citing *Brecht*, 507 U.S. at 633-34).  Instead, the Court concluded, a state prisoner "should not obtain federal 'habeas relief based on trial error unless' he can show the error had a 'substantial and injurious effect or influence' on the verdict."  *Id*. (quoting *Brecht*, 507 U.S. at 637).  The Court stressed that "undoing a final state-court judgment is an 'extraordinary remedy,' reserved for only 'extreme malfunctions in the state criminal justice system' and different in kind from providing relief on direct appeal."  *Id*. (quoting *Brecht*, 507 U.S. at 633-34).  "To allow a federal habeas court to set aside a conviction based on nothing more than 'speculation that the defendant was prejudiced by trial error[,]'" it explained, "would be to give short shrift to the State's 'sovereign interes[t]' in its final judgment."  *Id*. (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)).

The Court emphasized these principles recently in *Brown v. Davenport*, holding that a claim rejected by the state courts as harmless error must be evaluated in habeas under both the *Brecht* rule and AEDPA's deferential standard of review.  *Id*. at 134.  It explained that the two tests pose different questions: "where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict."  *Id*. at 136 (emphasis in original).

Here, Jones contends that the Ohio Supreme Court's decision that the trial court's error in admitting Ms. Jones' statements to Detective Morrison was "harmless beyond a reasonable doubt in view of the remaining evidence establishing Jones's guilt," *Jones*, 135 Ohio St. 3d at 44 (¶ 177), was "factually unreasonable" and prejudicial (Doc. 60 at 49-50).  The court cited the following remaining evidence of Jones' guilt:

> expert testimony that Jones's DNA was found on vaginal swabs obtained from the victim and a stain found on the inside of Yates's skirt. The police also recovered a

cross from Jones's home that was similar to the cross found over Yates's eye. Delores's excited utterance to Jeffries provided further evidence linking Jones to Yates's murder.

Moreover, Jones admitted that he killed Yates when he testified on his own behalf. He claimed that her death was an accident that occurred while they were having "rough" sex. However, Dr. Sterbenz testified that Yates had been strangled for an extended period of time. He found extensive bruising on Yates's neck and face during the autopsy. Dr. Sterbenz also found vaginal injuries that may have been caused by "a fist * * * or very large rigid foreign object." A twig was also found inside the victim's rectum about four to six inches from the anal opening. Finally, T.J. testified that Jones had threatened, choked, and raped her under similar circumstances in 1990.

*Jones*, 135 Ohio St. 3d at 44 (¶¶ 178-79).

Jones claims that the state court's inclusion of two of these factual findings as evidence of Jones' guilt were unreasonable under § 2254(d)(2):  (1) his admission that he killed Ms. Yates, because that fact was "undisputed," but his intent in killing her and whether he raped her were disputed; and (2) his prior rape, when that offense "involved manual strangulation, not the use of a ligature, so the probative value of the prior offense is minimal."  (Doc. 60 at 49-50.)  But Jones admitted that he killed Ms. Yates – to the police and to the jury in his trial testimony – and there was strong physical evidence of rape.  Further, the probative value of his prior rape, whether minimal or not, is not relevant in determining the reasonableness of a state court's factual finding under § 2254(d)(2).  As explained above, a state court's factual findings are "presumed to be correct," and Jones has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).  Jones has not met that burden here, and the two factual findings of the Ohio Supreme Court that Jones challenges did not violate § 2254(d)(2).[7]

---

[7]  To the extent Jones is arguing that the state court's inclusion of these two pieces of evidence itself is unreasonable, which would fall under the reasonable-application prong of § 2254(d)(1), that argument also fails.  It was clearly reasonable for the state court to include the fact that Jones admitted to killing Ms. Yates and that he had committed rape before in a similar

Jones further claims that Ms. Jones' statements to the detective "created genuine prejudice to [his] accident defense" because he could not cross-examine her as to whether his initial description of Ms. Yates' death was an accident "[d]ue to the trial court's ruling on spousal privilege." (Doc. 60 at 50-51.)  But it was Jones himself who asserted the privilege.  And the point of the court's harmless-error analysis was to evaluate the strength of the evidence of his guilt *excluding* Ms. Jones statements.  The Ohio Supreme Court's conclusion that the admission of Ms. Jones' statements to Detective Morrison was harmless error was neither such an unreasonable application of *Brecht* that "*every* fairminded jurist would agree that [the] error was prejudicial," nor does this court "*itself* harbor[] grave doubt about [Jones'] verdict." *Davenport*, 596 U.S. at 136 (emphasis in original).  This claim, therefore, fails.

## 2.  Statements to Ms. Jeffries

Jones claims that the Ohio Supreme Court's decision that Ms. Jones' statements to Ms. Jeffries were nontestimonial misapplied *Crawford* and was based on unreasonable factual determinations.  (Doc. 60 at 51-53.)  He argues that the primary purpose of her statements to her friend was to report Jones' criminal conduct to the police, and that she "fled to the safe harbor of Ms. Jeffries's house where she could initiate a call to the police, without the risk of Mr. Jones interrupting her call."  (*Id*. at 52.)  Jones, however, has no direct evidence to support this assertion.  He infers Ms. Jones' purpose from her initial statement to Ms. Jeffries that "he did it." (*Id*.)  The state court reasonably concluded that "[a]n objective witness would not reasonably believe that Delores's statements to her friend while in an emotional state, repeating what her husband had told her, would be available for later use at trial.  Indeed, Delores did not call the police until after she told Jeffries what Jones had told her." *Jones*, 135 Ohio St. 3d at 40-41.

_____

manner among the remaining evidence of Jones' guilt as part of a harmless-error analysis under *Brecht*.

The court's decision rejecting this claim, therefore, also did not contravene or misapply *Crawford* and was not based on an unreasonable determination of fact.

## II.    Second, Fifth, Sixth, Tenth, and Eleventh Grounds for Relief:  *Ineffective Assistance of Trial Counsel*

For his second, fifth, sixth, tenth, and eleventh grounds for relief, Jones asserts that he received constitutionally ineffective assistance from his trial counsel.  Combined, he alleges that trial counsel were ineffective in failing to:  (1) present testimony from a forensic expert to rebut the coroner's testimony that he caused Ms. Yates' death during a rape (Grounds Two and Eleven); (2) offer testimony from an expert in alternative sexual practices to support his claim that he accidentally caused Ms. Yates' death during rough consensual sex (Ground Two); (3) use photos, taken by the State, to demonstrate that Jones' hands showed no injuries, lending support to his assertion that he accidentally caused Ms. Yates' death during rough but consensual sex (Ground Two); (4) conduct a more thorough mitigation investigation before the trial began (Ground Five); (5) properly investigate mitigation evidence of sexual abuse and family dysfunction (Grounds Five and Six); and (6) properly investigate mitigation evidence of Jones' mental health and pediatric developmental abilities (Grounds Six and Ten).  (Doc. 44-2 at 56-70; 85-109, 110-22, 152-56, 157-73.)

### A.    Procedural Posture

Jones raised numerous ineffective-assistance claims in state court on post-conviction review.  (Doc. 18-2 at 546-798.)[8]  The trial court denied his petition.  (Doc. 18-2 at 844-64.)  The state appellate court affirmed the trial court's judgment as to the claims relating to the guilt-

---

[8]  The trial court denied Jones' original post-conviction petition as premature due to a defect in the sentencing entry, but the court of appeals reversed that decision and remanded the petition to the trial court for consideration on the merits.  *See Jones*, 2010 WL 3239315.  Meanwhile, Jones had filed an identical second post-conviction petition with the trial court.  (Doc. 18-2 at 546-798.)

phase of his trial, but remanded the case to the trial court for an evidentiary hearing as to his claims relating to the mitigation phase of his trial. *Jones*, 2011 WL 5869752, at *1. It specifically determined that the trial court had "exercised improper discretion when it denied Mr. Jones's penalty phase ineffective assistance of counsel claims without holding a hearing to determine whether his lawyers began their mitigation phase investigation early enough and whether they allowed [psychologist] Dr. Siddall and [mitigation specialist] Mr. Hrdy enough time to do a complete investigation into Mr. Jones's family life." *Id.* at *17 (¶ 66).

On remand, the trial court conducted a six-day evidentiary hearing (*see* Doc. 19-2 at 1021-23), after which it again dismissed Jones' petition (Doc. 18-2 at 417-85). The trial court's judgment was affirmed on appeal. *Jones*, 2019 WL 385467, at *1. And the Ohio Supreme Court declined to accept jurisdiction of Jones' appeal of that judgment. (*Id.* at 1291.)

Respondent concedes that Jones raised the claims asserted in grounds two, five, and six on state post-conviction review, where they were adjudicated and rejected on the merits, and they are therefore preserved for federal habeas review. (*See* Doc. 57 at 70-71.)

Respondent argues, however, that Jones' tenth and eleventh grounds are procedurally defaulted. (*Id.* at 73 n.5, 82 n.6.) Jones, for his part, contends the two claims were not litigated in state court and are unexhausted. (Doc. 60 at 156.) He moved this court to hold these proceedings in abeyance while he returned to state court to exhaust the claims pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005). (Doc. 45.) Respondent opposed the motion on the grounds that the two claims were not unexhausted but were procedurally defaulted, because Jones never raised them in state court and had no state-court remedy left to pursue. (Doc. 47.) This court determined that Jones already had raised the claims – albeit without the expert opinion he now offered – in state court on post-conviction review, where they were adjudicated on the merits.

47

(Doc. 54 at 5-9.)  *See Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) (citing *Picard v. Connor*, 404 U.S. 270, 277 (1971)) (generally, "it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite [the] variations"); *Carter v. Mitchell*, 829 F.3d 455, 466 (6th Cir. 2016)  (rejecting the argument that the *Rhines* stay-and-abey mechanism "permits stays for a petitioner to 'exhaust evidence'— in other words, to return to state court to submit additional evidence to buttress claims already exhausted").  Accordingly, this court concluded, the claims were exhausted and ripe for federal habeas review and Jones was not entitled to a stay.  (Doc. 54 at 12.)

In his return of writ, Respondent "reasserts" the argument he made in opposition to Jones' motion to stay, that Jones' tenth and eleventh grounds for relief are "procedurally defaulted for a lack of fair presentment in so far as it relies on evidence not before the state courts and there is no longer a means available to present the same."  (Doc. 57 at 73 n.5, 82 n.6.) In Jones' sur-reply to the return of writ, he moved for a reconsideration of the court's ruling on the motion to stay (Doc. 60 at 156-58; 170-73), which this court denied (Doc. 66).

For the reasons stated in this court's ruling denying Jones' motion to stay, the court finds that Jones' tenth and eleventh grounds for relief are exhausted and preserved for federal habeas review.[9]

## B.    Merits Analysis

The Supreme Court has long recognized the Sixth Amendment right to effective assistance of counsel at trial as a "bedrock principle in our justice system."  *Martinez v. Ryan*,

---

[9]  This court, therefore, will not consider any materials Jones submitted in support of his tenth and eleventh grounds for relief in its review of those claims.  *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

566 U.S. 1, 12 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963).  The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  An attorney's performance is "deficient" if his or her representation falls "below an objective standard of reasonableness."  *Id*. at 688.  The court must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id*. at 689.  Second, the petitioner must show that he was prejudiced by counsel's errors, demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id*.  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail.  *Id.*  Whether a petitioner has been deprived of the effective assistance of counsel is a mixed question of law and fact to which the unreasonable-application prong of § 2254(d)(1) applies.  *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'"  *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  It has explained that+ "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ."  *Strickland,* 466 U.S. at 689.  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the

exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'"  *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland,* 466 U.S. at 689).

The Court further has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so."  *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted).  It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id*.

### 1.  Failure to retain a forensic expert

Jones first argues that his trial counsel were ineffective for failing to present testimony from a forensic expert to refute the coroner's testimony regarding the victim's cause of death rather than relying on cross-examination of the coroner.  (*See* Doc. 60 at 59-63.)  The last state court to address this claim was the state court of appeals on post-conviction review, which opined:

> {¶ 12} Mr. Jones's first ground for relief was that his trial lawyers should have called an expert witness to establish that the sex he had with Ms. Yates was consensual. He argued that there were alternative explanations for the trauma to Ms. Yates's genitalia and that, if it was not rape, the murder charge would not have been a capital offense

> {¶ 13} To establish ineffective assistance of counsel, Mr. Jones "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008–Ohio–3426, at ¶ 204; *State v. Bradley*, 42 Ohio St.3d 136, paragraph two of the syllabus (1989)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

{¶ 14} The state medical examiner testified that Ms. Yates was sexually assaulted, pointing to bruising of the walls of her vagina and rectum and a small twig that was recovered from fecal matter in her rectum. He opined that the bruising was deeper inside Ms. Yates than a penis could cause and was consistent with something long and inflexible like a tool handle. He also testified that he found a wad of tissues or toilet paper inside Ms. Yates's vagina. The State's theory was that Mr. Jones attempted to clean his semen out of Ms. Jones's vagina and rectum and used a stick to insert and retrieve the paper. While he was able to retrieve the paper from her rectum, leaving the small twig, he was unable to get it out of her vagina.

{¶ 15} In support of his petition, Mr. Jones presented an affidavit by Dr. Werner Spitz, a forensic pathologist, who asserted that it is likely that any bruising to Ms. Yates's perivaginal, perianal, and perirectal soft tissues was actually the result of pulling and tugging associated with the process used to extract pelvic organs from the body during an autopsy. He wrote that, "[i]n the absence of actual organ injury and damage to the overlying skin, including the perineum, it is my opinion that the pelvic hemorrhage described in the autopsy report was the result of art[i]fact." Dr. Spitz also asserted that, because there were no perforations to Ms. Yates's rectum, she was not wearing any underwear, and there was dirt and debris found in her hair and on the back of her clothing, the small twig likely entered her rectum while Mr. Jones was attempting to resuscitate her. Dr. Spitz further opined that the fact that there was a small wad of paper in Ms. Yates's vagina suggests that the sex was consensual. According the [sic] Dr. Spitz, some women use paper as a contraceptive, and this would be consistent with Mr. Jones's testimony that Ms. Yates excused herself to urinate shortly before they engaged in sex. Dr. Spitz opined that Ms. Yates likely told Mr. Jones that she had to go to the bathroom so that she had an excuse to leave to place the paper wad.

{¶ 16} The trial court wrote that, except for the testimony of the people engaged in a sex act, it was unaware of any testimony, expert or otherwise, that can conclusively determine whether sex is consensual. It also noted that Dr. Spitz's affidavit did not account for the trauma that the medical examiner said had been inflicted to Ms. Yates's head. It further noted that Mr. Jones's lawyer had thoroughly cross-examined the medical examiner about his conclusions. It concluded that the lawyers' decision not to obtain an expert was a matter of trial strategy that did not constitute ineffective assistance, similar to *State v. Thompson*, 33 Ohio St.3d 1, 10–11 (1987) (concluding that trial counsel was not ineffective for not obtaining the appointment of a forensic pathologist in rebutting state's witness on issue of rape).

{¶ 17} In his brief, Mr. Jones has argued that his trial lawyers were ineffective because they failed to retain an expert to refute the medical examiner's rape findings. He has argued that, under the American Bar Association's guidelines for the appointment and performance of counsel in death penalty cases, his lawyers had a duty to conduct a thorough examination of his guilt. He has also argued that, because Ms. Yates's rape was the only capital specification in his trial, if he had not been found guilty of rape, he could not have been sentenced to death.

{¶ 18} We conclude that Mr. Jones has failed to demonstrate that the outcome of his trial would have been different if Dr. Spitz had testified. The state medical examiner testified that, at a certain point, the rectum curves and connects to the colon. He said that, if something is inserted into the rectum that is inflexible, it will eventually bump into tissue at that curve, which is where Ms. Yates had contusions. Dr. Spitz failed to explain in his affidavit why, if something was inserted so far into the rectum to cause such a contusion, he would expect "actual organ injury" or "damage to the overlying skin, including the perineum." We also note, as the trial court did, that Dr. Spitz did not attempt to explain how the abrasions and contusions that Ms. Yates suffered to her head are consistent with consensual sex. Furthermore, while Dr. Spitz's paper as contraception explanation makes sense in theory, Mr. Jones testified that Ms. Yates urinated in the road in front of him while he watched. While he said that she wiped herself, he did not say anything about her placing paper in her vagina. Finally, while it may have been possible for a small twig to become slightly embedded in Ms. Yates's rectum if Mr. Jones was moving her around while trying to revive her, Dr. Spitz did not offer an adequate explanation for the fact that the medical examiner discovered the twig four to six inches inside of her rectum. We, therefore, conclude that the trial court exercised proper discretion when it determined that Dr. Spitz's affidavit was insufficient to establish that Mr. Jones's trial lawyers were ineffective for not calling a sexual assault expert.

*Jones*, 2011 WL 5869752, at **3-5.

Jones argues that the state-court decision was contrary to, and an unreasonable application of, *Strickland*. (Doc. 60 at 61-63.) He contends the court used the wrong standard for prejudice when it concluded that Jones "failed to demonstrate that the outcome of his trial would have been different if Dr. Spitz had testified," rather than stating that he failed to show a "reasonable probability that the outcome would have been different." (Doc. 60 at 61-62.) Respondent does not address this argument. (*See* Doc. 57 at 76.)

The Supreme Court defined § 2254(d)(1)'s "contrary to" clause in the important AEDPA case *Williams v. Taylor*, 529 U.S. 362 (2000). It established that a state-court decision is contrary to the Court's precedent if "the state court arrives at a conclusion opposite to that reached by this Court on a question of law[,]" or if it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" its

own. *Id.* at 405.  The state court's decision, it elaborated, must be *substantially different* from the relevant precedent of this Court." *Id*. (emphasis added).  Using the very legal standard at issue here as an example, the Court explained that "[i]f a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different." *Id*. at 406 (quoting Webster's Third New International Dictionary 495 (1976) (for definition of "contrary") and *Strickland*, 466 U.S. at 694 (for standard for prejudice prong of ineffective assistance of counsel)).  And if a state-court decision "correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim[,]" then, "[q]uite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim." *Id*.

Here, the state court correctly identified *Strickland* as the controlling law, and correctly set forth the legal standard for ineffective assistance of counsel established in that case.  *See Jones*, 2011 WL 5869752, at *4 (¶ 14).  And although the state court, in its analysis of this particular claim (though not with other ineffective-assistance claims it addressed in the same decision, *see id.* at *7 (¶ 25)), omitted the "reasonable probability" language, Jones identifies nothing, and this court can find nothing, in the court's decision that indicates it did not properly apply the correct *Strickland* standard for prejudice.

Jones further argues that the state court unreasonably applied *Strickland* in concluding that there was no reasonable probability that the outcome of the trial would have been different had Dr. Spitz testified.  (Doc. 60 at 62-63.)  He essentially repeats the arguments he made to the state court.  He speculates that Dr. Spitz's testimony would have established that the injuries to Ms. Yates' vaginal cavity were caused by her autopsy and not a violent sexual assault.  (*Id*.)  But, as the state court reasonably concluded, it is unlikely that Dr. Spitz could have created sufficient doubt to undermine the jury's confidence in Dr. Sterbenz's opinion on that issue.   Jones, therefore, has not proven prejudice or a "reasonable probability" that the outcome of his case would have been different had his trial counsel consulted a forensic expert.

Accordingly, the state appellate court's decision rejecting this claim was neither contrary to, nor an unreasonable application of, *Strickland*.[10]

## 2.  Failure to retain an expert in alternative sexual practices

Jones next contends that his trial counsel were ineffective for failing to employ an expert in alternative sexual practices to support his defense regarding Ms. Yates' cause of death.  (Doc. 60 at 64-65.)  The post-conviction court of appeals was the last state court to address this claim, stating:

> {¶ 19} Mr. Jones also argued in his petition that his trial lawyers were ineffective during the guilt phase of his trial because they failed to call an expert on erotic

---

[10]  Jones has filed a "conditional" motion for an evidentiary hearing on this claim.  (Doc. 71.)  He acknowledges that the Supreme Court held in *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), that habeas courts may not conduct evidentiary hearings on claims that have been adjudicated on the merits in state court, as this claim has.  (Doc. 71 at 3.)  But he correctly notes that he may be entitled to one should this court determine that the state appellate court's decision rejecting the claim is not entitled to AEDPA deference because it is unreasonable under § 2254(d).  (*See id*. at 4 (citing *Pinholster*, 563 U.S. at 205 (Breyer, J. concurring)).)  As this court has concluded that the state court's decision does not violate § 2254(d), Jones is not entitled to an evidentiary hearing on this claim, and his motion is denied.

asphyxiation. He submitted the affidavit of Jay Wiseman, who claimed to be an expert on alternative sexual practices. According to Mr. Wiseman, he could have bolstered Mr. Jones's testimony regarding Ms. Yates's request to be choked during sex by explaining to the jury what erotic asphyxiation is, its prevalence, and its risks. In particular, Mr. Wiseman asserted that he would have testified that it is impossible to know when erotic asphyxiation is about to go too far and that death can occur within only a few seconds.

{¶ 20} The trial court determined that Mr. Wiseman's affidavit failed to demonstrate ineffective assistance because he did not opine that he had reviewed the autopsy findings and found them consistent with erotic asphyxiation. In his appellate brief, Mr. Jones has repeated the arguments he made in his petition, asserting that his trial lawyers failed to conduct a complete examination into his defense.

{¶ 21} The trial court properly determined that Mr. Wiseman's testimony would not have undermined the medical examiner's conclusions about the circumstances of Ms. Yates's death. While Mr. Wiseman asserted that the [sic] he could have convinced the jury that people actually do engage in erotic asphyxiation, that fact was not contested by the medical examiner. The medical examiner agreed that some people engage in such acts, but testified that Ms. Yates's injuries were inconsistent with anything he had ever seen or seen reported as erotic asphyxia. According to the medical examiner, Ms. Yates's injuries were consistent with a violent act, not a recreational act. He testified that, contrary to Mr. Jones's testimony that he heard a popping sound followed by Ms. Yates's immediate death, the medical evidence showed that her death was the result of the slow increase of blood in her skull. He testified that, because of the compression of Ms. Yates's neck, blood was able to enter her head but not exit. The increased pressure caused small blood vessels in her face to break, causing the petechia that was on her face. After 10 to 20 minutes, the blood in the head would have been depleted of oxygen, causing death by asphyxia. The medical examiner also explained that, although some of the cartilage in Ms. Yates's neck was fractured, it would not have made a popping sound as it fractured. Mr. Wiseman did not point to any medical evidence that was consistent with Mr. Jones's erotic asphyxiation story. We, therefore, conclude that the trial court exercised proper discretion when it determined that Mr. Jones failed to show that his lawyers were ineffective for not calling an expert in erotic asphyxiation.

*Jones*, 2011 WL 5869752, at **5-6.

Jones argues that the state court's decision was based on an unreasonable determination of fact under § 2254(d)(2), because it concluded that Wiseman "did not opine that he had reviewed the autopsy findings and found them consistent with erotic asphyxiation[,]" but

Wiseman was not a medical expert.  (Doc. 60 at 64-65 (quoting *Jones*, 2011 WL 5869752, at *6).  Instead, he argues, Wiseman could have "informed the jury about the occurrence of [autoerotic asphyxiation], and the attendant risks associated with it, to support [his] claim that he had in fact engaged in that arcane practice with Ms. Yates."  (*Id*. at 64.)

As noted above, however, a claim of ineffective assistance of counsel is a mixed question of law and fact to which the unreasonable-application prong of § 2254(d)(1) applies.  *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).  Regardless, the claim fails under either § 2254(d)(1) or (d)(2), as the state court did not mischaracterize Wiseman's proposed testimony; it simply concluded that it would not be effective in undermining the coroner's testimony regarding Ms. Yates' cause of death.

### 3.  Failure to use photographs of victim and of Jones at trial

Jones also complains that his trial counsel should have used photographs of his victim and of himself at trial.  (Doc. 60 at 70-76.)  The last state court to review this claim was the court of appeals on post-conviction review, which decided:

D.  Victim Photograph

{¶ 22} Mr. Jones also argued in his petition that his trial lawyers were ineffective during the guilt phase of his trial because they did not show a photograph of Ms. Yates to Deitra Snodgrass, who testified that Mr. Jones came to her house one evening with a woman matching Ms. Yates's description and that the woman already had a number of bruises. Ms. Snodgrass's testimony was consistent with Mr. Jones's testimony that, on the night of the incident, he came upon Ms. Yates involved in a fight with a man, broke up the fight, and drove Ms. Yates to Ms. Snodgrass's house because he thought Ms. Snodgrass might know someone who could sell her cocaine.

{¶ 23} Although Ms. Snodgrass initially testified that the woman who was with Mr. Jones when he was at her house had a similar build and was wearing clothes that matched the clothes Ms. Yates was found in, on cross-examination she testified that she did not think it was Ms. Yates who was in her apartment that evening. In his petition, Mr. Jones argued that, if his lawyers had shown a picture of Ms. Yates to Ms. Snodgrass, Ms. Snodgrass could have positively identified her as the woman she saw with Mr. Jones. The trial court inferred that Mr. Jones's lawyers' failure to show Ms.

Snodgrass Ms. Yates's picture was a tactical decision, which did not constitute ineffective assistance.

{¶ 24} Mr. Jones submitted an affidavit by Ms. Snodgrass that asserted that, if she had been shown a picture of Ms. Yates, she could have identified Ms. Yates as the person she saw in her apartment with Mr. Jones. In his brief, Mr. Jones has argued that the only reason the prosecution was able to cast doubt on her testimony was because she did not see a picture and, therefore, could not say that she was certain it was Ms. Yates she saw.

{¶ 25} Even if Ms. Snodgrass had been shown Ms. Yates's picture, Mr. Jones has not demonstrated that it is reasonably probable that the outcome of his trial would have been different. The medical examiner testified that Ms. Yates's neck had abrasions that were consistent with fabric being twisted against it and small gouges, which were consistent with Ms. Yates digging at her neck in resistance to the act. This was inconsistent with Mr. Jones's story that he only applied steady pressure in one spot with his hands.

{¶ 26} On cross-examination, the medical examiner conceded that, if there were two strangulation events close in time, he might not be able to determine that from the autopsy. According to Ms. Snodgrass, the woman with Mr. Jones had bumps and bruises to her face. That was consistent with Mr. Jones's testimony about her having been in a fight. She did not say, however, whether the woman had any injuries to her neck. Accordingly, even if she had been unequivocal in her testimony that Ms. Yates was the woman who had been at her house, her testimony would not have supported Mr. Jones's theory that Ms. Yates experienced a strangulation event before having sex with him. The trial court exercised proper discretion when it denied Mr. Jones's petition regarding this ground for relief.

E.   Photographs of Mr. Jones's Hands

{¶ 27} Mr. Jones further argued in his petition that his trial lawyers were ineffective during the guilt phase of his trial because they did not submit photographs showing that his hands were uninjured at the time he was arrested. He argued that, if he had violently strangled Ms. Yates, she would have resisted, inflicting scratch marks or other injuries to his hands. The trial court noted that the inference that Mr. Jones, apparently, would have wanted the jury to draw was that, since there were no injuries to his hands, the sex and choking must have been consensual. The court, however, rejected his argument as speculative.

{¶ 28} The detective who arrested Mr. Jones testified that Mr. Jones's hands were uninjured. Accordingly, photographs of Mr. Jones's hands would have been merely cumulative. In addition, the fact that Mr. Jones's hands were uninjured is not inconsistent with the medical examiner's explanation of Ms. Yates's death. As noted earlier, the medical examiner testified that the abrasions he saw were consistent with someone twisting clothing tight against Ms. Yates's neck. If that was the method Mr.

Jones used to restrict the blood flow from Ms. Yates's head, it is possible that she would have pulled at the fabric instead of his hands as she resisted.

{¶ 29} In his brief, Mr. Jones has acknowledged that there was no dispute over the detective's testimony that his hands were uninjured, but has argued that the court should have held a hearing to determine why his lawyers did not introduce "obvious evidence at their own disposal." We conclude, however, that the trial court exercised proper discretion when it denied Mr. Jones's petition on this ground. To the extent that Mr. Jones's first assignment of error is that the trial court should have held a hearing to determine whether his lawyers were ineffective during the guilt-phase of his trial, it is overruled.

*Jones*, 2011 WL 5869752, at **6-8.

Jones argues that the state appellate court's decision that Jones suffered no prejudice from counsel's failure to use Ms. Yates' photograph was based on an unreasonable factual determination and unreasonably applied *Strickland*, because the court "misstated the factual basis of his defense theory."  (Doc. 60 at 74.)  He points to the state court's conclusion that Ms. Snodgrass' testimony, even if she had been unequivocal in her identification of Ms. Yates during her cross-examination, "would not have supported Jones's theory that Ms. Yates experienced a strangulation event before having sex with him[,]" because she did not say whether the woman she saw with Jones the night of the murder had any neck injuries.  (*Id*. (quoting *Jones*, 2011 WL 5869752, at *7 (¶ 26))).  Jones maintains that the court was wrong because he did not claim the man whom he saw beating Ms. Yates injured her neck; his defense was that he injured Ms. Yates' neck through strangulation, but it was an accident, resulting from a consensual erotic-asphyxiation practice gone awry.

The court's mischaracterization of Jones' defense, however, did not affect its analysis of, or conclusion regarding, this claim.  The state court made clear earlier in its analysis that the medical examiner's testimony established that Ms. Yates' neck injuries were consistent with her attempt to resist the strangulation, which undermined Jones' accidental-death defense.  *Jones*,

2011 WL 5869752, at *7 (¶ 25). Thus, even if Ms. Snodgrass' testimony, with the aid of a photograph, had unequivocally established that some of Ms. Yates' injuries (but not to her neck) were caused by a different person the night of her death, it would not have explained the serious injuries to Ms. Yates' neck, and therefore would not have supported Jones' actual defense either – that her death was caused during consensual rough sex and was an accident. In other words, the court's analysis and result would have been the same regardless of whether Jones' defense included Ms. Yates having prior neck injuries or not, because Ms. Snodgrass' allegedly strengthened testimony would not have supported *either* defense given the strong evidence regarding the nature of her neck injuries. Counsel's failure to use Ms. Yates' photograph to assist Ms. Snodgrass, therefore, did not prejudice Jones, and the state appellate court's decision rejecting this claim did not unreasonably apply *Strickland.*

As to Jones' claim regarding defense counsel's failure to show Detective Morrison a photograph of his uninjured hand, it is unclear on what grounds Jones claims the state court's decision was unreasonable. And this court can find none. The state court reasonably concluded that this evidence was cumulative to the detective's testimony that Jones' hands were not injured when he was arrested and was not inconsistent with the medical examiner's explanation of Ms. Yates' death. This claim, therefore, also lacks merit.

### 4. Failure to conduct a proper mitigation investigation

Jones further contends that his trial counsel were ineffective because they failed to conduct a timely and comprehensive mitigation investigation, including (1) failing to begin the investigation in earnest before the trial began and then failing to spend sufficient time on it; (2) failing to properly investigate mitigation evidence of sexual abuse and family dysfunction; and

(3) failing to properly investigate mitigation evidence of Jones' mental health and pediatric developmental abilities.  (Doc. 44-2 at 110-22, 152-56, 157-73.)

As noted above, Jones raised these claims on post-conviction review.  The trial court initially denied his petition.  (Doc. 18-2 at 844-64.)  But the state appellate court reversed the trial court's judgment as to the claims relating to counsel's performance in investigating mitigation evidence and remanded the case to the trial court for an evidentiary hearing on those claims.  *Jones*, 2011 WL 5869752, at *17 (¶ 66).  The court found it "troubling" that defense expert psychologist Dr. James Siddall spent less than eight hours conducting interviews and tests before Jones' trial began, and even "more troubling" that Thomas Hrdy, the defense's mitigation specialist, did not begin any work on the case until a week into trial and spent only ten hours interviewing Jones' family members.  *Id*. at *12 (¶ 47), *14 (¶ 51).  In particular, the court observed,

> While Mr. Hrdy uncovered most of the potentially mitigating circumstances of Mr. Jones's childhood, he did not learn about the sexual abuse that Mr. Jones allegedly suffered or the other incestuous conduct that allegedly occurred in his home. In light of the fact that it was Mr. Jones's rape of Ms. Yates that resulted in the capital specification, details about deviant sexual conduct that Mr. Jones endured or was exposed to as a youth would have been more relevant to his defense than his parent's divorce or his abnormal eye.

*Id*. at *13 (¶ 49).  This situation, the state appellate court reasoned, could be "attributed to Mr. Jones's lawyers' failure to have him begin working on the case earlier and their failure to request a continuance before the sentencing phase of the trial."  *Id*. at *14 (¶ 51).  And it remanded the case to the trial court to hold a hearing to determine "whether his lawyers began their mitigation phase investigation early enough and whether they allowed Dr. Siddall and Mr. Hrdy enough time to do a complete investigation into Mr. Jones's family life."  *Id.* at *17 (¶ 66).

On remand, the trial court conducted a six-day hearing, at which the defense called twelve witnesses, five of whom were experts, and introduced twenty-two exhibits, (*see* Doc. 19-2 (Trial Tr.) at 1021-23), and the State presented all four members of the defense mitigation team:  Jones' two attorneys, Mr. Hrdy, and Dr. Sidall (*see id*. at 1022).  The transcript of the hearing comprises more than 1,100 pages.  (*Id*. at 1020-2167.)  The trial court then issued a comprehensive 68-page opinion.  (Doc. 18-3 at 417-85.)  The state appellate court, likewise, wrote a long and carefully considered opinion, setting forth in detail the trial court's findings and concluding that the lower court applied the proper legal standards and that its factual findings, apart from one, were supported by competent, credible evidence.  *Jones*, 2019 WL 385467, at *3-18.  It reasoned:

  A.  <u>Timing of the Mitigation Investigation</u>

{¶11} Jones first argues that the trial court erred when it concluded that his trial counsel were effective since his counsel had done limited mitigation investigation prior to the start of the trial and thus, could not have formed an appropriate trial or mitigation theory. We disagree for the following reasons.

{¶12} With regard to the timing of the mitigation investigation, the trial court made the following factual findings: the trial court authorized payment for defense counsel to retain Mr. Hrdy as an investigator two days after the start of jury selection; Jones's trial counsel did not ask the jurors questions pertaining to their theories of mitigation during jury selection; at the time jury selection began, Jones's trial counsel had information about Jones's background, education, family history, and mental health through competency evaluations, interviews and records; Jones's trial counsel "had the benefit of having already received the information and points of view of two psychologists" prior to jury selection; Jones's trial counsel had Jones's statement to the arresting detective that the victim's death was an accident; during the trial phase, Jones's counsel presented a defense consistent with their client's statement to the arresting detective that the victim's death was an accident and had the defense been successful, the jury would never have considered the death penalty; defense counsel did not receive Dr. Siddall's written report until two days before the start of the mitigation phase; Jones's own mitigation expert testified that some cases are "mitigation cases right up front" and trial counsel needs the mitigation information during jury selection, but that expert did not see Jones's case as such.

61

{¶13} A review of the record on appeal shows that with the exception of the trial court's finding that Jones's trial counsel "had the benefit of having already received the information and points of view of two psychologists," the above findings were supported by competent credible evidence. However, as we discuss below, the trial court's unsupported finding that Jones's counsel had information and points of view of two psychologists was not determinative in this case.

. . .

### 3.  <u>Jury Selection</u>

{¶17} Jones next argues that the trial court erred when it concluded that trial counsel's failure to ask about various mitigating factors during jury selection did not constitute ineffective assistance of counsel since counsel could not have made reasonable or strategic decisions because the mitigation investigation had barely begun.

{¶18} Regarding the information Jones's defense counsel had at the beginning of jury selection, the trial court stated that "[t]he evidence is clear that at the time voir dire began, defense counsel had information about [Jones]'s background, education, family history and mental health through competency evaluations, interviews and records. But they also had Petitioner's statement to the arresting detective that [S.Y.]'s death 'was an accident.'" The trial court further found that Jones's trial counsel "had the benefit of having already received the information and points of view of two psychologists" prior to jury selection. Although Jones takes exception to the trial court's finding that his trial counsel had the benefit of information and opinions from two psychologists prior to jury selection, even assuming without deciding that the record does not support that finding, such a conclusion would not be determinative in this case.

{¶19} The Supreme Court of Ohio has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157 (1998). "'Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.'" *Id*. at ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (C.A.6, 2001). "In some cases, asking few or no questions of a prospective juror 'may be the best tactic for a number of reasons.'" *Id*. at ¶ 65. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." (Emphasis added.) *Strickland*, 466 U.S. at 691. The United States Supreme Court has stated the following:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are

reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland* at 691, citing *United States v. Decoster*, 624 F.2d 196, 209-210 (D.C. Cir. 1976).

{¶20} The trial court found that Jones's defense counsel had information about Jones's background, education, family history and mental health through competency evaluations interviews and records. Jones's counsel testified at the post-conviction hearing that they had incorporated information regarding Jones's family history, background, and mental health issues into the defense at both the trial and the mitigation phase. However, the trial court emphasized that during the trial phase, defense counsel presented a defense that was consistent with Jones's statement that S.Y.'s death was an accident. A review of the trial record shows that finding is supported by competent credible evidence. *See also State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677. At trial, Jones testified on his own behalf and stated that he and S.Y. had rough, but consensual sexual intercourse. He further stated that putting his hands around S.Y.'s throat was not his idea and "I guess it got too – went too far, applied too much pressure, and * * * it was an accident." Additionally, defense counsel reiterated the defense's theory of the case that S.Y.'s death was an accident during closing argument.

{¶21} The trial court went on to state in its journal entry that based on the defense's strategy and intention to show that S.Y.'s death was an accident, the court failed to see how the introduction of information about Jones's mental history and dysfunctional family background would assist in showing S.Y.'s death was an accident. The trial court stated this was especially true in light of the potential for "other acts" evidence the jury would hear as a result. Thus, the trial court determined that an attempt by trial counsel to limit questions focusing on the death penalty may have been a tactical decision. We note that during the post-conviction relief hearing, neither of Jones's defense counsel testified regarding the defense's strategy during jury selection nor were they asked any questions regarding that strategy on direct or cross-examination. As the trial court applied the proper legal standard and its findings are support [sic] by competent, credible evidence, we cannot conclude that the trial court abused its discretion when it determined that asking potential jurors their views on mitigation was not essential to competent representation in this case.

{¶22} As Jones has failed to show that his trial counsel rendered deficient performance during jury selection we need not address whether Jones was prejudiced. *See Ray*, 2005-Ohio-4941 at ¶ 10.

**B. The Mitigation Investigation**

{¶23} Jones contends that the amount of time spent on the mitigation investigation was inadequate. First, Jones argues that because Mr. Hrdy spent fewer than 10 hours interviewing Jones's family, Mr. Hrdy did not discover Jones's family's "history of severe and pervasive dysfunction." Specifically, Jones maintains that if Mr. Hrdy and his trial counsel would have conducted an adequate investigation they would have learned of rampant sexual abuse and additional physical and emotional abuse within the family. Second, Jones contends that Dr. Siddall had neither the time nor the information necessary to do a complete a psychological evaluation and make a diagnosis for the purposes of the mitigation hearing. Thus, the extent of Jones's mental illness was not discovered.

**1.  The Mitigation Investigation**

{¶24} The trial court concluded that Mr. Hrdy's late start was not detrimental to Jones's mitigation investigation due to the nature and quality of the mitigation facts that the defense team was able to obtain, especially in light of the lengthy time that pre-existed the death penalty specification, during which there was the production of psychological reports, the development of a rapport between Jones and his attorneys, and significant communication and information gathering with the Jones family.

{¶25} Ample information regarding the dysfunction of the Jones family was presented during the mitigation phase of Jones's trial. *See Jones I*, 135 Ohio St.3d 10, 2012-Ohio-5677 at ¶ 226-227, 249-250 ("Dr. Siddall testified that Jones grew up in a troubled family where there was domestic violence * * * that Jones's family has a history of psychiatric, substance-abuse, and criminal-justice problems * * * Jones's father committed domestic abuse and suffered from a learning disability. * * * In an unsworn statement, Jones stated that he had an abusive childhood. He witnessed domestic violence on numerous occasions, and his family abused alcohol and drugs. Jones also watched his siblings fight. His oldest brother stole cars and gave Jones marijuana when he was seven years old. Jones's parents divorced when he was eight. His mother left home, and Jones was then raised by his aunt, his grandmother, and his father. * * * After witnessing the abuse in his family, Jones started 'acting out' as a teenager.") However, on appeal, Jones argues that the trial court erred when it determined that his trial counsel was not ineffective for failing to discover further neglect as well as physical, emotional, and sexual abuse.

**a.  Witnesses for the Defense**

{¶26} At the evidentiary hearing on Jones's petition for post-conviction relief, Jones called twelve witnesses, five of whom testified as experts. Jones himself did not testify. Of the seven lay witnesses' who testified regarding Jones's history and background, the trial court found that "much of the lay-witnesses' testimony, at least that which can be corroborated and is credible, was cumulative to that which was already presented during

mitigation." In support of these conclusions, the trial court made the following observations regarding the lay-witnesses' and experts' testimony.

{¶27} Pastor Fuller, whose testimony the trial court found credible, stated that he was Jones's first cousin once removed and that he was the Jones family's pastor. As such, Jones called on him for pastoral care when Jones experienced trauma in his life. Although he did not testify at Jones's mitigation hearing, Pastor Fuller stated that a member of the defense team had questioned him about his pastoral relationship with Jones and that there "may have been other questions, but [he] did not recall." He further stated that he had been a part of a group of persons who had met with defense counsel when defense counsel defined mitigation and asked if the group had any questions about mitigation. Pastor Fuller believed he should have testified at the mitigation hearing, since he had more knowledge of the Jones's family history and dysfunction than the pastor who ultimately testified at Jones's mitigation hearing. Nonetheless, Pastor Fuller was not aware of mental illness or specific drug abuse within the family, except that he had "seen family members looking high." However, he did state that he became aware of "possible" sexual abuse in the family through Jones's sister, but that the discussion had occurred in his capacity as a pastor and privilege would have prevented him from revealing even the possibility of abuse to the mitigation team. Accordingly, the trial court determined that Pastor Fuller's testimony was merely cumulative of the testimony received at Jones's mitigation hearing.

{¶28} Pastor Hargrave testified at Jones's mitigation hearing and at the hearing on Jones's petition for post-conviction relief. The trial court found that he repeated much of the same testimony he had given during Jones's mitigation hearing. With regard to mitigation preparation, he testified that he had "at least two conversations by phone, perhaps a third. There was a large gathering, the family was there, I was there as well and I was called back into a room individually with them * * * I talked about my role and the work that I do and my observations and I said I would like to help in any way that I could." Pastor Hargrave also testified about "significant disruption with boundaries, family boundaries, physical personal boundaries, for example bedroom space, what is borne outside the bedroom, and all of those things * * *." It was from this "boundaries" discussion with Jones's mother that Pastor Hargrave became aware of possible sexual abuse. However, he admitted that this conversation was not such that it caused him to feel compelled to make a police report under Ohio's mandatory reporting statute and that he would have been bound by privilege and not able to disclose the information to the mitigation team. The trial court found Pastor Hargrave to be credible, but noted that many of the opinions he presented regarding the dysfunction of the Jones family went beyond his role as a pastor and bordered on offering opinions and on issues beyond those for which he was qualified to testify.

{¶29} Rhonda Jones, one of Jones's sisters testified at the post-conviction relief hearing, but not during the mitigation phase. The trial court did not find Ms. Jones to be a credible witness. The trial court found that during her testimony, Ms. Jones was unfamiliar with the affidavit she executed as part of the evidence reviewed by this Court in Jones II and that during her testimony she denied making several of the statements

contained within it. Ms. Jones did testify as to the dysfunction in the Jones family, such as having to steal food to survive, being physically and mentally abused by her parents, and of her parents' drug and alcohol abuse. However, Ms. Jones stated she was not familiar with any mental health issues in the Jones family. Ms. Jones stated that she was at her parents' house when Mr. Hrdy came for a meeting with the family, but that "he was more sitting there watching the game than talking."

{¶30} Concerning alleged sexual abuse in the Jones family, the trial court found that Ms. Jones testified that her father had tried to molest her and that there were persons dressed in skeleton costumes who fondled the Jones girls at night. In her affidavit attached to Jones's petition for post-conviction relief, Ms. Jones stated "[m]y father tried to molest me. Once when he tried to get into my bedroom, I blocked the door. My father broke in. I was 17 years old, and my boyfriend was there. My boyfriend beat up my father." Although Ms. Jones stated in her affidavit that she was 17 years old at the time of the alleged incident, she testified during the mitigation hearing that she was 16 years old, going on 17 and then subsequently testified that she was 17 years old at the time of the alleged incident. At the post-conviction hearing, the trial court found that Ms. Jones gave a vivid account of her naked, enraged father pounding on her barricaded bedroom door and trying to burst through. She escaped out the back and was kicked out of the house shortly thereafter. Although Ms. Jones characterized the incident as an attempt by her father to molest her, the trial court determined that there was no credible evidence that this event was an attempted molestation. Rather, the trial court concluded that the facts were far more consistent with a father who was enraged that his 16-year-old daughter had her boyfriend behind her locked bedroom door.

{¶31} Jones's niece, Sh'torie Harpster, did not testify during the mitigation phase, but did testify at the post-conviction relief hearing. The trial court found that she had testified that Jones was a father figure to her and that she further testified about the dysfunction in the Jones family, including mental illness and that Jones's brother had sexually abused her. Additionally, she stated that she was at the group meeting at her grandmother's house and had spoken to someone from the trial team, but thought her individual conversation with Mr. Hrdy could not have been longer than five minutes. She stated that no one from the defense team spoke to her about sexual abuse. The trial court found Ms. Harpster's testimony to be merely cumulative of the testimony presented during Jones's mitigation hearing.

{¶32} Shain Harmel, Jones's nephew, did not testify at the mitigation hearing. The trial court found that Mr. Harmel testified during the post-conviction relief hearing that although he is not Jones's biological son, he had grown up thinking Jones was his father because Jones had treated him as such. The trial court found Mr. Harmel's testimony to be merely cumulative of the testimony presented during Jones's mitigation hearing.

{¶33} Yolanda Jones is Jones's sister. She testified at the mitigation hearing and during the post-conviction relief hearing. The trial court observed three significant points in her testimony: first, Ms. Jones testified about the abuse and dysfunction in the Jones family; second, she discussed rampant sexual abuse that she did not disclose during her

mitigation testimony; and third, she testified that she had not been properly prepared for her testimony during the mitigation hearing. The trial court, however, found Ms. Jones's testimony to be "wholly unbelievable" based on her rehearsed demeanor and that her testimony was contradicted by evidence in the record.

{¶34} The trial court found that Ms. Jones's testimony concerning the dysfunction of the Jones family was the same or similar to her mitigation phase testimony. However, Ms. Jones presented some additional examples about the abuse in the family. Specifically, she added some details of her own abuse of Jones when he was a child and offered testimony which painted their mother in a poor light. The trial court found the testimony regarding alleged physical and mental abuse suffered by the Jones children at the hands of their mother contradicted the testimony Ms. Jones gave during the mitigation hearing. Although Ms. Jones claimed she was not given an opportunity to give the same detailed information during her mitigation hearing testimony, the trial court found that during the mitigation hearing, Jones's defense counsel often guided Ms. Jones to specific subjects or instances that were helpful to mitigation and even asked her to give examples. Additionally, the trial court found that when the prosecutor asked Ms. Jones questions on cross-examination, that she asked many open-ended questions and did not cut Ms. Jones's testimony off at any point. The trial court also found that Jones's defense counsel asked questions during rebuttal that gave Ms. Jones the opportunity to clarify some of her responses during cross-examination.

{¶35} With regard to mitigation preparation, Ms. Jones stated she was never properly prepared for her testimony and that there were questions that were not asked during mitigation preparation or during the mitigation hearing. Nevertheless, Ms. Jones was not able to give any specifics of her mitigation preparation or lack thereof. Ms. Jones did admit that Mr. Hrdy had asked her about sexual abuse and that she understood at the time of Jones's mitigation hearing "that it was important to show that he came from an abusive, neglect (sic) family, where he was mistreated all his life." However, the trial court did not find her testimony about why she did not relate any of the abuse to the defense team to be credible.

{¶36} Christy Coffee testified that she was romantically involved with Mr. Jones. She testified at both the mitigation hearing and the hearing on post-conviction relief. The trial court found that her testimony at the post-conviction relief hearing was similar to the testimony she gave during the mitigation phase. However, Ms. Coffee gave additional testimony revealing that Jones's brother had raped her and that he, not Jones, was the father of her son.

{¶37} Ms. Coffee further stated that the only time she spoke with defense counsel prior to the mitigation hearing was with the Jones family at defense counsel's office. She stated that the attorneys asked about her relationship with Jones, but did not ask if she had children by his brothers or if a paternity test had been done. She acknowledged that Mr. Hrdy had asked her open-ended questions about sexual abuse, but that she felt it was too quick. She further stated that she knew the attorneys had asked the Jones family

about sexual abuse at the meeting "[b]ecause when the family came out that is what they were talking about, they talked about."

{¶38} Dr. Howard Fradkin is a psychologist with an expertise in the area of adult survivors of child sex abuse. He did not testify at the mitigation hearing. The trial court found that at the time of his post-conviction relief testimony, Dr. Fradkin had devoted thirty-four years of his practice to the area of adult survivors of child sexual abuse. He is also an advocate of the interviewing style called the Forensic Experiential Trauma Interview (FETI) which he believes is the most appropriate when interviewing trauma survivors. This form of interviewing did not come into existence until 2013. Dr. Fradkin opined that Jones is the survivor of male child sex abuse and that from the time of Jones's alleged suicide attempt at age six and for thirty years subsequent to that, medical professionals missed the diagnosis of sexual abuse. Dr. Fradkin further testified concerning prolific sexual abuse committed against Jones by Jones's brothers, Jones's sister's boyfriend, and Jones's stepmother. He attributed the defense team's failure to discover this horrific abuse to deficient mitigation investigation and methods. However, Dr. Fradkin also testified that the disclosure of sexual abuse "varies from person to person. It could take months. It could take years" and that "[m]ost men go to their graves without ever talking about [sexual abuse]."

{¶39} While admiring Dr. Fradkin's devotion to helping survivors of child sexual abuse, the trial court gave no weight to his testimony for a number of reasons. First, the trial court found it questionable that Dr. Fradkin's FETI interview method would survive a Daubert challenge, but even assuming it did, the trial court found that Dr. Fradkin's opinions were based almost entirely upon the hearsay affidavits of family members whom Dr. Fradkin had never met or personally interviewed as well the self-serving statements of Jones, which were made in a setting in which Dr. Fradkin was not treating or diagnosing Jones. Second, the trial court found that Dr. Fradkin's report was "fraught with mischaracterizations of the evidence." These mischaracterizations were partly attributable to the fact that Jones's current counsel did not provide him with all of Jones's records and partly to the fact that he simply ignored the evidence he did have. Third, the trial court noted that although Dr. Fradkin referenced Jones's prison disclosure of sexual abuse by his father, Dr. Fradkin failed to reconcile Jones's non-disclosure of that abuse during his own FETI interview with Jones when Jones was sharing memories of abuse by at least five other people. Finally, the trial court found that Dr. Fradkin had conceded that he could not have testified to sexual abuse at a time when Jones and his family were denying its occurrence.

{¶40} Dr. Bob Stinson is an expert in forensic psychology. He testified at the postconviction relief hearing, but not during the mitigation hearing. The trial court found that Dr. Stinson testified about the dysfunction and abuse with the Jones family. He personally interviewed Jones, but did not conduct any tests. In addition to the interview, Dr. Stinson relied upon the affidavits of family members and Dr. Fradkin's report. Dr. Stinson opined during his post-conviction relief testimony, that a review of Jones's medical records and school records indicate dysfunction that is consistent with a person who is sexually abused. The trial court found that Dr. Stinson remained firm in his

opinion that the mitigation investigation should have uncovered the alleged sexual abuse at the time of the mitigation hearing. However, when offering his opinion about why the abuse was now being disclosed, he stated it may be "because the main perpetrator and person who said 'we do not talk about these things' ( [Jones's mother] ) eventually died." The trial court noted that Jones's mother was alive at the time of the mitigation hearing.

{¶41} Dorian Hall testified at the post-conviction hearing as an expert in the area of mitigation investigation. The trial court found that she has been employed by the Ohio Public Defender's Office since 1988 as a mitigation specialist and at the time of the post-conviction relief hearing supervised that office's mitigation specialists. Ms. Hall opined that an investigator must begin at least 90 days before jury selection in order to conduct a proper investigation and was critical of Mr. Hrdy's acceptance of the engagement to do work on Jones's case after jury selection had already begun. She was also critical of the amount of time Mr. Hrdy spent on the mitigation investigation, Mr. Hrdy's method of group interviewing, and of Mr. Hrdy's note keeping and record keeping. Ms. Hall further criticized the portrayal of Jones's father as a good role model during the mitigation phase and blamed the deficient detailed mitigation for allowing that portrayal.

{¶42} The trial court found Ms. Hall to be a professional and credible witness, but acknowledged that Ms. Hall's many years of employment with the Ohio Public Defender's Office gave the trial court cause to question her objectivity regarding her criticisms of Mr. Hrdy. Additionally, Ms. Hall was not able to comment on what Mr. Hrdy specifically did or did not do with regard to his mitigation investigation nor was she able to give any support for her opinion that a mitigation investigation should begin 90 days prior to jury selection. Although the trial court acknowledged that 90 days would be optimal, Ms. Hall also testified that "[g]enerally you need to spend as much time as you need to get all the information." The trial court found that although Ms. Hall criticized the lack of detailed, anecdotal information presented during the mitigation phase, that the additional anecdotal information Ms. Hall ultimately presented was obtained solely from affidavits of Jones's family members. Thus, since she had not personally spoken to the family members, she had not been given the opportunity to assess their credibility. The trial court noted, however, that it "had the opportunity to do so with several of the witnesses who executed the affidavits upon which Ms. Hall relied and [ ] found their credibility questionable."

### b. **Witnesses for the State**

{¶43} In addition to Jones's witnesses, all four members of the defense mitigation team testified at the hearing for post-conviction relief. The trial court made the following observations about their testimony.

{¶44} Mr. Hrdy is a licensed social worker and part-time mitigation specialist. The trial court found that at the time of his testimony, Mr. Hrdy had finished his casework for his doctorate, was a member of the National Legal Defenders Association as a mitigation specialist, and has worked as a mitigation specialist since 1994. Mr. Hrdy admitted that

he was engaged to work on Jones's case "late in the game." Excluding travel time, Mr. Hrdy spent approximately three hours with Jones and approximately ten additional hours with others, including family members and ministers. Mr. Hrdy spent additional time retrieving and reviewing records, meeting with Dr. Siddall and Jones's attorneys, and other casework. Mr. Hrdy stated he had no difficulty gathering information from Jones and found him to be cooperative. Mr. Hrdy also found the Jones family to be cooperative and forthcoming. Mr. Hrdy testified that he explained mitigation to the family and the fact that Jones was facing the death penalty. He felt that the family was able to provide him with information that was helpful to Jones's case. He further testified that he would not have specifically asked the family a leading question about sexual abuse, but if anyone had indicated such, he would have noted it and provided that information to Dr. Siddall and Jones's attorneys.

{¶45} Mr. Hrdy testified that he met with many family members for four and a half hours at Jones's mother's home. He stated that he asked how the family preferred to be interviewed and that they preferred to be interviewed as a group. Mr. Hrdy acknowledged that a Cleveland Browns football game remained on the television during the interview, but with the volume turned down. Mr. Hrdy explained that he found advantages to the group interview because "a dynamic forms where someone will say something that will trigger a memory from someone else and you get a fuller interview." However, he did acknowledge that there could be some disadvantages such as someone not wanting to disclose personal information in a group setting or a stronger personality taking over, but that he always leaves his business card and asks the interviewees to call him if they remember anything else.

{¶46} Mr. Hrdy further testified that he had "enough and appropriate time to gather the records, interview the witnesses, assist the defense attorneys and Dr. Siddall in preparation of mitigation in this case." The trial court found this testimony very compelling since Mr. Hrdy had attested in an unrelated case about his mitigation investigation being substandard due to a lack of time to do an appropriate job. *See Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, ¶ 36-38. Mr. Hrdy's testimony combined with the amount and type of mitigating evidence produced during Jones's trial, together with the trial court's credibility evaluations of other witnesses, caused the trial court to accept Mr. Hrdy's statement that he had "enough and appropriate time to gather the records, interview the witnesses, assist the defense attorneys and Dr. Siddall in preparation of mitigation in this case" as true.

{¶47} Dr. Siddall is in an expert in forensic psychology and had testified as an expert in "maybe a dozen" capital mitigation hearings prior to Jones's case. The trial court found that he is licensed in both clinical and forensic psychology and also practices in the area of drug addiction. He has been licensed since 1975, is published and has received awards. At the time of his testimony, Dr. Siddall had taught graduate level courses, including courses on diagnosis. Although he is currently in private practice, Dr. Siddall has had significant experience with persons in a criminal legal setting through his work at a diagnostic clinic.

{¶48} Dr. Siddall stated that as a rule he would get records and complete his report before the start of trial, but in this case he completed his report after Jones's trial, but before the mitigation phase. Dr. Siddall visited Jones in the Summit County Jail on two occasions, spending about three and a half hours at each visit. The visits were divided equally between interviewing and testing Jones. In addition to documentary sources, Dr. Siddall relied on information from Jones and detailed family information he received from Mr. Hrdy. Dr. Siddall testified that he had enough time to complete the tasks he was assigned to do, but that he had also been aware that if he needed additional time, he would be able to ask for and receive more time. Dr. Siddall also testified that he asked Jones if he was sexually abused or if there was sexual abuse in the family. Jones denied both and Dr. Siddall testified that sex abuse would be evident in the records.

{¶49} Attorney Donald Hicks represented Jones during his trial. The trial court found that at the time of his testimony, Attorney Hicks had been practicing law for over thirty years, doing "a considerable amount of criminal defense work." When the grand jury initially indicted Jones with aggravated murder and rape, no death penalty specification was attached. Although Attorney Hicks was not certified to handle capital cases when he was appointed to Jones's case, he was certified by the time the death penalty specification was attached to Jones's indictment. From the time of the original indictment to the time of Jones's trial, Attorney Hicks testified he had met with Jones fifty or sixty times and met with him at least a couple of times a week. He stated that some of the meetings were "face-time," as he had promised to meet with Jones any time he was at the jail. However, at other such meetings, he discussed the death penalty and mitigation with Jones. He further stated that such discussions occurred even before the death penalty specification was added because there had been ongoing discussions with the prosecutors about the possibility of the addition of the death penalty specification. The trial court further found that Attorney Hicks felt he had built a rapport and trust with Jones and during his discussions with Jones, he had gathered information that would be useful in the mitigation phase and incorporated that information into Jones's defense during both trial and the mitigation phase. Attorney Hicks testified that Jones never indicated that he had been sexually abused.

{¶50} Attorney Hicks recalled the primary family contact person was Jones's sister, Yolanda. He also recalled speaking to Yolanda "a couple of dozen times" on the phone and "eight or ten times, maybe a dozen" in person. Meetings occurred after court hearings and in his office. Attorney Hicks stated that the mitigation team "had a lot of contact with the family." However, there were never any indications from Yolanda, the Jones family, or any other contacts whose names were provided to the defense team that Jones had been subjected to sexual abuse. Although Attorney Hicks acknowledged the defense team got a late start hiring experts due to the timing of the death penalty specification, he felt he had enough time to prepare for the mitigation hearing. He stated he would have requested a continuance of the trial if he had felt they had not had enough time to prepare for mitigation and was confident the request would have been granted as the trial court's predecessor judge had a reputation for being "exceedingly accommodating."

{¶51} Attorney Kerry O'Brien also represented Jones during his trial. The trial court found that at the time of his testimony, Attorney O'Brien had practiced law for over thirty-eight years and had been certified to handle capital cases since the mid-1980s and had defended over 30 death penalty cases. Attorney O'Brien testified that he met with Jones on average once a week and they had no communication or trust issues. He recalled speaking with Jones's mother mostly by telephone and recalled meeting with family members two or three times on Saturday or Sunday mornings at his office. The meetings included updates on the case and conferences. Attorney O'Brien testified that he explained the purpose of mitigation to the family and the goal of what they were trying to accomplish. He stated that he asks about "the complete family history from day one" and that he usually asked

> did the client have a rough upbringing, or what were the financial circumstances of the family, was there any physical abuse, did the defendant suffer any head injuries like fall off of a tree or hit by a car or hit by a baseball bat or something like that. And then I go into emotional or mental retardation. I then ask if the client had any mental evaluation. I also ask about sex abuse, whether an uncle or an aunt or something like that had molested him.

Attorney O'Brien stated that he would have absolutely used sexual abuse during mitigation if it had been mentioned. However, Jones denied any sexual abuse when Attorney O'Brien asked him about it.

### [c]. Conclusion - Counsels [sic] Performance

{¶52} Despite the extensive amount of mitigating evidence presented during Jones's mitigation hearing, *See Jones I*, 135 Ohio St.3d 110, 2012-Ohio-5677, at ¶ 224-256, Jones contends his defense counsel were ineffective for not finding merit. However, the trial court determined that much of the credible lay witness testimony at the post-conviction relief hearing was cumulative to that which was presented during the mitigation hearing. Further, the trial court determined that "because of the nature and quality of the mitigation facts Mr. Hrdy was able to obtain, as well as the lengthy time that pre-existed the death penalty specification, during which there were psychological reports, the development of a rapport with [Jones] and his attorneys (especially Mr. Hicks), communication with the family and information gathering, the late start was not detrimental to [Jones's] mitigation investigation." As shown above, these findings were supported by competent, credible evidence.

{¶53} With specific reference to the allegations of sexual abuse in the Jones family, the trial court acknowledged that the purpose of the post-conviction relief hearing was not to determine the merits of Jones's sexual abuse or incest claims, but to determine if the defense team should have reasonably discovered the abuse. However, in so doing, the trial court necessarily had to evaluate the testimony and credibility of the witnesses. The trial court found that the credible testimony in this case showed that all four members of the mitigation team asked about sexual abuse and that they were all met with denials. Based on the trial court's observations of the testimony and evidence presented at the

post-conviction relief hearing, we conclude that this determination was supported by competent credible evidence.

{¶54} "The Sixth Amendment entitles criminal defendants to the ' "effective assistance of counsel" '–that is, representation that does not fall 'below an objective standard of reasonableness' in light of 'prevailing professional norms." ' " *Bobby v. Van Hook*, 588 U.S. 4 (2009), quoting *Strickland*, 466 U.S. at 686, quoting *McMann v. Richardson,* 397 U.S. 759, 771 (1970). Counsel's failure to reasonably investigate a defendant's background and present mitigating evidence to the jury can constitute ineffective assistance of counsel. *Wiggins*, 539 U.S. at 521-522. However, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland* at 691, citing *Decoster*, 624 F.2d at 209-210 (D.C.Cir.1976).

{¶55} In applying the above standard, the trial court determined that in light of the variety of circumstances Jones's trial counsel faced, their investigation was reasonable and thus, counsel was not ineffective for failing to discover additional alleged abuse. First, the trial court found that the mitigation team's failure to utilize the FETI method of questioning was not unreasonable as FETI did not come into existence until 2013. Second, Dr. Fradkin testified that "most men go to their graves without ever talking about [sexual abuse]" and the disclosure of sexual abuse "varies from person to person. It could take months. It could take years." Consequently, the trial court determined that even assuming there was any truth to the allegations of sexual abuse and incest within the Jones family,

> in light of the 30 years of failure of trained medical, psychiatric, psychological and education professionals to uncover the abuse, to require his attorneys to discover such information in the limited time provided by the time constraints of a criminal trial in which the defendant is incarcerated is unreasonable and beyond any requirements of the ABA Guidelines.

Third, Dr. Stinson testified that the abuse may have been disclosed now "because main perpetrators and the main individuals who said we do not talk about this eventually died." The trial court further determined that if that was the case, Jones's defense counsel would have had no chance of obtaining any type of disclosure since Jones's mother was still alive at the time of the mitigation investigation.

{¶56} As the trial court applied the appropriate legal standard and the trial court's findings were based upon competent credible evidence, we cannot conclude that the trial court abused its discretion when it determined that Jones's trial counsel did not render deficient performance when they failed to discover alleged sexual abuse and additional alleged physical and emotional abuse perpetrated against Jones during their mitigation investigation. *See Maryland v. Kulbicki*, 136 S.Ct. 2, 4-5 (2015) (recognizing that the right to effective assistance of counsel does not demand that lawyers go "looking for a needle in a haystack" when they have "reason to doubt there is any needle there.") As Jones has failed to show that his trial counsel rendered deficient performance during

their mitigation investigation we need not address whether Jones was prejudiced. *See Ray*, 9th Dist. No. 22459, 2005-Ohio-4941 at ¶ 10.

## 2. Dr. Siddall's Evaluation & Diagnosis

{¶57} Jones next argues that Dr. Siddall had neither the time nor the information necessary to perform a complete a psychological evaluation and make a diagnosis for the purposes of the mitigation hearing. Thus, the extent of Jones's mental illness was not discovered and his trial counsel's assistance was ineffective due to their failure to adequately review Jones's mental health records and ensure that Dr. Siddall did so as well.

{¶58} Dr. Siddall's testimony regarding Jones's mental illness during the mitigation hearing was summarized by the Supreme Court of Ohio in the following way:

> In summary, Dr. Siddall testified that Jones has "a chronic history of mental illness which has required very expansive psychiatric treatment while he was incarcerated and in the community." Jones has been repeatedly hospitalized and been treated with antidepressants, mood-stabilizing drugs, and antipsychotic medications. Jones was also raised in a family with a long history of psychiatric problems, alcohol and drug abuse, domestic violence, and involvement with the criminal-justice system. Dr. Siddall testified that these severe problems affect most members of Jones's family and represent "a rather unusual cluster of very serious problems in a given family." He opined that "certain psychiatric problems, certain psychological problems * * * are known to be biologically based * * * [and were] genetically transmitted * * * across generations in the Jones family."

During cross-examination, Dr. Siddall acknowledged that a Dr. Stafford, a psychiatrist who treated Jones at the Oakwood Forensic Hospital, reported that Jones admitted that he falsely reported hearing voices. Dr. Stafford concluded, "He is not psychotic at all. His whole outlook is due to malingering and put on." Dr. Stafford's report also stated that Jones "puts on psychosis due to experience with mental health professionals through the years. He is difficult to differentiate because he is clever to answer vaguely." *Jones I*, 135 Ohio St.3d, 2012-Ohio-5677, at ¶ 236-237.

{¶59} Dr. Siddall is an expert in forensic psychology and testified as an expert in "maybe a dozen" capital mitigation hearings prior to Jones's case. He testified at Jones's postconviction relief hearing as a witness for the State. Based on this testimony, the trial court found that he is licensed in both clinical and forensic psychology and also practices in the area of drug addiction. He has been licensed since 1975, is published and has received awards. At the time of his testimony, Dr. Siddall had taught graduate level courses, including courses on diagnosis. Although he is currently in private practice, Dr. Siddall has had significant experience with persons in a criminal legal setting through his work at a diagnostic clinic.

{¶60} Dr. Siddall stated that as a rule he would get records and complete his report before the start of trial, but in this case he completed his report after Jones's trial, but before the mitigation phase. Dr. Siddall stated that when he first became involved in the case, "[t]here was a ship load of records that came in and continued to come in." He also stated that he thought he had received some records after he had completed his report, but did not recall which ones. The trial court found that Dr. Siddall's report identified his documentary sources as Jones's educational records from Akron Public Schools (1978-1986), as well as mental health records from the Ohio Department of Rehabilitation and Corrections, Summit Psychological Associates, Portage Path Mental Health Center, and the Psycho-Diagnostic Clinic. Dr. Siddall also visited Jones in the Summit County Jail on two occasions, spending about three and a half hours at each visit. The visits were divided equally between interviewing and testing Jones. The trial court found that Dr. Siddall's invoice documented billing for 32.75 hours of casework, which included interviews, testing, record review, and consultations with Jones's attorneys and mitigation specialist. In addition to the documentary sources, Dr. Siddall relied on information from Jones and detailed family information he received from Mr. Hrdy. Dr. Siddall testified that he had enough time to complete the tasks he was assigned to do, but that he had also been aware that if he needed additional time, he would be able to ask for and receive more time.

{¶61} Dr. Siddall diagnosed Jones with a mood disorder. Dr. Siddall testified that he was aware that other diagnoses had been made with regard to Jones that differed from the one to which he opined during mitigation. However, he testified that it would be inappropriate for him to diagnose Jones by giving him a diagnosis given by another doctor rather than making his own diagnosis. Dr. Siddall stated that "you have to understand that anybody that has been in the system for years will probably have many diagnoses" and that "[t]he important thing here is that the core of defendant's psychological problems included a depressive disorder, psychotic like features, and the history of antisocial behavior. Those are the things that needed to be represented in the diagnosis. There is various ways of labeling them."

{¶62} At the post-conviction relief hearing, Jones called three expert witnesses to testify concerning his mental health. The first was Dr. Jeffery Madden. Dr. Madden is an expert in neuropsychology. The trial court found that Dr. Madden had performed a battery of neuropsychological tests on Jones to determine if there were any signs of organic brain injury. During his post-conviction relief testimony, he opined that those results validated Jones's prior diagnosis of schizoaffective disorder-bipolar type. However, Dr. Madden could not opine to a reasonable degree of neuropsychological certainty as to the presence or absence of neurological dysfunction or whether Jones suffered from a cognitive disorder attributable to organic brain damage. However, Dr. Madden did opine to a reasonable degree of scientific certainty that Jones was not malingering at the time that Dr. Madden conducted his tests in January 2013.

{¶63} Jones also called Dr. Gary Beven, an expert in psychiatry and forensic psychiatry. The trial court found that Dr. Beven was the Chief Psychiatrist at the Southern Ohio Correctional Facility from 1995-2003, during which time Jones was incarcerated at the

75

facility. Dr. Beven was the primary lead of the mental health team and provided Jones with mental health treatment. Dr. Beven had examined Jones 35 times while he was incarcerated and had diagnosed Jones with schizoaffective disorder-bipolar type with personality disorder. During the entire time of Dr. Beven's treatment of Jones, Jones remained on the mental health C.I.C. caseload, indicating serious and chronic mental illness. Dr. Beven acknowledged a discussion of malingering or exaggeration in his case notes, but that discussion did not cause him to second-guess his diagnosis of Jones. Dr. Beven's last contact with Jones was in 2003 and he could not offer any testimony about Jones after that time. Jones's original mitigation team did not contact Dr. Beven prior to Jones's capital trial.

{¶64} Jones also called Dr. Bob Stinson, an expert in forensic psychology. The trial court found that Dr. Stinson testified about the dysfunction and abuse with the Jones family. He personally interviewed Jones, but did not conduct any tests on Jones. In addition to the interview, Dr. Stinson relied upon the affidavits of family members and Dr. Fradkin's report. Dr. Stinson opined to a reasonable degree of psychological certainty that Jones suffers from schizoaffective disorder, bipolar type. During his testimony, Dr. Stinson was critical of Dr. Siddall's diagnosis of mood disorder, his testing methods, his mitigation testimony regarding Jones's malingering, and the amount of time Dr. Siddall spent with Jones. Dr. Stinson was further critical of the amount of time Dr. Siddall spent reviewing Jones's records. However, when testifying about the difference between his diagnosis and that of Dr. Siddall's, Dr. Stinson stated that "we are actually not as far off as it may seem, but mood disorder not otherwise specified is our label for saying, I see a mood component to his illness, but I don't have enough information to tell you exactly what category it fits in." Dr. Stinson's further stated that he would not say Dr. Siddall's diagnosis was wrong, but that he did not have enough information to give a more specific diagnosis.

{¶65} Despite the extensive amount of mitigating evidence presented during Jones's mitigation hearing, *See Jones I*, 135 Ohio St.3d, 2012-Ohio-5677 at ¶ 224-256, Jones contends his defense counsel were ineffective due to their failure to adequately review Jones's mental health records and ensure that Dr. Siddall did so as well. However, even assuming without concluding that counsel was deficient, Jones is not able to show he was prejudiced by the mitigation investigation into his history of mental illness. When assessing prejudice, " 'the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " *Herring*, 142 Ohio St.3d, 2014-Ohio-5228, at ¶ 116, quoting *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 163, quoting *Strickland*, 466 U.S. at 694. Accordingly, "[a]dditional mitigating evidence that is merely cumulative of that already presented does not undermine the results of sentencing." (Internal quotations omitted.) *Id*. at ¶ 117.

{¶66} In this case, the trial court determined that the testimony given about the manifestations of Jones's mental illness given by Dr. Stinson and Dr. Beven was consistent with and cumulative of the testimony presented by Dr. Siddall at Jones's

mitigation hearing. Specifically, the trial court found that "[w]hile [Jones] is mentally ill, his mental illness is inextricably wrapped around his anti-social personality disorder." The trial court based this determination on the "scores of case notes in the prison records and other documents submitted as evidence." The trial court then pointed to Dr. Siddall's mitigation testimony, in which he gave a significantly more detailed diagnosis than just the named disorder and determined that despite the differing names of the diagnoses, Dr. Stinson's and Dr. Beven's testimonies about the manifestations of Jones's mental illness and the medications used to treat him was consistent with and cumulative of testimony given by Dr. Siddall at the mitigation hearing. Such manifestations included suicide attempts, self-mutilation, depression, hallucinations, and psychiatric hospitalizations and the medications included mood stabilizing drugs for bipolar disorder and antipsychotic drugs. The trial court additionally noted that when testifying about the differences between his diagnosis and Dr. Siddall's, Dr. Stinson stated that their diagnoses were "not as far off as it may seem" and that in his own report, Dr. Stinson did not reference any of the records he suggested Dr. Siddall needed in order to have a more complete picture of Jones's mental illness. However, when forming his opinion, the trial court noted that Dr. Stinson did not have access to the 1448 pages of mental health records contained in Jones's ODRC records, was selective in his use of the information in some of Jones's other records, and did not personally conduct any tests on Jones. Accordingly, we conclude that the trial court's determination that the testimony given by Dr. Stinson and Dr. Beven was consistent with and cumulative of the testimony presented by Dr. Siddall at Jones's mitigation hearing did not constitute an abuse of discretion.

{¶67} Furthermore, the trial court determined that Jones's argument that Dr. Siddall used an inappropriate method to diagnosis Jones's malingering ignored the fact that Dr. Stafford also opined that Jones showed evidence of malingering during his competency evaluation. During his testimony, Dr. Siddall pointed out that mental illness and malingering are not mutually exclusive. Furthermore, Dr. Siddall's testimony regarding malingering was part of the focus of the State's cross-examination on Jones's history of malingering and that Dr. Siddall addressed the malingering the most positive way possible.

{¶68} Therefore, we cannot conclude that the trial court abused its discretion when it determined that the testimony given about the manifestations of Jones's mental illness given by Dr. Stinson and Dr. Beven was consistent with and cumulative of the testimony presented by Dr. Siddall at Jones's mitigation hearing. As Jones has failed to show he was prejudiced by his counsels' actions we need not address whether counsel was deficient. *See Ray*, 2005-Ohio-4941 at ¶ 10.

## C.  Conclusion

{¶69} Jones has failed to demonstrate the trial court abused its discretion when it determined that Jones's trial counsel was not deficient for failing to discover further alleged abuse during their mitigation investigation or that Jones was prejudiced by counsel's alleged failure to discover the extent of Jones's mental illness. Therefore, Jones's first assignment of error is overruled.

*Jones*, 2019 WL 385467, at *4-18 (footnote omitted).

Jones asserts that the state appellate court decision "failed to provide an honest analysis of the evidence presented in the evidentiary hearing and, failing to do so, the decision was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state court." (Doc. 60 at 97.)  But, as Respondent argues, Jones provides few *specific* allegations relating to the state appellate court's decision – the only opinion relevant here – to support this broad and conclusory assertion.  (Doc. 57 at 102-03.)

As explained above, the Supreme Court has set a high bar for petitioners to prevail on ineffective-assistance claims under *Strickland*'s standard of double deference.  *See Richter,* 562 U.S. at 105.  Indeed, in a case similar to this one, in which a habeas petitioner claimed his trial counsel were ineffective in developing and presenting mitigation evidence, the Court cautioned that a habeas petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly."  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (citing *Williams*, 529 U.S. at 411).  Rather, the Court explained, "he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Id*. at 699.  *See also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable.").  Jones has not satisfied that burden with respect to his mitigation-related ineffective-assistance claims.

*Voir Dire.*  Jones claims that the state court contravened or misapplied *Strickland* in determining that his trial counsel did not perform deficiently in conducting voir dire because they

had not yet completed their mitigation investigation.  (*See* Doc. 60 at 102-05.)  He challenges the

state court's determination that his trial counsel may have made a reasonable tactical decision not

to ask potential jurors their views on mitigation given the defense's theory that Ms. Yates' death

was an accident.  (Doc. 60 at 104-05.)  He argues that "[w]hile there is no strict requirement that

trial counsel question the jurors about mitigation, that strategic decision cannot be made without

a complete investigation."  (*Id*. at 104.)  He denounces the state court's reasoning regarding

counsel's strategy as "pure speculation," pointing out that his trial counsel never testified at the

post-conviction hearing that they had a strategy to forgo questioning prospective jurors about the

death penalty.  (*Id*.)

As the state court explained, however, while "'counsel has a duty to make reasonable

investigations,'" they also may "'*make a reasonable decision that makes particular

investigations unnecessary*.'"  *Jones*, 2019 WL 385467, at *5 (quoting *Strickland*, 466 U.S. at

691) (emphasis added by state court).  And often the defendant's own actions or statements

influence counsel's decision-making.  *Id*. at *6.  Furthermore, when reviewing habeas claims of

ineffective assistance of counsel, the Supreme Court has recognized that,

> [a]lthough courts may not indulge "post hoc rationalization" for counsel's
> decisionmaking that contradicts the available evidence of counsel's actions, . . .  neither
> may they insist counsel confirm every aspect of the strategic basis for his or her actions.
> There is a "strong presumption" that counsel's attention to certain issues to the exclusion
> of others reflects trial tactics rather than "sheer neglect."

*Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citations omitted).

The state appellate court noted that, in this case, Jones told his attorneys from the

beginning that Ms. Yates' death was an accident, which could reasonably have impacted their

decision to limit voir dire questioning about various mitigating factors and the death penalty.

*Jones*, 2019 WL 385467, at *6.  The court further observed that such questioning carried risks, as

it could have opened the door for the prosecution to introduce damaging information about Jones.  *Id*.  And finally, it observed that Jones' counsel did not testify about their jury-selection strategy at the post-conviction hearing because they were not asked about it.  *Id.*  The state court's finding that Jones' trial counsel may have reasonably decided to limit questioning potential jurors about mitigation factors or the death penalty – even though they had not yet completed their mitigation investigation – was therefore supported by the evidence and an objectively reasonable application of *Strickland*.  *See, e.g., Miller v. Francis*, 269 F.3d 609, 620 (6th Cir. 2001) ("Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors.  Nor may we substitute our judgment for that of the state appellate court.").

*The mitigation investigation*.  Jones further claims, more broadly, that the state appellate court unreasonably rejected his claim that his trial counsel and their retained experts, Mr. Hrdy and Dr. Siddall, spent insufficient time investigating mitigation evidence, failing to uncover the extent of his family's dysfunction, including sexual abuse, and his severe mental illnesses and developmental disabilities.  (*See* Doc. 60 at  97-102, 108-10, 112, 121-22.)

First, Jones asserts that the state appellate court was unreasonable in "completely dismiss[ing]" his post-conviction expert Dorian Hall's testimony, which he asserts established that the late start of Jones' mitigation team did not allow them sufficient time to conduct an adequate mitigation investigation.  (*Id*. at 98-99, 108-09.)  But the state court did not dismiss her testimony.  As Jones concedes, the appellate court noted that the trial court found Ms. Hall to be a "professional and credible witness."  *Jones*, 2019 WL 385467, *11 (¶ 42).  It recounted the trial court's findings regarding her lengthy experience and her various criticisms of Jones' counsel's mitigation efforts.  *Id*. at *11 (¶¶ 41-42).  It also addressed the lower court's findings regarding

the weaknesses of her opinions, including her bias as a long-time public defender and her lack of

knowledge of Mr. Hrdy's investigation and access to Jones' family members, whose credibility

the court had found "'questionable.'"  *Id*. at *11 (¶ 42).  And it noted that while the trial court

agreed with Ms. Hall that a mitigation investigation ideally should begin ninety days before trial,

she acknowledged that "'[g]enerally you need to spend as much time as you need to get all the

information.'"  *Id*.

In the end, the state appellate court found the trial court's findings regarding Ms. Hall's

testimony (as the testimony of the other witnesses at the post-conviction hearing) well supported

by "competent, credible" evidence.  *Id*. at *13 (¶ 52).  Furthermore, it agreed with the lower

court's determination that "'because of the nature and quality of the mitigation facts Mr. Hrdy

was able to obtain, as well as the lengthy time that pre-existed the death penalty specification,

during which there were psychological reports, the development of a rapport with [Jones] and his

attorneys (especially Mr. Hicks), communication with the family and information gathering, the

late start was not detrimental to [Jones' counsel's] mitigation investigation.'"  *Id.*  The state

appellate court's decision finding Jones' trial counsel had sufficient time to conduct an adequate

mitigation investigation, therefore, was objectively reasonable and did not contravene or

misapply *Strickland*.

Jones also challenges the state appellate court's finding that "'[a]mple information

regarding the dysfunction of the Jones family was presented during the mitigation phase of

Jones's trial.'"  (Doc. 60 at 98 (quoting *Jones*, 2019 WL 385467, at *7 (¶ 25)).  He protests that

"[t]he jury never learned about [Jones'] nightmarish childhood.  They did not learn that Mr.

Jones suffered from severe mental illness."  (*Id*. at 120.)  Again, this court disagrees.

In support of this finding, the state appellate court relied on the Ohio Supreme Court's detailed summary of the mitigation evidence adduced at Jones' trial in its opinion on Jones' direct appeal. *Jones*, 2019 WL 385467, at *7 (¶ 25) (citing *Jones,* 135 Ohio St. 3d at 52-58 (¶¶ 224-56)). The Ohio high court described Dr. Siddall's testimony about the "very serious problems" within Jones' family, which had a "long history of psychiatric problems, alcohol and drug abuse, domestic violence, and involvement with the criminal-justice system." *Jones,* 135 Ohio St. 3d at 52-54 (¶¶ 22-27, 236). The court explained that Jones' mother and oldest sister also testified about the family's problems with criminal behavior and substance abuse. *Id.* at 54 (¶¶ 238-41). Finally, the court noted that Jones, in an unsworn statement, described to the jury his "abusive childhood," in which he witnessed domestic violence, substance abuse, physical abuse, and instability. *Id*. at 56 (¶ 249).

The Ohio Supreme Court also noted Dr. Siddall's testimony about Jones' developmental, intellectual, and psychiatric disabilities, including: his low-range IQ and academic and adjustment struggles in school, ending in his expulsion in the tenth grade; his criminal history; his history of depression, mood disorder, antisocial personality disorder, reported hallucinations, alcohol and cannabis abuse, multiple suicide attempts, self-harm, and "very expansive psychiatric treatment' while incarcerated and in the community. *Id*. at 53-54 (¶¶ 230-37). Jones' mother and sister, and Jones himself, also testified about his mental health problems and suicide attempts. *Id*. at 54-57 (¶¶ 239, 241, 249-51).

Ultimately, the Ohio Supreme Court found that, although Jones' character offered nothing in mitigation, it gave weight to Jones' history and background, explaining,

> Jones grew up in a troubled family where his parents fought and argued frequently. Jones was also raised in a family with a history of mental-health problems, alcohol and drug abuse, and involvement with the criminal justice system. Jones has a chronic history of mental illness, which required psychiatric treatment. In addition, Jones had a difficult

childhood. He was taunted and teased as a child because he had a lazy eye. Jones had difficulty in school. Jones was also involved in the criminal-justice system at an early age and has spent most of his life incarcerated.

*Id*. at 58 (¶ 258).   Nevertheless, it concluded that the mitigating evidence "pale[d] in comparison" to the aggravating circumstance of his crimes against Ms. Yates.  *Id.* at 59.   In discussing the murder, it opined:

> {¶ 218} In any event, Yates's body was the best evidence that Jones raped her. And it was the best evidence that he killed her while she resisted the rape. Jones's DNA was found in Yates's badly bruised and torn vagina, which had also suffered injuries that were caused by a fist or "very large rigid foreign object." Yates suffered similar injuries to her anus and rectum. Moreover, the back of Yates's head had suffered a pounding action from being slammed to the ground repeatedly. She clawed at her own neck trying to free her airway while Jones vigorously and relentlessly strangled her.

> {¶ 219} Yates's body told the story of the unmitigated and gruesome events that took place in the graveyard that night. Her body screamed the terror that Yates suffered: "I was killed while resisting rape." Jones silenced Yates's voice; the dissent seeks to silence her body.

*Id*. at 51.

This court also has reviewed the transcript of the mitigation phase of Jones' trial and finds the state appellate court's determination that Jones' trial counsel presented "ample" mitigating evidence at trial, including information relating to Jones' troubled family and serious mental health problems, was not objectively unreasonable.

And yet, Jones' central complaint is that his trial counsel should have uncovered and presented even more mitigation evidence at trial, especially regarding his family's dysfunction and his mental health.  He argues in sweeping terms that the state appellate court unreasonably determined the credibility of witnesses he presented at the post-conviction hearing and the value of their testimony in rejecting this claim.  He asserts, for example, that the state court: "completely discounted" the "significant evidence" presented at the hearing; "entirely dismissed" the testimony of defense psychologist expert Dr. Howard Fradkin; "totally discounted" the

testimony of Jones' family members, pastors, and romantic partner; and improperly "accepted a 'close enough' approach to counsel's investigation." (Doc. 60 at 98, 101-02, 108, 121-22.) Jones appears to be seeking review of his claims as if this court were conducting an appellate or de novo review, rather than habeas review, repeatedly referring to the state appellate court's earlier opinion remanding the case and the trial court's decisions, but rarely citing to the state appellate court opinion at issue. And, critically, he does not "show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cone*, 535 U.S. at 699.[11]

In the trial court's 68-page opinion, it carefully summarized the testimony of each witness at the hearing and set forth its conclusions regarding the witnesses' credibility. (Doc. 18-3 at 434, 436-37, 473-77, 478.) The state appellate court, in a similarly thorough opinion, recounted in detail the trial court's findings regarding the evidence presented and each witness's testimony and credibility. *Jones*, 2019 WL 385467, at *3-18. It was not bound by the trial court's evaluations of evidence or assessments of witnesses' credibility, nor was it bound by its previous decision in Jones' initial post-conviction appeal; it was free to reach its own conclusions on Jones' claims of ineffectiveness. And it concluded that, on Jones' ineffective-assistance claims relating to mitigation evidence of family sexual abuse and mental illness, the lower court applied the proper legal standards, and its factual findings were supported by competent, credible evidence. *See id*. at *14 (¶¶ 55-56), *17 (¶ 68).

---

[11] Jones also incorrectly argues that the state appellate court's decision improperly failed to address the prejudice prong of *Strickland*'s test. (Doc. 60 at 112, 122.) The court actually decided Jones' claim regarding evidence of the extent of his mental illness on the ground that he failed to show prejudice. *See Jones*, 2019 WL 385467, at *17-18. And it correctly determined that because counsel's performance was not deficient in investigating evidence of family dysfunction and sexual abuse, there was no need for it to consider whether Jones was prejudiced. *Id*. at *14 (¶ 56); *see Strickland*, 466 U.S at  687 (explaining that if a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail).

Again, this court has reviewed the transcripts of the post-conviction hearing and finds the state appellate court's determination that Jones' trial counsel were not deficient for failing to discover alleged sexual abuse and additional instances of dysfunction in Jones' family and that Jones was not prejudiced by counsel's alleged failure to discover the extent of his mental illness and developmental disabilities were objectively reasonable. Jones has not shown that the state court's opinion "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter,* 562 U.S. at 103. *See, e.g., Wong v. Belmontes*, 558 U.S. 15, 25 (2009) (rejecting habeas petitioner's "'more-evidence-is-better'" approach to mitigation evidence); *Maryland v. Kulbicki*, 577 U.S. 1, 4-5 (2015) (courts must not "demand that lawyers go 'looking for a needle in a haystack,' even when they have 'reason to doubt there is any needle there.'") (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)).

Accordingly, Jones' claims of ineffective assistance of counsel relating to the mitigation phase of trial are denied.

## III.    Third Ground for Relief:  *Trial-Court Error / Evidentiary Rulings*

Jones' third ground for relief asserts that the trial court erred in admitting certain evidence at trial.  (*See* Doc. 60 at 77-88.)  Specifically, he argues the court should not have:  (1) permitted the admission of "prior acts" evidence in the form of testimony regarding a prior rape; and (2) permitted the prosecution's use of a demonstrative doll during its cross-examination of Jones and in the rebuttal examination of an expert.  (*Id*.)

### A.  Procedural Status

Jones raised claims based on these evidentiary rulings on direct appeal to the Ohio Supreme Court, which adjudicated them on the merits. *See Jones*, 135 Ohio St. 3d at 19-29, 45-

47.  Respondent contends, however, that the claims are procedurally defaulted, because Jones did not fairly present them to the Ohio Supreme Court as federal constitutional claims.  (Doc. 57 at 43-44.)  He further argues the claims are non-cognizable on federal habeas review.  (*Id*. at 44-45.)  As the court agrees with Respondent that the claims are not cognizable on habeas, it need not address the issue of procedural default.  *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

### B.  Merits Analysis

As a general rule, to the extent that Jones' claims allege violations of Ohio evidentiary law, they are not cognizable on federal habeas review.  *See, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review").  It is well established that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  In particular, federal habeas courts presume that state courts correctly interpret state law in their evidentiary rulings.  *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005).  Their review of state-court evidentiary rulings, therefore, "is limited to whether [a petitioner] can demonstrate a violation of his federal constitutional rights."  *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (citing *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976)).

State-court evidentiary rulings may "rise to the level of due process violations [if they] 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to

be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

### 1.  "Other acts" evidence

As to Jones' claim regarding the admissibility of the "other acts" evidence, the Ohio Supreme Court stated:

{¶ 184} "Other acts" testimony. In proposition of law IV, Jones argues that the trial court erred in admitting evidence that Jones had attacked and raped T.J. in 1990.

{¶ 185} "Evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. Evid.R. 404(B). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 186} T.J.'s testimony was admissible to prove lack of mistake or accident. Jones told police after he was arrested, "[A]ll I'm going to say about this is that it was an accident." Thus, T.J.'s testimony was material because Jones claimed that he had accidentally killed Yates, and the testimony was therefore properly offered by the state in its case-in-chief to prove absence of accident.

{¶ 187} Jones argues that T.J.'s testimony was improperly admitted to prove identity because he "admitted to being there," and therefore, "[i]dentity was not a material issue in this case." Because absence of mistake provided an independent basis for the admission of the testimony in the state's case-in-chief, we need not address whether T.J.'s testimony could also be admitted during the state's case-in-chief to prove identity. But we do hold that, at the very least, Jones's testimony raised identity to justify the jury's ultimate consideration of T.J.'s testimony as to both identity and absence of accident.

{¶ 188} Jones testified that when he picked up Yates, "[s]he was kind of battered from the fight because [another man] was kind of dwelling on her." Accordingly, he claimed that he did not cause the injuries to Yates's face and neck. And Jones testified that "some other guy" was also likely responsible for Yates's anal and rectal injuries. The presence of these injuries was central to the state's case and Jones's denying having caused them directly implicated identity.

{¶ 189} Several common features link Yates's murder and rape and T.J.'s rape. Jones drove both women, whom he barely knew, to an isolated location. He then beat, choked, and vaginally raped them. Jones attempted to anally rape T.J. Similarly, Jones anally raped Yates; a twig was found inside her rectum, and significant bruising was found on the outer surfaces of her anus and rectum. Although there are some factual differences, the evidence of the first rape tends to show the identity of the perpetrator of the second rape. Thus, evidence of Jones's rape of T.J. meets the requirements for admissibility to show proof of identity. *See State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 44 (defendant's prior rape admissible to show proof of identity where "[s]everal common features" linked that rape to charged offenses of rape and murder).

{¶ 190} T.J.'s testimony also helped to establish Jones's motive for murdering Yates to escape detection or apprehension. *See Craig* at ¶ 45. After being raped and released, T.J. immediately notified police that Jones had raped her; he was convicted and was then incarcerated for 14 years. *See id.* T.J.'s testimony supports the state's argument that Jones killed Yates so that she could not notify the police that he had raped her.

{¶ 191} Jones contends that T.J.'s testimony should not have been admitted because the 1990 rape and the 2007 rape-homicide were too removed in time. In considering whether "other acts" evidence is too remote from the offense charged, we have stated:

> [A]lthough "other acts evidence aimed at showing an idiosyncratic pattern of conduct should not be so remote from the offense charged as to render them non-probative, logic does not require that they necessarily be near the offense at issue in both place and time. * * * The key to the probative value of such conduct lies in its peculiar character rather than its proximity to the event at issue."

*Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 46, quoting *State v. DePina,* 21 Ohio App.3d 91, 92, 486 N.E.2d 1155 (9th Dist.1984).

{¶ 192} The 17–year separation of time, while significant, does not preclude the admissibility of T.J.'s testimony. The two events present similar fact patterns with similar and unique features that tend to identify Jones as the person who raped and murdered Yates. The length of time between the offenses is also less significant because Jones had been in prison for 14 of the 17 years. Accordingly, this argument is rejected.

{¶ 193} Finally, Jones argues that T.J. should not have been allowed to testify, because her testimony ran a high risk of unfairly prejudicing the jury against him. But the trial court provided the jury with the following limiting instruction:

> Evidence was received about the commission of other acts alleged to have been committed by the defendant in 1990 involving T.J. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character. If you find that the evidence of other acts is true and the defendant

88

committed them, you may consider that evidence only for the purpose of deciding whether it proves: One, the defendant's absence of mistake or accident, motive, intent or purpose, opportunity, preparation or plan to commit the offenses charged in this trial; or, two, the identity of the person who committed the offenses in this trial through his scheme, plan or system.

This evidence cannot be considered for any other purpose.

{¶ 194} "A presumption exists that the jury has followed the instructions given to it by the trial court." *State v. Murphy*, 65 Ohio St.3d 554, 584, 605 N.E.2d 884 (1992). These instructions minimized the likelihood of any undue prejudice regarding the jury's consideration of T.J.'s testimony. In view of these instructions and the probative value of T.J.'s testimony, we conclude that the trial court did not abuse its discretion in admitting T.J.'s testimony.

{¶ 195} Based on the foregoing, proposition IV is overruled.

*Jones*, 135 Ohio St. 3d at 45-47.

Jones presents the same arguments here that he asserted on direct appeal to the Ohio Supreme Court – namely, that T.J.'s testimony was improperly admitted to prove identity or to disprove an accident because the crimes were seventeen years apart, identity was immaterial in his case, and T.J.'s testimony was unduly prejudicial. (*Compare* Doc. 18-1 (Merit Brf.) at 473-77 *with* Doc. 60 at 85-87.) He adds here that the testimony also was not probative of absence of accident because the evidence adduced at trial showed that Jones strangled Ms. Yates with a ligature, whereas T.J. testified that Jones choked her with his hands. (Doc. 60 at 86.)

The court finds, however, that the state court's thorough and well-reasoned decision rejecting Jones' arguments about this "other acts" evidence was not so fundamentally unfair as to infringe on Jones' due process rights. And Jones' additional argument about the different means used to choke the victims in the two offenses is not significant enough to render the decision fundamentally unfair. This claim, therefore, is not cognizable on federal habeas review.

## 2. Demonstrative evidence

Regarding Jones' claim about the demonstrative doll, the Ohio Supreme Court opined in relevant part:

{¶ 71} Demonstrative evidence. In proposition of law I, Jones argues that the trial court abused its discretion by allowing the state to use a demonstrative doll during its cross-examination of him and during the rebuttal testimony of the medical examiner, Dr. Sterbenz.

{¶ 72} On direct examination, Jones testified that Yates died while they were having "rough" sex. Jones stated that as the two began having sex, Yates asked him to place his hands around her throat in order to restrain her breathing as she came close to orgasm. Defense counsel queried, "You have your hands, at least one or both, around her throat; is that correct?" Jones answered, "One of them." Jones further testified that he then heard "a crack, cracking sound or popping sound" and noticed that Yates was not moving.

{¶ 73} Before Jones's cross-examination began, the prosecutor told the court that he anticipated calling Dr. Sterbenz as a rebuttal witness and therefore requested that Dr. Sterbenz be permitted to observe the state's cross-examination of Jones. The defense objected to Dr. Sterbenz's observing Jones's testimony. It also objected to Jones's demonstration on the doll.

{¶ 74} As to the doll, defense counsel argued only:

[W]e will object to having the State request that Mr. Jones perform any type of act on any type of—if I can use the phrase—

The court finished defense counsel's sentence by saying, "Demonstrative doll."

Defense counsel continued:

A doll, all right, your Honor. We are going to object to that. The doll is no way close to the body size of Susan Yates. And so what we are going to do is state an objection to this. Your Honor, I don't think it is a fair comparison; besides the doll is not alive.

{¶ 75} The prosecutor responded, "I have not raised the issue of the doll yet. I didn't mention that, but actually the doll is the same size as Ms. Yates, approximately the same weight and height." The trial court ruled, "Note the objection. He may use it."

{¶ 76} But the trial court sustained the objection to the state's request for Dr. Sterbenz to observe Jones's cross-examination. The prosecutor then informed the court of the state's alternative plan to convey Jones's demonstration to the medical examiner:

Mr. LoPrinzi (the prosecutor): So we are clear on the record, I'm going to have Mr. Jones demonstrate on the dummy what he did, and * * * I will redemonstrate for the doctor, hopefully accurately. I'll do the best I can. I would rather have the doctor see what he does, even if he's just in for that portion.

Mr. O'Brien (defense counsel): It destroys the cross-examination for our side, your Honor.

The Court: You will do the best you can, and if he's not doing it right, they will make that clear. The defense will make that clear.

*Use of the demonstrative doll*

{¶ 77} During cross-examination, the prosecutor asked Jones to use a life-sized doll to demonstrate how he accidentally killed Yates, as he had described on direct examination. The record is far from clear, but it does reflect that Jones left the witness stand and performed some type of demonstration.

{¶ 78} The following exchange took place during the demonstration:

Q (the prosecutor): Can you show me how you grabbed her neck? I assume * * * you were laying [sic] on top of her, correct?

A (the defendant): Yes, sir, I was.

Q: Okay. And you used both hands to do it?

A: Yes, sir.

Q: All right. And how hard did you do it?

A: I was just like applying pressure up here.

Q: Just like that?

A: Yes.

Q: No movement?

A: I was * * * having sex with her also at the time.

Q: I'm talking about with your hands around her neck
.
A: Just like this.

Q: That was it, steady pressure, just like that?

91

A: I believe so, yes.

* * *

Q: And other than what you are showing us right there, you did nothing else?

A: I was like this, and I was coming—I mean I was having sex, and I was putting my weight on her like that, both arms, like that.

* * *

Q: And then you heard the pop?

A: Yes, sir.

Q: And when you heard the pop, did she stop moving?

A: Yes, sir.

* * *

Q: All right. Now you can get up. You can get up.

The Court: I think he can sit down.

Mr. LoPrinzi: Yes.

The Court: You can sit down, Mr. Jones.

{¶ 79} At the start of Dr. Sterbenz's rebuttal testimony, trial counsel objected to the prosecutor's being allowed to attempt to replicate Jones's demonstration with the doll. The trial court overruled the objection and stated, "[T]he jury will remember what was produced now and determine whether it is the same, similar or not at all." The prosecutor then used the doll in framing the following question:

Q: Doctor, the defendant indicated he put both hands around her neck in this fashion, was up on both feet, over the top of her engaged in intercourse with all his weight pressed on her neck in that fashion, never did anything additional but put pressure.

During that period of time, she was moving her arms on his arms, mumbling and engaging in sex, sexual activity with him or sex act, at which time he heard a pop in her neck area. She stopped moving. He then stopped choking her, and she was dead as he tried to revive her.

92

{¶ 80} The prosecutor then asked Dr. Sterbenz "whether that scenario is consistent with [his] medical findings." Before providing his opinion, Dr. Sterbenz took the doll and expressed his understanding of what he had just been told:

A (Dr. Sterbenz): I'd like to clarify the circumstances or the terms * * * I will refer to as strangulation, for purposes of being very clear here, and I'm interpreting this as * * * a description of how the event occurred, I'm interpreting as any other hypothetical that I would have placed before me and asked my opinion[.]

Q (the prosecutor): That's what we are asking.

* * *

The Witness: One, can I approach the dummy?

The Court: You may.

A: What you are telling me is that the person, this individual is forward on—I mean, straddling this person and the hands are placed about the neck, gripping the neck, right and left hand gripping the neck.

Also what you are telling me is that, I'm interpreting at least, if I'm wrong I would like to be corrected, that the hands other than gripping the neck and squeezing the neck, are otherwise static on the neck.

Q: That's his testimony.

* * *

A: I'm also assuming that the individual themself [sic], this case a dummy, is not in any way moving their hands in such a way to claw or grab or try to pry the hands off of her neck?

Q: That's his testimony.

A: Okay. And that the weight of this individual is in front to back direction as I am demonstrating, as I'm positioned here. I mean, front to back of the dummy, pushing front, pushing straight down, not to the side or anything. * * * [I]t is just pushing down on the neck and squeezing the neck.

Q: That's how it was shown.

{¶ 81} Dr. Sterbenz opined that the physical evidence did not support Jones's explanation about how Yates had died. Dr. Sterbenz explained that "[s]imply placing hands on the neck and squeezing would not yield that type of pattern of injury" that Yates suffered. He stated that the fractures of the cornu and hyoid bone resulted from a "violent squeezing

force to the neck." Dr. Sterbenz also testified that "asphyxiation takes quite a number of minutes to occur, and after unconsciousness occurs, the pressure then needs to be maintained until death is accomplished. And she has quite a bit of obvious petechia[e] on her face and eyes indicating that this is the type of pressure that occurred."

*Applicable law*

{¶ 82} Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 4014 and if it is substantially similar to the object or occurrence that it is intended to represent. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 90; *State v. Palmer*, 80 Ohio St.3d 543, 566, 687 N.E.2d 685 (1997). The admission of demonstrative evidence is subject to Evid.R. 403.5 The trial court has discretion to determine whether demonstrative evidence is helpful or misleading to the trier of fact. *State v. Cowans*, 87 Ohio St.3d 68, 77, 717 N.E.2d 298 (1999). A trial court's ruling on the admission of demonstrative evidence is reviewed under the abuse-of-discretion standard. *State v. Herring*, 94 Ohio St.3d 246, 255, 762 N.E.2d 940 (2002). *See also Travers*, Propriety of Requiring Criminal Defendant to Exhibit Self, or Perform Physical Act, or Participate in Demonstration, During Trial and in Presence of Jury, 3 A.L.R.4th 374 (1981).

{¶ 83} We will address the two prongs of admissibility in turn.

*Relevance*

{¶ 84} The prosecutor's use of the doll during cross-examination of Jones and during Dr. Sterbenz's rebuttal testimony was relevant to Jones's claim that he had accidentally killed Yates. *See State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), quoting *Hanoff v. State*, 37 Ohio St. 178 (1881), paragraph one of the syllabus.

{¶ 85} In *Landrum*, the defendant testified on his own behalf during his murder trial. On direct examination, Landrum stated that he used a knife only to threaten the victim and that he did not cut the victim's throat. *Id*. at 109, 559 N.E.2d 710. During cross-examination, the prosecutor handed the knife to the defendant and asked him to hold the knife just as he had on the night of the murder. *Id*. at 110, 559 N.E.2d 710. As an initial matter, we noted, "[T]he cold record does not reflect theatrics as Landrum claims." *Id*. at 111, 559 N.E.2d 710. We then found no plain error in the court's allowing the demonstration because it was relevant to impeach the defendant. *Id*., quoting *Hanoff*, paragraph one of the syllabus. In so holding, we explained, " 'Where upon a trial of an indictment the defendant offers himself as a witness, and testifies in his own behalf, he thereby subjects himself to the same rules, and may be called on to submit to the same tests as to his credibility as may legally be applied to other witnesses.' " *Id*., quoting *Hanoff*, paragraph one of the syllabus.

{¶ 86} Jones's demonstration showed how he placed his hands around Yates's neck, as he had described on direct examination. But Jones's story changed. On direct examination, Jones expressly testified that he used one hand to restrain Yates's breathing. On cross-

examination, Jones demonstrated that he had used two hands to do so. This discrepancy is obvious from the record and would have been glaring to the jurors.

{¶ 87} Similarly, the prosecutor and Dr. Sterbenz used the doll during Dr. Sterbenz's rebuttal testimony to clarify Jones's explanation about what happened with Yates. In turn, Dr. Sterbenz used autopsy photographs to explain that it was physically impossible for Jones to have killed Yates in the manner that he had demonstrated.

{¶ 88} First, Dr. Sterbenz explained that Jones's placing of his hands on Yates's neck and squeezing would not produce the complex pattern of abrasions that were present on Yates's neck. To the contrary, Yates had upward abrasions that were consistent with a force "where there is twisting of one surface against the other, possible for skin to skin contact with very vigorous activity, but a soft ligature in between, such as twists of clothing about the neck is certainly another definite consideration." Dr. Sterbenz explained in contrast, "Simply placing hands on the neck and squeezing would not yield that type of injury." In addition, the severity of the bruising on Yates's neck was not consistent with simply squeezing but rather "shows a violent act, level of force, and that is commonly conceived as or interpreted as violent."

{¶ 89} Next, Dr. Sterbenz explained that Jones's explanation that Yates's arms were not near her neck as Jones "restrained her breathing" was not credible because Yates's neck had "gouging," "fingernail type" injuries, which "speak [ ] to the concept that the victim is grasping at their neck and also clawing to try to move, remove whatever is the strangulation force around her neck."

{¶ 90} Dr. Sterbenz further explained that Yates had a bruise on the left side of her neck that was not a mark that would be left by a hand. "This is not a hand mark, this is no kind of mark that would be simply imparted by a hand statically squeezing the neck by any means." He also referred to a "big broad abrasion under the chin" that could not be explained by Jones's version of events.

{¶ 91} Regarding internal injuries, Dr. Sterbenz explained that there was a "hemorrhage along the left side of the larynx surrounding the blood vessels on the left side of the neck" that was inconsistent with Jones's explanation. Rather, that injury would be caused "from vigorous moving, vigorous, violent movement at the neck."

{¶ 92} Dr. Sterbenz explained that one would expect to find the thyroid cartilage to be fractured under Jones's version of events—and it was. But he explained that Yates's fracture was a crack that was less than a centimeter and, from his professional experience with autopsy procedures, he knew that such a fracture would not produce a "pop." The medical examiner addressed each of the remaining fractures that he found in Yates's neck and explained that none of them would produce a "pop."

{¶ 93} Additionally, Dr. Sterbenz pointed out that Jones had claimed that there was no other movement. But the autopsy revealed large bruises on the back of the head that indicated that Yates's head had been subjected to a "pounding action."

{¶ 94} Finally, Dr. Sterbenz explained that if Yates had gone limp and died immediately thereafter—as Jones claimed—one would expect to find some kind of injury to the spinal cord. Dr. Sterbenz found no such injury. Instead, Dr. Sterbenz discovered that Yates had fracturing of the larynx, which "is not going to result in a neurologic injury that would result in her suddenly going limp and sudden death." To further explain, Dr. Sterbenz testified that Yates died from strangulation relating to neck compression, which restricts the blood flow and which would have had to have been maintained for some time after Yates became unconscious. In sum, Dr. Sterbenz found all of Jones's explanation of the strangulation to be inconsistent with the autopsy.

{¶ 95} Jones's demonstration directly aided the jury in understanding, and thus assessing, the credibility of his version of events. Likewise, use of the demonstrative doll during rebuttal aided the medical examiner's understanding of Jones's explanation of the critical events and his ability to scientifically assess Jones's story. In turn, the jury was aided by Dr. Sterbenz's opinion.

{¶ 96} We readily conclude that the demonstrative evidence was relevant to Jones's claim that he accidentally killed Yates.

*Similarity*

{¶ 97} The demonstrations were the same as or similar to the events that they were intended to represent. Jones's demonstration involved testimony about his own conduct. Before providing the relevant testimony, Jones twice unequivocally stated that he recalled the night of Yates's murder. In any event, any dissimilarity between Jones's demonstration on the doll and his actions with Yates did not give rise to unfair prejudice. *See Moore v. Texas*, 154 S.W.3d 703, 708 (Tex.App.2004) (defendant's use of a doll during cross-examination was fair comparison to act in question because defendant demonstrated his own conduct).

{¶ 98} And nothing in the record indicates that the prosecutor's and the medical examiner's use of the doll during rebuttal was different from Jones's demonstration. Indeed, Jones's counsel lodged no objections to the accuracy of the replications and engaged in no cross-examination based on any alleged discrepancies.

{¶ 99} Further, the trial court, which viewed the doll before ruling on its use, did not abuse its discretion in concluding that the demonstrative doll could be used because it was similar in size to the victim. "'An exhibit is not necessarily incompetent because it fails to show some exact thing in connection with the subject under investigation, provided it shows some matter bearing directly upon the matter under investigation, with an explanation of how it differs from that which is being investigated.'" *State v. Cowans*, 87 Ohio St.3d 68, 77, 717 N.E.2d 298 (1999), citing *Cleveland Provision Co. v. Hague*, 20 Ohio C.C. (N.S.) 34, 41 Ohio C.C. 223, *aff'd*, 87 Ohio St. 483, 102 N.E. 1121 (1912), and citing *State v. Palmer*, 80 Ohio St.3d 543, 564–566, 687 N.E.2d 685 (1997).

{¶ 100} In any event, Jones no longer claims that the use of the doll was unfair because of its lack of similarity to the victim. Indeed, he now concedes that "[t]he doll was approximately the same size of Ms. Yates." Thus, nothing shows that the trial court abused its discretion because of the doll's alleged lack of similarity to the victim.

*Evid. R. 403*

*Unfair prejudice*

¶ 101} Jones contends that the use of the doll resulted in unfair prejudice because it improperly "focused the jury's attention on only the cross-examination of Appellant, to the exclusion of the rest of the evidence." Jones did not raise this objection at trial; therefore, he has waived all but plain error. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 58. Neither plain nor any other error occurred.

{¶ 102} As an initial matter, we, like the court in Landrum, note that the cold record does not reflect the theatrics Jones claims occurred at trial. While conceding that the record is "not entirely clear," Jones suggests that "it appears Appellant was asked to lay [sic] on top of the doll, apply pressure to the neck with both hands, mimicking having sex."

{¶ 103} A review of the transcript reveals that Jones was never asked to simulate sexual intercourse with the doll. And there is no reason to believe that he, in fact, did engage in such a simulation. We once again consider the following exchange for example:

Q (the prosecutor): Can you show me how you grabbed her neck? I assume * * * you were laying [sic] on top of her, correct?

A (the defendant): Yes, sir, I was.

Q: Okay. And you used both hands to do it?

A: Yes, sir.

Q: All right. And how hard did you do it?

A: I was just like applying pressure up here.

Q: Just like that?

A: Yes.

Q: No movement?

A: I was * * * having sex with her also at the time.

Q: I'm talking about with your hands around her neck.

{¶ 104} This exchange reveals that the prosecuting attorney questioned Jones about the placement of his hands around Yates's neck, the amount of pressure he applied to her neck, and the movement of his hands on her neck. When Jones referred to the sexual intercourse, it was the prosecuting attorney who actually redirected Jones to the strangulation.

{¶ 105} Indeed, Jones's demonstration related to the strangulation, which he claimed to be accidental, not to the intercourse, which he claimed to be consensual. And the medical examiner's clarifying questions and rebuttal testimony focused squarely on the position of Jones's hands around Yates's neck and the nature and direction of the pressure that Jones claimed to apply.

{¶ 106} Moreover, the prosecutor used the doll only during a short segment of his cross-examination of Jones and the rebuttal testimony of Dr. Sterbenz. The transcript of the guilt phase of the trial is more than 2,000 pages; the portion reflecting the use of the demonstrative doll by both witnesses totals seven pages, strongly suggesting that the demonstration was not unduly sensational or prolonged.

{¶ 107} Finally, the demonstration was not per se unfairly prejudicial in requiring Jones to leave the witness stand to conduct the demonstration. Prosecutors are allowed to ask the defendant during cross-examination to step down from the stand and demonstrate his or her conduct.

{¶ 108} In *State v. Harris*, 2d Dist. No. 94 CA 37, 1995 WL 614348 (Oct. 18, 1995), the defendant testified that he did not intend to kill the victim when he fired shots. *Id*. at *5. The prosecutor then asked the defendant during cross-examination to step down from the stand and to demonstrate the angle at which he had held the gun when he fired the shots. The prosecution also asked the defendant to approximate, by reference to another person involved in the demonstration, the distance that had existed between himself and the objects struck by the bullets. *Id*. The state used this demonstration to show that it was physically impossible for a bullet fired as the defendant demonstrated to have struck the objects he indicated. *Id*. In upholding the admission of the demonstration, the court stated, "It related directly to the veracity of Harris's sworn statements and was a proper subject of cross-examination." *Id*. We adopt Harris 's reasoning and likewise conclude that the demonstration here related directly to Jones's veracity and was a proper subject of cross-examination.

{¶ 109} We reject Jones's claim that the demonstration was unfairly prejudicial.

*Confusion of the issues and misleading the jury*

{¶ 110} The prosecutor's purpose in using the demonstrative doll was obvious and would not have confused the issues or misled the jury. The entire case turned on Jones's claim that he had accidentally killed Yates while they were having rough sex. His demonstration and the prosecutor's use of the doll during rebuttal were plainly for the

purpose of impeaching Jones and to counter his testimony, which—if believed—would have constituted a defense to all of the charges contained in the indictment.

{¶ 111} Based on the foregoing, we overrule proposition I.

*Jones*, 135 Ohio St. 3d at 19-29 (footnotes omitted).

Jones asserts that the Ohio Supreme Court's decision was unreasonable because the prosecution's use of the doll was unduly prejudicial.  (Doc. 60 at 87-88.)  He cites as support this passage from the dissenting opinion:

> {¶ 272} It is at this point in the fair-trial inquiry that the prosecution's entire case comes into play. Dr. Sterbenz, the medical examiner who conducted the autopsy of Susan Yates, concluded that she died from asphyxia by strangulation. It was apparently always the view of Dr. Sterbenz that it would be impossible to cause Yates's throat injuries as a side effect of choking her. Dr. Sterbenz postulated that the injuries to Yates's neck and throat could have been caused only by a violent skin-on-skin action, presumably from a head lock or the use of a ligature involving cloth tightened by twisting it with some object. He did not use the doll to demonstrate either theory. Thus the demonstration on the doll forced on Jones by the state and then again staged by the prosecutor and by Dr. Sterbenz's [sic] during rebuttal served no purpose other than to inflame the jury. It was not probative of anything.

*Jones*, 135 Ohio St. 3d at 61 (Pfeiffer, J., dissenting).

The Ohio Supreme Court set forth a comprehensive and well-supported analysis of Jones' arguments concerning the State's use of a demonstrative doll at trial.  Jones does not specify anything, and this court finds nothing, so fundamentally unfair in the state court's decision that Jones' due process rights were violated.  This claim also is not cognizable on federal habeas review.

## IV.    Fourth Ground for Relief:  *Juror Misconduct*

For his fourth ground for relief, Jones argues that juror misconduct violated his constitutional rights to a fair trial.  (*See* Doc. 60 at 89-92.)  He bases the claim on an interview Jones' defense team conducted with a juror during state post-conviction proceedings, in which the juror allegedly stated that he considered improper, non-statutory aggravating circumstances

99

in sentencing and discussed the case with his wife, who had attended portions of the trial, against the trial court's instructions.   (*Id*. at 89.)   The juror, however, would not sign an affidavit attesting to these facts, so an  attorney who was present at the interview did so instead.   (*Id*.; *see also* Doc. 18-2 at 767-68 (Fleming Aff.).)   Jones raised this claim in state post-conviction proceedings, supported by the attorney's affidavit, and it is preserved for federal habeas review.

The state appellate court was the last state court to review the claim, deciding:

{¶ 55} Mr. Jones also argued in his petition that he was deprived of his right to a fair trial because the jury failed to follow the instructions of the trial court. He noted that the court told the jury that the only aggravating circumstance that it could consider in determining whether to recommend death was the rape of Ms. Yates. He submitted an affidavit from a lawyer who interviewed one of the jurors after the trial, asserting that the juror told him that the aggravating circumstances that compelled him to vote for death were the testimony of a woman who Mr. Jones previously raped and the fact that he thought Mr. Jones had lied about the crime. The juror also reportedly said that he had talked to his wife about the case, in violation of the court's instructions.

{¶ 56} Mr. Jones argued in his petition that the juror's statements demonstrate that the jury did not understand the concept of aggravating circumstances and the process of weighing them with mitigating circumstances. He further argued that they demonstrate that Ohio's death penalty scheme is defective and unconstitutional.

{¶ 57} The trial court rejected the lawyer's affidavit as hearsay. It also noted that, under Rule 606(B) of the Ohio Rules of Evidence, a juror may not testify "as to any matter or statement occurring during the course of the jury deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith."

{¶ 58} In his appellate brief, Mr. Jones has acknowledged that Evidence Rule 606(B) sets forth Ohio's aliunde rule. *State v. Hessler*, 90 Ohio St.3d 108, 123 (2000). The purpose of the rule is "to maintain the sanctity of the jury room and the deliberations therein." *Id*. The Ohio Supreme Court has explained that the rule "requires a foundation from nonjuror sources" and that the "information [alleging misconduct] must be from a source which possesses firsthand knowledge of the improper conduct." *Id*. (quoting *State v. Schiebel*, 55 Ohio St.3d 71, 75 (1990)). Applying the rule, it has held that a criminal defendant "does not have a constitutional right to know the nature of jury discussions during deliberations." *State v. Mason*, 82 Ohio St.3d 144, 167–68 (1998). While Mr. Jones has asked that we reconsider whether the aliunde rule violates his constitutional rights, we have no power to reconsider a decision of the Supreme Court. We conclude that the trial

100

court correctly determined that Evidence Rule 606(B) prohibits Mr. Jones from relying
on hearsay statements of a juror to support his claims for relief.

*Jones*, 2011 WL 5869752, at *15.

Jones first argues that because the state appellate court did not review the merits of his
federal constitutional claim, and decided the claim instead based on Ohio evidentiary law, he is
entitled to *de novo* review.  (Doc. 60 at 90.)  As Respondent counters, however, Jones is
incorrect.  When a petitioner has raised a federal constitutional claim in state court, but the state
court rejects the claim as purely a matter of state law, habeas courts presume the state court
considered and rejected the federal claim on the merits as well, triggering AEPDA's deferential
review.  *See Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been
presented to a state court and the state court has denied relief, it may be presumed that the state
court adjudicated the claim on the merits in the absence of any indication or state-law procedural
principles to the contrary."); *Johnson v. Williams*, 568 U.S. 289, 292-93 (2013) (applying *Richter*
presumption to state-court decisions that rule against a defendant and address some issues, but
not expressly the federal claim in question).  Jones makes no argument to overcome this
presumption, and AEDPA deference applies to this claim.

Regarding Jones' allegation that the juror considered non-statutory aggravating
circumstances, as the state court explained, Ohio Rule of Evidence 606(B) bars testimony from
jurors about their deliberations or mental processes, but permits admission of evidence that the
jury was influenced by outside or extraneous information.  *See, e.g., Mammone v. Jenkins*, 49
F.4th 1026, 1045 (6th Cir. 2022); *Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010).  And
when cases "'involve internal factors that affected the jury, rather than extraneous influences,' . .
. there is no constitutional impediment to enforcing Rule 606(B) . . . ."  *Id.* (internal citation
omitted) (citing *Hoffner*, 622 F.3d at 501; *Brown v. Bradshaw*, 531 F.3d 433, 436, 438 (6th Cir.

2008) (holding a juror's affidavit that other jurors bullied her into changing her vote was inadmissible under Ohio law and that enforcing the rule was constitutional)).  The Sixth Circuit has distinguished cases involving the influence of extraneous information in which Rule 606(B) has been applied unconstitutionally.  *Id*. (citing *Nian*, 994 F.3d at 756 (holding that where a case came down to a credibility determination and a juror introduced extraneous information about the defendant's criminal record during deliberations, applying Rule 606(B) to exclude juror testimony was constitutional error); *Doan v. Brigano*, 237 F.3d 722, 732 (6th Cir. 2001) (holding the state court's application of Rule 606(B) to prevent inquiry into a juror's injection of extraneous evidence conflicted with Supreme Court precedent recognizing a defendant's constitutional right to confront the witnesses and evidence against him), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003)).

Here, Jones' allegation that the juror considered improper factors in sentencing did not involve extraneous evidence – the juror allegedly considered the prior acts evidence admitted at trial and his belief that Jones had lied about the crime.  Accordingly, the Ohio court of appeals' decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

The state court also reasonably rejected Jones' allegation that the juror spoke to his wife about the trial.  A jury's verdict must be based on the evidence introduced at trial, not extraneous information.  *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Thompson v. Parker*, 867 F.3d 641, 647 (6th Cir. 2017).  In addition to this evidence's hearsay problem, however, the affidavit does not even support his claim.  The affidavit Jones' attorney submitted contains only this one statement about the juror's wife:

> Before the interview with Mr. Brown began, his wife said that she attended a couple of days of the trial. When asked if she had discussed the case with her husband while he was serving as a juror on the case, she said, "No, not really."

102

(Doc. 18-2 at 768 (Fleming Aff.).)  This evidence is inadmissible and insufficient to support Jones' claim of juror misconduct, and the state appellate court neither contravened, nor misapplied Supreme Court precedent in denying this claim as well.

## V.      Seventh Ground for Relief:  *Right to Present a Defense*

Jones claims for his seventh ground for relief that the trial court violated his rights under the Sixth and Fourteenth Amendments when it failed to permit the introduction of certain mitigation evidence in the form of affidavits and hearsay testimony at a post-conviction hearing. (Doc. 60 at 124-30.)  Jones raised this claim in state post-conviction courts, which rejected it on state-law grounds.  *See Jones*, 2019 WL 385467, at *18-21.  Respondent argues that this claim is not cognizable on federal habeas review.  (Doc. 57 at 61-62.)  The court agrees.

As the state appellate court noted in addressing this claim, "[i]n Ohio, post-conviction relief is governed by statute, and the right to file a petition for post-conviction relief is a statutory right, not a constitutional one."  *See Jones*, 2019 WL 385467, at *19 (citing *State v. Calhoun*, 86 Ohio St. 3d 279, 281 (Ohio 1999), and Ohio Rev. Code § 2953.21).  Accordingly, the Sixth Circuit repeatedly has held that "errors in post-conviction proceedings are outside the scope of federal habeas corpus review."  *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *see also Leonard*, 846 F.3d at 854-55 (declining to revisit issue).  As the Sixth Circuit has explained, "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'"  *Id*. (quoting *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)).  Challenges to state post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration."  *Kirby*, 794 F.2d at 247.  A due process claim related to collateral post-conviction proceedings, therefore, even if resolved in a petitioner's favor, would

not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Id*.  Such claims, therefore, cannot be brought in federal habeas proceedings.  *Id*. at 246.  This claim, too, fails.

## VI.     Eighth Ground for Relief:  *Prosecutorial Misconduct*

For his eighth ground for relief, Jones claims that prosecutors rendered his trial fundamentally unfair through the following conduct during the penalty phase of trial:  (1) improperly cross-examining defense witness Joseph Dubina about commutations for death row inmates; and (2) encouraging the jury to base its sentencing recommendations on improper considerations during opening statements.  (*See* Doc. 60 at 131-36.)

### A.  Procedural Posture

Respondent concedes that Jones raised sub-claim (1), as listed above, on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits.  ((Doc. 57 at 64.)  This claim is therefore preserved for habeas review.

As to sub-claim (2), Respondent argues that although Jones also raised this claim on direct appeal to the Ohio Supreme Court, it is procedurally defaulted, because Jones' counsel did not object to the challenged remarks at trial, so the state court found the claim waived and reviewed it only for "plain error."  (*Id*. (citing *Jones*, 135 Ohio St. 3d at 49 (¶ 204).)  The court agrees.

Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected.  *State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998); *State v. Glaros*, 170 Ohio St. 471 (Ohio 1960), paragraph one of the syllabus.  Failure to adhere to the "firmly-established"

contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  And the Ohio Supreme Court's plain-error review does not constitute a waiver of the state's procedural default rules and resurrect the issue.  *Id*.

Jones argues, however, that this claim's default should be excused by his appellate counsel's ineffective assistance in failing to raise the claim that the prosecution improperly argued future dangerousness under *Simmons v. South Carolina*, 512 U.S. 154 (1994).  (Doc. 60 at 132.)  "Attorney error that constitutes ineffective assistance of counsel is cause."  *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).  This includes the ineffective assistance of appellate counsel.  *See Murray v. Carrier*, 477 U.S. 478, 492 (1986).  But claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  Jones did not raise this appellate-counsel ineffective-assistance claim in state court and no longer may do so.  *See State v. Williams*, 99 Ohio St. 3d 179, 181 (Ohio 2003) ("there is no right to file successive applications for reopening"); *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review.").  This claim, therefore, also is procedurally defaulted and cannot constitute cause for the default of the underlying prosecutorial-misconduct claim.  Jones' sub-claim (2) is procedurally defaulted.

### A.  Merits Analysis

Even if both of Jones' prosecutorial-misconduct claims were preserved for review, they would fail.

The Supreme Court established the test for claims of prosecutorial misconduct in *Darden v. Wainwright*, 477 U.S. 168 (1986): "The relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). The Court emphasized that "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *Donnelly,* 416 U.S. at 642); *see also Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) ("We do not possess supervisory powers over state court trials."); *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979) ("[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority."). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct," therefore, "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations' . . . ." *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (quoting *Yarlborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (rejecting the Sixth Circuit's multi-step test for prosecutorial misconduct).

The Ohio Supreme Court, in considering Jones' claims of prosecutorial misconduct, reasoned:

{¶ 196} Prosecutorial misconduct. In proposition of law V, Jones argues that the prosecutor committed misconduct by improperly cross-examining Joseph Dubina, a defense witness, during the penalty phase.

{¶ 197} Dubina, the regional administrator of the Akron Regional Adult Parole Authority, testified that Senate Bill 2 was passed in 1996 and enacted "truth in sentencing." He testified that a person sentenced to life in prison without the possibility of parole will remain in prison until he dies. Thus, he testified, if Jones receives a sentence of life without parole, he will never get out of prison. Trial counsel also asked Dubina the following questions:

Q (defense counsel): From time to time, we have heard the word commutation of sentence, or that sort of thing. You have been with the parole board twenty-six years; is that correct?

A: Parole authority, yes.

Q: And up until—as far as you know, officially, in the last 15 years, has any governor pardoned anybody or let them off death row?

A: No, none that I'm aware of in the last 15 years.

{¶ 198} During cross-examination, the prosecutor asked Dubina about the commutation of sentences:

Q: Okay. Attorney O'Brien asked you about a sentence, sentences being commuted. Tell the jury what that mean[s]?

A: The governor has the authority to commute or pardon sentences that were set forth in court. And so they have the authority to do that. And also, if there is a law, change sometime between their sentence, when it is set and when it is finished * * * can change it as well.

Q: So if somebody is sentenced to death row, they are placed on death row, the governor could commute that sentence, correct?

A: Yes.

{¶ 199} Over defense objection, the prosecutor asked Dubina about another death-row inmate:

Q: Are you aware of a defendant named Spirko, I believe out of Cuyahoga County who had been on death row and his sentence just today was commuted, just in the paper today, commuted by the governor?

A: I have not officially heard or seen that. I know there was hot media attention and a lot of issues there, but I have not—

Q: That wouldn't surprise you that happened today?

A: No. He has the authority to do that.

{¶ 200} The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the

fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 201} Jones argues that the prosecutor's questions about Spirko's commutation were irrelevant and improper. Evid.R. 611(B) provides, "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." Moreover, "[t]he limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre*, 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983).

{¶ 202} The prosecutor committed no misconduct in asking about the Spirko commutation, because the defense opened the door to this line of cross-examination when Dubina testified that the governor has not pardoned anyone on death row in the last 15 years. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 318. Nevertheless, Jones claims that such cross-examination effectively eliminated any sentencing option other than death from the jury's consideration, because the jurors were left with the impression that his sentence could be commuted at some point in time. We reject this argument because it is wholly speculative, at best. Proposition V is overruled.

{¶ 203} In proposition of law VII, Jones argues that the prosecutor committed misconduct during its penalty-phase opening statement in stating:

> What has been determined in the state of Ohio, as in some other states throughout the country, is that a citizen should not have to worry about walking down the street and being raped and murdered, and in this case, I would say specifically Susan Yates. That is why this case has such significance, because it was in connection, this aggravated murder was in connection with this rape.

{¶ 204} Jones argues that the prosecutor's remarks improperly appealed to the fears and passions of the jury by telling them that the death penalty was appropriate because citizens should be free to walk the streets and not worry about being raped and murdered. But Jones failed to object to these remarks and thus waived all but plain error. *See State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus. No plain error occurred.

{¶ 205} "During opening statements, counsel is accorded latitude and allowed 'fair comment' on the facts to be presented at trial." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 145, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. The prosecutor's comments portrayed what happened to Yates on the day she was raped and murdered. The prosecutor's remarks were not overly emotional and represented fair comment. Moreover, the trial court instructed the jury that "[t]he opening statements * * * of counsel are designed to assist you. They are not evidence." It is presumed that the jury followed the instructions of the judge. *Diar* at ¶ 145.

{¶ 206} Based on the foregoing, we reject proposition VII.

*Jones*, 135 Ohio St. 3d at 47-50.

Both of these claims are reviewed under AEDPA's deferential review.  In *Stewart v. Trierweiler*, 867 F.3d 633 (6th Cir. 2017), the Sixth Circuit recognized as controlling precedent that AEDPA deferential review applies to a state court's plain-error analysis if it "conducts any reasoned elaboration of an issue under federal law."  *Id.* at 638 (citing *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009)).  As the state court, in its plain-error review of the opening-argument claim, analyzed it under both federal and state law, AEDPA applies to  that claim.  *See Jones*, 135 Ohio St. 3d at 49-49 (¶ 200).

Jones argues that the Ohio Supreme Court's decision on these claims was unreasonable.  First, he contends the prosecutor's questioning of Dubina regarding commutation was improper because it created an "inference of future dangerousness," as he could be commuted even with a sentence of life without parole, and "'[b]ecause petitioner's future dangerousness was at issue, he was entitled to inform the jury of his parole ineligibility.'"  ( Doc. 60 at 134-35 (quoting *Simmons*, 512 U.S. at 171).)  Jones further contends the state court improperly analyzed the two prosecutorial-misconduct sub-claims "piecemeal, failing to account for both comments taken together violating Mr. Jones due process rights."  (*Id*. at 136.)

Jones' arguments are not persuasive.  First, *Simmons* is not controlling clearly established Supreme Court precedent here.  In that case, a plurality of the Court concluded that a trial court erred by refusing to give a jury instruction regarding a capital defendant's non-eligibility for parole, as the state "may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole."  *Simmons*, 512 U.S. at 171.  By

contrast, this claim concerns a prosecutor's cross-examination of a witness that provided accurate information regarding the commutation of a capital inmate's sentence by a state governor, which has nothing to do with eligibility for parole.  The cases are very different.  *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case).

Further, the Ohio Supreme Court addressed each of Jones' prosecutorial-misconduct claims separately, as Jones presented them to the court.  This court finds nothing unreasonable in its decision either on each claim independently or the two combined.  Jones' eighth ground for relief is denied.

## VII.    Ninth Ground for Relief:  *Ineffective Assistance of Appellate Counsel*

For his ninth ground for relief, Jones claims his appellate counsel provided constitutionally ineffective assistance.  (*See* Doc. 60 at 137-54.)  Specifically, he argues that his appellate counsel should have raised claims on direct appeal asserting:  (1) the trial court improperly gave an unrequested jury instruction on the legal concept of "accident"; (2) trial counsel were ineffective for failing to request a jury instruction on "reckless homicide"; (3) trial counsel were ineffective for failing to more fully investigate the possible defense of diminished capacity; (4) trial counsel violated Jones' right to autonomy by failing to inform the jury during opening statements that Jones would testify and that he had consensual rough sex with Ms. Yates, and to argue in closing argument the defenses of reckless homicide or accident; and (5) the prosecution made improper comments during guilt-phase closing arguments.  (*Id.*)

### A.  Procedural Posture

Respondent argues that sub-claims (1) through (4), as listed above, are procedurally defaulted, as they were never fairly presented to state courts.  (Doc. 57 at 105-08.)  As explained above, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a habeas claim.  28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  To "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).

Regarding sub-claim (1), which relates to the trial court's instruction on the legal concept of "accident," Jones contends he raised the claim in his application to reopen his direct appeal. (Doc. 60 at 137.)  But the claim from his reopening application that he cites to concerns the trial court's  refusal to issue a jury instruction on the lesser-included non-capital offenses of involuntary and voluntary manslaughter and reckless homicide.  (*Compare* Doc. 60 at 140-45 *with* Doc. 18-1 at 747-48.)  Jones' defense that Ms. Yates' death was an accident is a complete defense to intentional murder and distinct legally and factually from the lesser-included offenses in Jones' claim in the reopening application.  Because Jones did not fairly present this claim, and no longer can do so, this claim is procedurally defaulted.  *See State v. Williams*, 99 Ohio St. 3d 179, 181 (Ohio 2003) ("there is no right to file successive applications for reopening"); *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion

bars federal court review.").  Jones also concedes that sub-claim (4) is procedurally defaulted. (Doc. 60 at 150.)

Moreover, Jones does not offer any argument regarding the cause for, or prejudice resulting from, his procedural default of either sub-claims (1) or (4).  Nor does he contend that he is actually innocent such that the defaults should be excused.  Those claims are procedurally defaulted.

Respondent also claims Jones never raised in state court sub-claims (2) and (3).  (Doc. 57 at 106-07.)  But these claims are substantially similar to claims he raised in his reopening application.  (*See* Doc. 18-1 at 747-50.)  They are therefore preserved for review.  And Respondent concedes that Jones raised sub-claim (5) in his reopening application.  (Doc. 57 at 109.)  It, too, is ripe for habeas review.

### B.  Merits Analysis

As noted above, Jones raised sub-claims (2), (3), and (5) in his application to reopen his direct appeal, which the Ohio Supreme Court denied in a summary disposition.  (Doc. 18-1 at 763.)  The state court's opinion is presumed to be a judgment on the merits.  *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011).  Jones has not presented evidence to overcome this presumption, so AEDPA deference applies to these claims.  *See, e.g., Mammone v. Jenkins*, 49 F.4th 1026, 1060 (6th Cir. 2022).

A criminal defendant is entitled to effective assistance of counsel in his or her first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Jones, therefore, must demonstrate that appellate counsel's performance was deficient, and that the deficient

performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable.  *Strickland*, 466 U.S. at 687.

Appellants have no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  Only when issues are "clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

### 1.  Reckless homicide jury instruction

Jones claims that his appellate counsel were ineffective for failing to raise a claim regarding his trial counsel's failure to request a jury instruction on the lesser-included offense of reckless homicide.  (*See* Doc. 60 at 145-48.)  This claim is not cognizable on federal habeas review.

As previously explained, federal habeas corpus relief "does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  And federal courts are bound by state courts' interpretations of state law.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  Accordingly, challenges related to a state court's jury instructions rarely rise to the level of federal constitutional violations, unless an erroneous jury instruction has deprived a petitioner of a fundamentally fair trial.  *See, e.g., Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall,* 790 F.2d 548, 551–52 (6th Cir. 1986).

However, where a jury instruction regarding lesser-included offenses was correct as a matter of state law, the Sixth Circuit has observed that, "[e]ven if [it were to] assume that the

113

failure to give a requested lesser included offense instruction could ever be cognizable in a habeas corpus proceeding, such failure clearly does not rise to the level of constitutional error when the failure was correct as a matter of state law." *Pilon v. Bordenkircher*, 593 F.2d 264, 267 & n.4 (6th Cir.), *vacated on other grounds*, 444 U.S. 1 (1979).  That is the case here.

In Ohio, the offense of reckless homicide occurs when a person "recklessly cause[s] the death of another."  Ohio Rev. Code § 2903.041(A).  A person acts "recklessly" when, "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."  Ohio Rev. Code § 2901.22(C).  Reckless homicide is a lesser-included offense of aggravated murder.  *See, e.g., State v. Colvin*, No. 26063, 2012 WL 5248876, at *4 (Ohio Ct. App. 2012).

Ohio law further provides, however, that "a defendant's own testimony that he did not intend to kill his victim does not entitle him to a lesser-included offense instruction."  *State v. Grube*, 987 N.E.2d 287, 297 (Ohio Ct. App. 2013) (citing *State v. Wright*, No. 01CA2781, 2002 WL 1666223, at *5 (Ohio Ct. App. Mar. 26, 2002); *State v. Campbell*, 69 Ohio St. 3d 38, 48 (Ohio 1994); *State v. Thomas,* 40 Ohio St. 3d 213, 217-18 (Ohio 1988); *State v. Rawlins*, No. 97CA2539, 1998 WL 961056 (Ohio Ct. App. Dec. 24, 1998)).  Even though the defendant's own testimony may constitute some evidence supporting a lesser offense, if the evidence as a whole does not reasonably support an acquittal on the murder offense and a conviction on a lesser offense, the court should not instruct on the lesser offense.  *Id*.  The Ohio Supreme Court has explained, "To require an instruction to be given to the jury every time 'some evidence,' however minute, is presented going to a lesser included . . . offense would mean that no trial judge could ever refuse to give an instruction on a lesser included . . . offense."  *State v. Shane*, 63 Ohio St. 3d 630, 633 (Ohio 1992).

114

Jones' defense, from the start, was that while he caused Ms. Yates' death, it was an accident.  His initial statement to police after being arrested was, "I – I – now, I – I know where I picked her up.  Uh, I'm not a – I didn't kill her, it was accidental."  (Doc. 19-1 (Trial Tr.) at 50.)  And he repeatedly asserted this defense during his testimony at trial.  On direct examination, defense counsel asked Jones if he killed her "intentionally."  (Doc. 19-2 (Trial Tr.) at 231.)  He answered, "No, it was an accident."  (*Id.*)  When the prosecution asked him on cross-examination "[w]hat he was guilty of[,]" he replied, "Unintentionally causing her death.  It was an accident.  I didn't intend to kill Susan."  (*Id.* at 329.)  Thus, the evidence as a whole did not reasonably support Jones' acquittal on the aggravated murder offense *and* his conviction on the lesser offense, and the Ohio Supreme Court's rejection of this claim was correct as a matter of Ohio law.

Indeed, this was the basis for the trial court's denial of defense counsel's requested instruction on the lesser-included offense of involuntary manslaughter.  The trial court explained, "Based on the fact that [Jones'] position is that, one, death was – he was there, death was caused, but it was accidental and the rape was consensual, having nothing to do with the possibility of involuntary."  (Doc. 19-2 (Trial Tr.) at 524-25.)

Jones' claim, therefore, that his appellate counsel were ineffective for failing to raise a claim that his trial counsel were ineffective for failing to request a jury instruction, which Jones was not even entitled to as a matter of state law, is not cognizable on federal habeas review, and this claim fails.

## 2.  Diminished capacity defense

Jones also claims that appellant counsel were ineffective for failing to raise a claim that trial counsel were ineffective for failing to retain "an expert to investigate a diminished capacity

defense in the trial phase beyond the rudimentary fitness-to-proceed style of diagnostic testing performed by Dr. Stafford[,]" who the trial court appointed to evaluate Jones' competency to stand trial.  (Doc. 60 at 149.)  He claims Dr. Siddall was the "only expert service counsel utilized." (*Id*.)

Jones is mistaken.  Soon after receiving the report of Dr. Stafford, who determined that Jones was competent to stand trial, defense counsel asked the trial court to authorize its own expert, Robert Bynes, Ph.D., to conduct a sanity and competency evaluation of Jones.  (Doc. 18-1 at 65-66.)  Counsel also requested authorization for Dr. Byrnes to enter the Summit County Jail to conduct the evaluation and for the release of Jones' medical records.  (*Id*. at 67-68, 82.)  The court granted all of the requests.  (*Id*. at 84-86.)  Jones' trial counsel did, in fact, retain an investigator early in his case to evaluate his competency and mental health, and this claim, therefore, lacks merit.

### 3.  Prosecution's comments during closing argument

Jones further argues that his appellate counsel should have raised a claim that the prosecution made three impermissible comments during its closing argument.  (*See* Doc. 60 at 150-54.)  They are:

1. If you remember, the defendant gave you a very long statement about what happened that night. As you heard, the defendant never made that statement before he testified the other day. The only thing he told the police up until last Friday was that it was an accident and said, I won't give you any details, keeping in mind when he told the police he'd already been given up by his wife.

   So at that point, he doesn't know what they know, but he knows that they have him. And if you were in that situation, what's the first thing you would do if you thought -- if you had just murdered somebody and they knew who you were, they were on to you? The first thing you would do is try and mitigate, and by mitigating you say it is an accident.

   (Doc. 19-2 (Trial Tr.) at 435.)

116

2. He cannot explain this earring in the street.  He can't explain why there is a cross exactly like the one on Susan's eye in his wife's jewelry box.  All these things go unexplained, not to mention the fact that he just outright tells you lies, lying to the fact that he tells you that he comes home the morning following the murder or home the morning following the murder, Monday morning, the 23rd, and he reads the newspaper which says that the murder occurred.  And that's how he knew about it, that's how he talked about it, that's what he was thinking about and was aware of.

(*Id*. at 442.)

3. His story is so absurd, so unbelievable, I hope that you don't even consider it. But the judge will tell you that you should consider all the evidence, and I know you will.  I'm sure when you get in the jury room you will review the evidence and you will come up with the same conclusion that the state has.

(*Id*. at 454.)

Defense counsel did not object to any of these statements.[12]

As explained above, the Supreme Court established the test for claims of prosecutorial misconduct in *Darden v. Wainwright*, 477 U.S. 168 (1986): "The relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  Courts consider the prosecutor's remarks within the context of the entire trial to determine whether any improper remarks resulted in prejudicial error.  *United States v. Young*, 470 U.S. 1, 11 (1985). Prosecutors have "leeway to argue reasonable inferences from the evidence" during closing arguments.  *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quotation marks and citation omitted).  They can argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence.  *See, e.g., Cristini v.*

---

[12] Jones states that defense counsel objected to the second and third statements.  (Doc. 60 at 152.)  But he provides no citation to the record supporting this assertion, and no objection from defense counsel to these statements is recorded in the trial transcript.

*McKee*, 526 F.3d 888, 901 (6th Cir. 2008).  But they cannot offer their opinions as to credibility of a witness or the guilt of a defendant.  *Id*. (citing *Hodge v. Hurle*y, 426 F.3d 368, 378 (6th Cir.2005)).  They also may not discuss any purported facts not introduced into evidence.  *Id*. (citing *Byrd*, 209 F.3d at 535).

Jones argues that the first statement he challenges improperly commented on his silence before trial, in violation of his Fifth Amendment right to remain silent.  (Doc. 60 at 150-51 (citing *Griffin v. California*, 380 U.S. 609 (1965)).)  He acknowledges that the Supreme Court has held that, while the Fifth Amendment prevents the prosecution from commenting on the silence of a defendant who asserts the right to remain silent during his criminal trial, it is not violated when a defendant who testifies in his own defense is impeached with his prior silence. *Jenkins v. Anderson*, 447 U.S. 231, 235 (1980).  But Jones claims the prosecution was not impeaching him through this statement because his trial testimony was consistent with his statement to the police that "[he] didn't kill her, it was accidental."  (Doc. 60 at 150-51.)

The court disagrees.  By highlighting Jones' extended silence between his barebones statement to police that Ms. Yates' death was an accident and his very detailed account of the events surrounding her death at trial, the prosecution was not trying to impeach Jones by showing the inconsistency of his statements.  It was trying to impeach Jones by showing that *both* of Jones' statements – to police and to the jury – were untruthful.  Appellate counsel, therefore, could reasonably have determined that other issues were clearly stronger to raise on direct appeal.

Jones complains that the other two statements were "patently improper," as they were not based on evidence, but on the prosecutor's own opinion of Jones' testimony instead.  (Doc. 60 at 152.)  In *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005), the Sixth Circuit remarked that "[i]t is

patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Id*. at 378 (citing *Young*, 470 U.S. at 17–19; *Berger v. United States*, 295 U.S. 78, 86–88 (1935) (citing prosecutor's statements suggesting that he had personal knowledge that a witness was not being truthful as one example of egregious prosecutorial misconduct)).  In that case, the court was considering whether the defendant's trial counsel had performed ineffectively in failing to object to numerous improper comments the prosecutor made during closing argument.  *Id*. at 375-76.  In so doing, the court found that the prosecutor had "repeatedly" and improperly commented on the credibility of several witnesses throughout closing argument, and, most egregiously, argued that the defendant was "lying to extricate himself from what he's done," but the complaining witness and her family were "absolutely believable." *Id*. at 377.  The circuit court explained,

> The prosecutor's numerous statements on witness credibility—often unsupported by any rational justification other than an assumption that Hodge was guilty—cannot avoid suggesting to the jury that the prosecutor knows something they do not. Moreover, because these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey an impression to the jury that they should simply trust the State's judgment that Fenn was a credible witness and that the defendant's witnesses were non-credible, if not perjurious. This misconduct is especially prejudicial in this case given the extent to which the jury's determination as to Hodge's guilt or innocence hinged almost entirely on the credibility of Hodge and Fenn.

*Id*. at 378 (footnotes omitted).

Here, the prosecutor's comments that Jones was "lying," and his testimony was "absurd" and "unbelievable," were undoubtedly improper.  Nevertheless, as the Supreme Court has observed, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young*, 470 U.S. at 11.  This is not a case like *Hodge*, where the prosecutor repeatedly made

grossly improper comments and had little concrete evidence to support the state's case, leaving and the defendant's "guilt or innocence [to] hinge[] almost entirely on the credibility" of him and his victim. *Hodge*, 426 F.3d at 378. This court cannot say that, when viewed in the context of the prosecutor's entire closing argument, the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks and citations omitted). It follows that appellate counsel could have reasonably decided not to assert this claim on appeal for that reason.

Moreover, as Respondent argues, appellate counsel could have reasonably declined to raise this claim on appeal in light of the claim's waiver due to defense counsel's failure to object to the comments at trial, and it would have been reviewed under the stringent plain-error standard.

Accordingly, the Ohio Supreme Court's decision rejecting these claims was neither contrary to, nor an unreasonable interpretation of, Supreme Court precedent.

### CERTIFICATE OF APPEALABILITY ANALYSIS

The court must now determine whether to grant a Certificate of Appealability ("COA") for any of Jones' claims for relief. The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right.  *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id*.

After taking the above standards into consideration, the court finds as follows:

The Court will not issue a COA for:  fourth and eighth grounds for relief, and ninth ground for relief, sub-claims (2) and (3), and tenth and eleventh grounds for relief.  No jurist of reason would debate the court's conclusions on these claims.

No COA will issue for:  ninth ground for relief, sub-claims (1) and (4), because they are unequivocally procedurally defaulted.

In addition, no COA will issue for grounds for relief:  third and seventh grounds for relief, because they are not cognizable on federal habeas review.

The court will issue a COA for Jones' first, second, fifth and sixth grounds for relief and ninth ground for relief, sub-claim (5).  A reasonable jurist could debate the court's conclusions regarding these claims.

**CONCLUSION**

For the foregoing reasons, this court denies Jones' Second Amended Petition for Writ of Habeas Corpus.  (Doc. 44.)  The court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to the first, second, fifth, and sixth grounds for relief and ninth ground for relief, sub-claim (5), and the court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only.  As to all remaining claims, the court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

March 29, 2024